# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

|  |  |  |
|---|---|---|
| CARL HOFFER,<br>RONALD MCPHERSON, and<br>ROLAND MOLINA,<br>individually and on behalf<br>of a Class of persons<br>similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>JULIE L. JONES, in her<br>official capacity as Secretary of the<br>Florida Department Corrections,<br><br>    Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. |

## VERIFIED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.    The Florida Department of Correction (FDC) is refusing to provide life-saving treatment to thousands of incarcerated people with hepatitis C. This policy, practice, and custom has resulted in the suffering and probable death of numerous prisoners, and puts tens of thousands of other prisoners at serious risk of experiencing pain, liver failure, cancer, and death—despite the fact that there are medications that will cure almost all hepatitis C patients with little to no side effects,

and the fact that the medical standard of care requires treatment for all such patients. The failure to provide treatment also creates the potential for further spreading of the disease to the general public. These actions amount to deliberate indifference to the serious medical needs of FDC prisoners with hepatitis C, in violation of the Eighth Amendment to the United States Constitution, and discrimination on the basis of disability, in violation of the Americans with Disabilities Act and Rehabilitation Act. Accordingly, Plaintiffs seek declaratory and injunctive relief on behalf of all FDC prisoners with hepatitis C, so that they can receive the treatment that they desperately need.

## Jurisdiction and Venue

2.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3.     Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured to the Plaintiffs by the Constitution and laws of the United States.

4.     Plaintiffs' claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys'

-2-

fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983. Plaintiffs' claims are also brought pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C. § 794, and pursuant to 42 U.S.C. § 12205, and 29 U.S.C. § 794a, which authorize an award of attorneys' fees and costs to the prevailing plaintiffs.

5.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

6.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and § 1391(c), as Defendant does business in this judicial district and division, and many of the events or omissions giving rise to the claims occurred in this judicial district and division.

7.     Plaintiffs seek a preliminary and permanent injunction pursuant to Rule 65, Federal Rules of Civil Procedure.

## Parties

8.     Plaintiff Carl Hoffer is incarcerated in the FDC system, and was at all relevant times. He suffers from hepatitis C but has not been treated for it.

9.     Plaintiff Ronald McPherson is incarcerated in the FDC system, and was at all relevant times. He suffers from hepatitis C but has not been treated for it.

-3-

10.     Plaintiff Roland Molina is incarcerated in the FDC system, and was at all relevant times.  He suffers from hepatitis C but has not been treated for it.

11.     Plaintiffs have exhausted all available administrative remedies.

12.     Defendant Julie L. Jones is the Secretary of the Florida Department of Corrections (FDC).  As such, she is responsible for the overall operation of the FDC, including the operation of Florida's prison system and compliance with the Constitution and federal laws.  Defendant Jones has a non-delegable duty to provide constitutionally adequate medical care to all persons in her custody.  She is sued in her official capacity for injunctive and declaratory relief.  Defendant Jones may be referred to herein as the Florida Department of Corrections or FDC.

13.     Defendant Jones has statutory authority to implement the relief sought in the Compliant.  *See* Fla. Stat. § 20.315.

14.     The actions of Defendant Jones and her agents were performed under color of state law and constitute state action.

15.     All staff members mentioned herein were employees or agents of Defendant and acted within the scope of their employment or agency at all relevant times.

-4-

16.     The FDC is a public entity under Title II of the ADA, and receives federal financial assistance within the meaning of the RA, and has at all relevant times.

## General Factual Allegations

### *Hepatitis C and Its Symptoms*

17.     Hepatitis C is a blood borne disease caused by the hepatitis C virus (HCV).  The virus causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants.

18.     HCV is transmitted by infected blood via several methods, including intravenous drug use and tattooing using shared equipment, blood transfusions with infected blood (typically before regular screening of donated blood began), and sexual activity.  Intravenous drug use is the most common means of HCV transmission in the United States.

19.     HCV can be either acute or chronic.  In people with *acute* HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure.  *Chronic* HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure.  Fifty-five to eighty-five percent of infected people will develop chronic HCV.

20.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

21.     People with chronic HCV develop *fibrosis* of the liver, a process by which healthy liver tissue is replaced with scarring.  Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity.  Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

22.     When scar tissue begins to take over most of the liver, this extensive fibrosis is termed *cirrhosis*.  Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

23.     Cirrhosis   causes   additional   painful   complications,   including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased

risk of infection, seizures, and extreme fatigue.  Most of these complications can occur before cirrhosis.  If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

24.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid.  Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

25.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible.  Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

26.     Cirrhosis that is accompanied by serious complications is known as *decompensated* cirrhosis. Cirrhosis without serious complications is called *compensated* cirrhosis.

27.     Thus, HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment.  This physical impairment substantially limits one or more major life

activity, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.

28.     For all FDC prisoners who have been diagnosed with HCV, there is a record of their impairment.

29.     The FDC regards all prisoners with HCV as having a physical impairment that substantially limits one or more major life activity.

30.     HCV is a serious medical need.

### *General Prevalence of Hepatitis C*

31.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

32.     In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

33.     In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

34.     Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

35.     HCV is the leading indication for liver transplants in the United States.

## *Hepatitis C in Prison*

36.     The prevalence of HCV in prison is much higher than in the general population.  It is estimated that between 16% and 41% of the United States jail and prison population has HCV.  Thus, incarceration is a risk factor for HCV.

37.     The FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,010 prisoners have HCV.  As of August 8, 2016, the FDC listed 4,797 prisoners as having HCV in its internal records.

38.     Because the FDC does not conduct routine opt-out testing for HCV, upon information and belief, FDC is undercounting the number of prisoners with HCV.

39.     In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC prisoners have HCV.  The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida:  Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## *Standard of Care for HCV*

40.     For many years, there were no universally safe and effective treatments for HCV.  The standard treatment prior to 2011, which included the use of interferon and ribavirin medications, sometime required injections, had a long treatment

duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

41.     In 2011, however, the Food and Drug Administration (FDA) began approving new oral medications, called direct-acting antiviral (DAA) drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

42.     These DAA drugs—currently Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazprevir), and Epclusa (sofosbuvir/velpatasvir)—have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

43.     Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

44.     For HCV, a "cure" is defined as a sustained virologic response (SVR)—i.e., no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

45.     In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV.  The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.  The Centers for Disease Control and Prevention (CDC) encourages health care professionals to follow the evidence-based standard of care developed by the IDSA/AASLD.

46.     The IDSA/AASLD guidelines set forth the medical standard of care for the treatment of HCV, which is now well-established in the medical community.

47.     The IDSA/AALSD panel, through the HCV Guidance, recommends immediate treatment with DAA drugs for all persons with chronic HCV.  This is the

standard of care for the treatment of HCV, and it reflects the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

48.     The Florida Department of Children and Families (DCF), the agency responsible for administering the Medicaid program in Florida, recently confirmed that, in determining what is medically necessary and therefore covered by the Medicaid program, DAA medications for HCV should be approved for all adult patients with an HCV diagnosis.  DCF also specifically eliminated any requirement that there be any evidence of hepatic fibrosis before covering treatment.  Thus, DCF has recognized that the standard of care for HCV is to provide immediate treatment with DAA drugs to all patients with HCV, regardless of the stage of the disease.

49.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

50.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

51.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

### *Screening, Diagnosis, and Monitoring of HCV*

52.     Under the IDSA/AASLD guidelines, all persons with risk factors for HCV infection should be offered testing for HCV.  This includes all persons born between 1945 and 1965 and all persons who were ever incarcerated.

53.     A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies.  A follow-up blood test determines whether the genetic material of HCV remains in the blood.  A third blood test can determine which variation, or genotype, of HCV a person has.

54.     Although the standard of care is to treat all persons with chronic HCV with DAA drugs, it is still useful to determine the progression of fibrosis and/or cirrhosis in the liver to choose the appropriate DAA drug, to treat other conditions or complications a person may be experiencing, to screen for liver cancer, to advise patients about contraindications and drugs to avoid, and to determine whether liver transplantation is necessary.

55.     There are several methods used to determine the level of cirrhosis or fibrosis, along with an evaluation of the patient's symptoms.  One such method is a liver biopsy, which is a surgery wherein a small sample of liver tissue is removed

and histologically assessed.  A typical biopsy evaluation method is a system called Metavir, which assigns a number corresponding to the amount of scar tissue on the liver, with 0 meaning no fibrosis and 4 meaning severe fibrosis or cirrhosis.  A score of 2 or greater is considered significant fibrosis.  Liver biopsies are generally regarded as the most accurate measure of fibrosis and cirrhosis, but they are not routinely recommended because they are invasive and potentially dangerous, and also because they are generally unnecessary, as the standard of care is to treat all HCV patients, regardless of disease progression.

56.     Other methods of assessing fibrosis and cirrhosis include blood tests, such as the APRI (AST to Platelet Ratio Index) score.   This score is a ratio derived by comparing the level of an enzyme in the blood called aspartate aminotransferase (AST) with the usual amount of AST in the blood of a healthy person and the number of platelets in the affected person's blood.  Generally, an APRI score greater than 0.7 indicates significant fibrosis, and a score of 1.0 or greater indicates cirrhosis.  But as explained below, a low APRI score does not necessarily indicate the absence of fibrosis.

57.     Another blood test is called the FIB-4, which is a ratio derived using the level of two enzymes in the blood, AST and alanine aminotransferase (ALT), as well as platelet count and the person's age.

-14-

58.    Standard ultrasounds or sonograms of the liver are unreliable indicators of the level of fibrosis, as advanced fibrosis may not be detected by these scans.  But there is a more accurate version called FibroScan, which is a type of ultrasound known as transient elastography that uses sound waves to determine the amount of fibrosis present in the liver.

59.    In assessing the level of fibrosis or cirrhosis, the entire clinical picture must be taken into account.  There is no one blood test, scan, or symptom that will accurately determine the extent of liver damage, and therefore relying solely on strict numerical cutoffs of any test result is inappropriate.  Any abnormal test result or symptom should be taken as a sign of fibrosis or cirrhosis, but normal results in isolation cannot rule out fibrosis or cirrhosis.

60.    Relying solely on the APRI score to make treatment decisions is not adequate or appropriate because APRI has significant limitations.  First, when an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but low and mid-range scores may miss many people who have significant fibrosis or cirrhosis.  In fact, in more than 90% of HCV cases, an APRI score of at least 2.0 indicates that a person has cirrhosis, but more than half of people with cirrhosis will not have an APRI score of at least 2.0.  Second, where a person has been diagnosed with cirrhosis or advanced fibrosis through some other means, a

low APRI score does not negate the diagnosis—it should be presumed the patient has cirrhosis.  Third, because AST levels fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

61.    A health care provider must also evaluate a patient's symptoms and determine whether the liver disease is compensated or decompensated.  Once liver disease has advanced, scoring of the clinical degree of liver dysfunction is done using the Childs-Pugh (C-P) score, also termed the Child-Turcotte-Pugh score (CPT).  Variables include the serum albumin and bilirubin, ascites, encephalopathy, and prothrombin time (a measure of how well the blood clots). The score ranges from 5 to 15.  Patients with a score of 5 or 6 have CPT class A cirrhosis (well-compensated cirrhosis), those with a score of 7 to 9 have CPT class B cirrhosis (significant functional compromise), and those with a score of 10 to 15 have CPT class C cirrhosis (decompensated cirrhosis).

62.    Once cirrhosis has developed, patients should also be followed with twice yearly alfa fetoprotein (AFP) screens, which is a serum marker for the development of liver cancer.  Increases in AFP indicate the possible presence of liver cancer.

63.     Individuals with comorbid HIV (or other immune disorders) and HCV are at a much greater risk for more rapidly progressive liver disease, and should be treated and closely followed.

### FDC's Unlawful Policy and Practice of Denying Treatment for HCV

64.     Despite the clear agreement in the medical community that all persons with chronic HCV should be treated with DAA drugs, the FDC does not provide these lifesaving medications to FDC prisoners with HCV.  Instead, Defendant has a policy, custom, and practice of not providing DAA medications to prisoners with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of prisoners with HCV.

65.     This policy, practice, and custom has caused, and continues to cause, the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC prisoners with HCV.

66.     Although Defendant has a policy governing the treatment of prisoners with HCV, which is outlined in Supplement #3 to Health Service Bulletin (HSB) 15.03.09 and was promulgated on June 27, 2016, in practice almost no prisoners receive DAA medications.  Instead, Defendant simply enters the names of prisoners with known HCV infection into a database and enrolls them in a gastrointestinal

-17-

clinic—which means blood draws are taken every six to twelve months—but does not actually treat them.

67.     Although the HSB states that "all patients with chronic HCV infection may benefit from treatment," it does not require treatment for anyone.  Rather, the HSB recommends treatment based on priority levels.

68.     In Priority Level 1 ("highest priority") are patients with decompensated cirrhosis measured as a 7-9 on the CTP scale, liver transplant candidates or recipients, patients with hepatocellular carcinoma and other serious comorbid medical conditions, and patients on immunosuppressant medication.  In Priority Level 2 ("high priority") are patients with an APRI score greater than 2, advanced fibrosis shown on a liver biopsy, or other comorbid diseases and infections.   In Priority Level 3 ("intermediate priority") are patients with Stage 2 fibrosis shown on a liver biopsy, an APRI score greater than 1.5, and patients with porphyria or diabetes.  In Priority Level 4 ("routine") are patients with stage 1 fibrosis shown from a liver biopsy and all others with HCV infection.  There is no further guidance in the policy regarding which priority levels receive treatment, or when. And again, despite this written policy of prioritization, in practice FDC provides almost no treatment with medications.

69.     Liver biopsies are generally not performed for FDC prisoners with HCV.

70.     Because the standard of care is to treat everyone, without regard to the stage of the disease, Defendant's written policy (even if it was followed) of only providing treatment to patients with the most advanced stages of the disease amounts to deliberate indifference to serious medical needs, in violation of the Eighth Amendment.  It is not consistent with the standard of care.  Delaying treatment until a patient is extremely sick has the perverse effect of withholding treatment from the patients who could benefit the most from it, because the treatment is less effective for patients with the most advanced stages of the disease.

71.     But even if the policy were adequate, the FDC does not follow it because it provides treatment to almost none of the HCV-positive prisoners in its custody.  Indeed, despite the fact that Defendant knows of at least 4,790 patients with chronic HCV, as of July 6, 2016, Defendant has treated *only five* with DAA drugs.  Upon information and belief, Defendant also knows, based on national estimates and the fact that FDC does not routinely test for HCV, that it is very likely that at least 14,700, and as many as 40,184 FDC prisoners have HCV.

72.     In fact, the FDC's treatment rate is among the lowest in the country for which there is reported data.

-19-

73.     And since 2013, the year the FDA approved DAA medications that cure HCV, at least 160 FDC prisoners have died of chronic liver disease, cirrhosis, and other diseases of the digestive system.  Since HCV is the most common cause of liver failure in the United States, it is likely that most of these deaths were due to chronic HCV.  Upon information and belief, past and current practices of the Defendant are resulting in deaths that could have been prevented through treatment of HCV.

74.     Furthermore, assuming that prioritization were appropriate, Defendant's policy is also inadequate because it relies on strict numerical cutoffs (and almost exclusively on the APRI score) rather than a holistic evaluation of the entire clinical picture to determine the level of fibrosis.

75.     And assuming that using numerical cutoffs were appropriate, FDC has set them so high that it precludes treatment for all but the most advanced cases of cirrhosis and fibrosis.

76.     Further, assuming that numerical cutoffs were appropriate and were set at appropriate levels, FDC is not even following them.  Of the 4,790 patients identified by FDC as having chronic HCV, an analysis of their APRI scores and platelet counts indicates that almost 400 have probable cirrhosis, over 1,000 likely have advanced fibrosis, and over 1,700 likely have significant fibrosis.  At the very

-20-

least, all of these prisoners should receive treatment. Yet, only five have been treated.

77.    The FDC also unjustifiably delays providing HCV treatment, even though the standard of care requires treatment as early as possible. If DAA treatment is delayed until a patient has advanced fibrosis or cirrhosis (generally, the first two FDC priority levels), these medications can be significantly less effective. Moreover, if DAA treatment is delayed until a patient develops decompensated cirrhosis (generally, the first FDC priority level), a liver transplant preceded or followed by DAA treatment is the only way to cure the patient.

78.    In practice, the FDC delays treatment for virtually all patients with HCV, regardless of their disease progression, until the patient is released from prison or dies.

79.    Moreover, Defendant's policy does not address liver transplantation, the only possible cure for people with decompensated cirrhosis. Even if given DAA treatment, many of these patients will likely die without liver transplants.

80.    Defendant's policy does not address the need for liver cancer screening, which is standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis. Unless there is regular surveillance to find cancers early and remove them surgically, liver cancer has a very dismal prognosis. Contrary to the

proper and necessary medical procedures and the community standard of care, Defendant has not been screening Plaintiffs, and, upon information and belief, other HCV-positive FDC prisoners with advanced fibrosis and cirrhosis, for liver cancer.

81.     The HSB does not include routine opt-out testing for HCV (i.e., requiring the test unless the prisoner affirmatively opts out).  Thus, FDC does not know the full number of FDC prisoners who have HCV, even though, upon information and belief, it knows the number to be much higher based on national estimates.

82.     Defendant categorically withholds treatment from FDC prisoners with HCV, but does not categorically withhold treatment from prisoners with other similar diseases or conditions (such as HIV) or from other prisoners without similar diseases or conditions.

83.     The FDC has enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to prisoners with HCV subjects those prisoners to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death.  Defendant has acted with deliberate indifference to the serious medical needs of FDC prisoners with chronic HCV.

84.     Defendant will continue its course of conduct unless enjoined by this Court.  Plaintiffs have no adequate remedy at law.

### *Public Health Benefits of Treatment in Prison*

85.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent prisoners from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

86.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings.  One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

87.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

***Allegations Regarding Named Plaintiffs***

<u>Plaintiff Carl Hoffer</u>

88.     Plaintiff Carl Hoffer has been incarcerated in the FDC system since 1988.  He is 70 years old.  He has chronic HCV and decompensated cirrhosis.

89.     His chronic HCV is a physiological disorder or condition that affects one or more of his body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment.  This physical impairment substantially limits one or more major life activity, including but not limited to walking, bending, sitting, lifting, and thinking; the operation of major bodily functions such as his digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of his liver.

90.     Mr. Hoffer has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment, and the FDC has diagnosed him with HCV, records some of his symptoms in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

91.     Mr. Hoffer is regarded by FDC as has having an impairment that substantially limits one or more major life activity, as FDC perceives him as having such an impairment, has diagnosed him with HCV, records some of his symptoms

in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

92.    Mr. Hoffer meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by FDC, including but not limited to medical services.

93.    Mr. Hoffer first learned he had contracted HCV around 1999, while at Florida State Prison.  Mr. Hoffer requested treatment for HCV then, and was told that he did not meet the requirements for treatment.

94.    Mr. Hoffer continued to request treatment at every annual checkup, but to no avail.  He was told that he was not sick enough to be treated.

95.    About eight years ago, while at Jackson Correctional Institution, Mr. Hoffer noticed that his ankles and calves were beginning to swell painfully.  Chronic swelling of the legs and feet is a symptom of HCV.

96.    Mr. Hoffer repeatedly requested treatment for this painful swelling and for HCV, but his requests were ignored.  His condition continued to worsen.

97.     In May and June of 2015, Mr. Hoffer's feet, ankles, calves, knees, thighs, testicles, and stomach became painfully swollen.  His shins were cracked and leaking white liquid.

-25-

98.     In June of 2015, FDC staff transferred Mr. Hoffer to the prison clinic, where he was put on antibiotics and a liquid diet.  He had developed severe ascites. Mr. Hoffer remained there for approximately 28 days until his symptoms diminished.

99.     Since then, while housed at Suwanee Correctional Institution, two doctors have told Mr. Hoffer that they would recommend treatment for him for HCV. However, he has never received treatment for HCV.

100.     Mr. Hoffer has filed numerous grievances, complaining of his symptoms and requesting treatment, and appealed them to the Defendant Secretary's Office, yet they have all been denied.

101.     In August of 2016, Mr. Hoffer was sent to the emergency room at Memorial Hospital Jacksonville.  He was diagnosed with ascites, cirrhosis of the liver, and chronic hepatitis C.  Paracentesis was performed to drain the fluid, and Mr. Hoffer stayed in the hospital for 19 days.

102.     Mr. Hoffer's condition has continued to worsen.  His feet, ankles, and calves are swelling again.  His liver is failing.  Further grievances have been denied.

103.     Mr. Hoffer uses a wheelchair because of the swelling and pain associated with end stage liver disease caused by HCV.  Sometimes it hurts Mr.

Hoffer to walk or even just to sit.  Mr. Hoffer also has problems remembering names, facts, and people.  Mental confusion is associated with late-stage HCV.

104.     If Mr. Hoffer does not receive treatment for HCV, he will likely die of liver disease.  He has an approximately 10% chance of dying each year.  Mr. Hoffer needs a liver transplant and DAA treatment to save his life.

105.     Despite all of this, FDC's response to Mr. Hoffer's latest grievance, signed April 11, 2017, by the FDC Health Services Director, states that his "treatment is being deferred at this time until it becomes clinically indicated."

106.     The FDC's deliberate indifference to Mr. Hoffer's serious medical needs caused his liver to decompensate as early as June 2014, and his condition has been getting worse ever since.  Despite Mr. Hoffer being so sick that he now qualifies as "Priority 1" for HCV treatment under FDC's own guidelines, he continues to be denied treatment.

107.     He will continue to suffer, and will likely die of liver disease, unless he receives the DAA drug treatment and a liver transplant.

Plaintiff Ronald McPherson

108.     Ronald McPherson has been incarcerated in the FDC system since July of 2013.  He is 53 years old.   He has chronic HCV.

109.     His chronic HCV is a physiological disorder or condition that affects one or more of his body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment.  This physical impairment substantially limits one or more major life activity, including but not limited to performing manual tasks, walking, bending, lifting, concentrating, working, and eating; the operation of major bodily functions such as his digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of his liver.

110.     Mr. McPherson has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment, and the FDC has diagnosed him with HCV, records some of his symptoms in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

111.     Mr. McPherson is regarded by FDC as has having an impairment that substantially limits one or more major life activity, as FDC perceives him as having such an impairment, has diagnosed him with HCV, records some of his symptoms in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

112.    Mr. McPherson meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by FDC, including but not limited to medical services.

113.    At his initial physical exam in prison in July of 2013, Mr. McPherson reported to medical staff that he had HIV and HCV.  Subsequent tests at Reception and Medical Center in Lake Butler confirmed this.  He receives treatment for HIV, which is well-controlled.

114.     Mr. McPherson has not been seen by an HCV specialist since being incarcerated in July of 2013.  He has not been informed by FDC medical staff about the stage of his HCV.

115.    Beginning in May of 2014 and continuing through the present, Mr. McPherson has filed numerous grievances and appeals, complaining about his HCV related symptoms and requesting treatment. They have all been denied.

116.    Mr. McPherson experiences acute weakness, dizziness, chest pains, muscular spasms, nausea, and memory loss.  He is anemic and bruises easily.  He has difficulty eating due to his medical condition.   His lab tests and medical records indicate that he has cirrhosis and is likely in liver failure.

117.    In August of 2016, Nurse Juliann Dwares recommended that Mr. McPherson be treated with Harvoni (a DAA drug) for twelve weeks, due to his

genotype, low platelet levels, APRI score of over 2.0, and HIV co-infection.  But he never received the treatment.

118.     In December of 2016 or January of 2017, Mr. McPherson filed another formal grievance asking for HCV treatment.  It was denied and Mr. McPherson filed a timely appeal.

119.     On February 10, 2017, Mr. McPherson was seen by Nurse Dwares at Columbia Correctional Institution.  She again recommended that Mr. McPherson be treated for HCV.

120.     On February 13, 2017, Mr. McPherson was seen by Dr. Cruz at Baker Correctional Institution.  Dr. Cruz did not refer Mr. McPherson for HCV treatment and said that the only thing they would do is continue monitoring his illness.  Dr. Cruz "recommended" that Mr. McPherson avoid injuries in order to maintain his health.

121.     In the last six months, Mr. McPherson has passed out four times.  His platelet levels are dangerously low, as is his pulse.  Mr. McPherson's blood doesn't clot properly.

122.     Despite the recommendations for DAA medication, Mr. McPherson has still not received HCV treatment.  The delay in treating Mr. McPherson's HCV has

caused cirrhosis of his liver and has significantly decreased the possibility that the DAA drugs (if given to him) will be effective.

123.    The FDC's deliberate indifference to Mr. McPherson's serious medical needs caused his quality of life to substantially deteriorate, has likely caused his liver to fail, and has caused him to experience the numerous symptoms described above. He is at risk for developing further symptoms, further advanced liver failure, and even death. He may not survive his five-year prison sentence. Despite Mr. McPherson qualifying for HCV treatment under FDC's own guidelines, he continues to be denied treatment.

124.    He will continue to suffer, and his liver disease will continue to advance, unless he receives the DAA drug treatment.

Plaintiff Roland Molina

125.    Roland Molina has been incarcerated in the FDC system since 2004. He is 51 years old.   He has chronic HCV, which he contracted by donating blood.

126.    His chronic HCV is a physiological disorder or condition that affects one or more of his body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment.  This physical impairment substantially limits one or more major life activity, including but not limited walking and standing; the

-31-

operation of major bodily functions such as his digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of his liver.

127.     Mr. Molina has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment, and the FDC has diagnosed him with HCV, records some of his symptoms in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

128.     Mr. Molina is regarded by FDC as has having an impairment that substantially limits one or more major life activity, as FDC perceives him as having such an impairment, has diagnosed him with HCV, records some of his symptoms in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

129.     Mr. Molina meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by FDC, including but not limited to medical services.

130.     In January of 2013, Mr. Molina told FDC staff that he had been diagnosed with hepatitis 15 year ago.  A hepatitis panel was ordered and Mr. Molina was diagnosed with HCV.  Thereafter, FDC staff began monitoring Mr. Molina's HCV through biannual blood draws, but has not treated his underlying disease.

131.    Mr. Molina has suffered from abnormally low platelet levels since at least 2013, caused by his untreated HCV.  The low platelet levels have caused Mr. Molina to have surface bleeding, which can be seen in red blotches just underneath his skin.  The condition is very painful.  On a scale of one to ten, Mr. Molina would rate it a seven or eight.  Mr. Molina also bruises very easily.

132.    Mr. Molina's platelet levels were so dangerously low in February of 2015 that the doctor had to order Prednisone.  That caused his platelet levels to increase slightly, but within a couple of months they were at dangerously low levels again.

133.    In January 2016, Mr. Molina filed a grievance asking for HCV treatment, but it was denied.  He appealed the denial, but it was also denied.

134.    In May of 2016, Mr. Molina's labs indicated his APRI score was 2.652, indicating cirrhosis.

135.    Mr. Molina should be found eligible for treatment under the FDC's own guidelines due to his low platelet levels and APRI scores, which indicate liver cirrhosis.

136.    In addition to suffering from surface bleeding and jaundice, Mr. Molina gets easily tired.  Mr. Molina is only 51 years old and has always exercised and taken

care of himself.  However, his doctor has told him not to exercise due to his low platelet levels.

137.    Mr. Molina suffers from numbness and a brown discoloration in his legs, feet, and toes.  A nurse told Mr. Molina that he has cryoglobulinemia, a complication of HCV.  Mr. Molina experiences severe pain through his legs, feet, and toes.  The pain is constant and on a scale of one to ten, it sometimes reaches a ten.

138.    The FDC's deliberate indifference to Mr. Molina's serious medical needs caused his quality of life to substantially deteriorate and his liver to be scarred with cirrhosis.  He suffers from the above symptoms and is at serious risk for developing more symptoms, and experiencing further serious liver failure and death. Despite Mr. Molina qualifying for HCV treatment under FDC's own guidelines, he continues to be denied treatment.

139.    He will continue to suffer, and his liver disease will continue to advance, unless he receives the DAA drug treatment.

## Class Action Allegations

140.    Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs seek to certify a class of all current and future prisoners in FDC custody who have been diagnosed, or will be diagnosed, with chronic HCV (the "Plaintiff Class").

141.    Upon information and belief, Defendant has the ability to identify all such similarly situated class members, through medical and other records in Defendant's possession.

142.    The requirements of Rule 23(a) are satisfied:

a. *Numerosity.* The class is so numerous that joinder of all members is impracticable.   The FDC has identified approximately 5,000 FDC prisoners with HCV.  But national estimates suggest there are likely at least 14,700 FDC prisoners with HCV, and as many as 40,184.

b. *Commonality.*   There are questions of law or fact common to the class, including but not limited to: 1) whether HCV is a serious medical need; 2) whether Defendant's policy and practice of not providing HCV treatment constitutes deliberate indifference to serious medical needs in violation of the Eight Amendment; 3) whether Defendant has knowingly failed to provide the necessary staging of HCV patients in accordance with the prevailing standard of care, including the pretreatment testing to determine the severity of the disease; 4) whether Defendant has knowingly employed policies and practices that unjustifiably delay or deny treatment for HCV;  5) whether Defendant has permitted cost considerations to improperly interfere with the treatment of HCV; 6) whether HCV is a disability under the ADA; 7) whether medical

services in prison are a program or service under the ADA; and 8) whether Defendant has discriminated against FDC prisoners with HCV on the basis of their disability by categorically denying them medical treatment, while providing treatment for other diseases and conditions such as HIV.

c. *Typicality.* The claims or defenses of the class representatives are typical of the claims or defenses of the class.  The class representatives have been diagnosed with chronic HCV but have been refused treatment, and suffer from the same kind of complications and substantial risk of serious harm that the class members suffer from.

d. *Adequacy.* The class representatives and class counsel will fairly and adequately protect the interests of the class.  The class representatives are committed to obtaining declaratory and injunctive relief that will benefit themselves as well as the class by ending Defendant's unconstitutional policy and practice.  Their interests are consistent with and not antagonistic to the interests of the class.  They have a strong personal interest in the outcome of this case and have no conflicts with class members.  They are represented by experienced counsel who specialize in civil rights and class action litigation on behalf of prisoners.

143.    The requirements of Rule 23(b)(2) are satisfied, as the party opposing the class has acted and refused to act on grounds generally applicable to the class so that final declaratory and injunctive relief would be appropriate to the class as a whole. Injunctive relief will end the policy and practice for all class members, allowing them to receive proper medical evaluation and treatment for HCV.

## CAUSES OF ACTION

### COUNT I
### Eighth Amendment to the U.S. Constitution
### via 42 U.S.C. § 1983

144.    Defendant and its policymakers know about and enforce the policies and practices described herein.  Defendant and its policymakers know of Plaintiffs' and the Plaintiff Class's serious medical needs, yet Defendant has intentionally failed and refused to provide treatment that will address those serious medical needs, knowing that those actions have resulted, and will continue to result, in Plaintiffs and the Plaintiff Class's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

145.    Defendant has caused the wanton infliction of pain upon FDC prisoners with HCV, and has exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class, in violation of the Eighth Amendment.

146.    Defendant knows, and has known, of the substantial risk of serious harm, and actual harms, faced by FDC prisoners with chronic HCV. Yet Defendant has disregarded, and continues to disregard, those risks and harms by failing to provide the very medication that would alleviate those risks and harms. Defendant has been deliberately indifferent to the substantial risk of serious harm to FDC prisoners with chronic HCV.

147.    By denying Plaintiffs and the Plaintiff Class their medically needed HCV treatment, Defendant has imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

148.    Defendant's denial of Plaintiffs and the Plaintiff Class's medically necessary HCV treatment violates all standards of decency, contrary to the Eighth Amendment.

149.    Defendant's actions with respect to Plaintiffs and the Plaintiff Class amount to grossly inadequate care.

150.    Defendant's actions with respect to Plaintiffs and the Plaintiff Class is medical care so cursory as to amount to no medical care at all.

151.    As a direct and proximate cause of this pattern, practice, policy, and deliberate indifference, Plaintiffs and the Plaintiff Class have suffered, and continue

to suffer from harm and violation of their Eighth Amendment rights. These harms will continue unless enjoined by this Court.

## COUNT II
### Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.

152.    This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. and 42. U.S.C. § 12131 – 12134, and its implementing regulations.

153.    Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

154.    All Plaintiffs and the Plaintiff Class have chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment.  42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b).  This physical impairment substantially limits one or more major life activity, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.  42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

155.    All Plaintiffs and the Plaintiff Class have a record of having an impairment that substantially limits one or more major life activity, as they have a history of such an impairment.   42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

156.    All Plaintiffs and the Plaintiff Class are regarded by FDC as has having an impairment that substantially limits one or more major life activity, as FDC perceives them as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).  Defendant FDC has subjected them to a prohibited action because of an actual or perceived physical impairment.

157.    All Plaintiffs and the Plaintiff Class are qualified individuals with a disability because they meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by FDC, including but not limited to medical services.  42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

158.    By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excludes Plaintiffs and the Plaintiff Class from participation in, and denies them the benefits of FDC services, programs, and activities (such as medical services), by reason of their disability.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

-40-

159.     By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjects Plaintiffs and the Plaintiff Class to discrimination.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

160.     Defendant FDC fails to provide Plaintiffs and the Plaintiff Class with equal access and enjoyment of effective medical services.  28 C.F.R. § 35.130(b)(1).

161.     Defendant FDC utilizes criteria or methods of administration that have the effect of subjecting Plaintiffs and the Plaintiff Class to discrimination and that defeat or substantially impair accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

162.     Defendant has known about the violations noted herein but has failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

163.     As a direct and proximate cause of these actions and omissions, Plaintiffs and the Plaintiff Class have suffered and continue to suffer from harm and violation of their ADA rights.  These harms will continue unless enjoined by this Court.

## COUNT III
## Rehabilitation Act, 29 U.S.C. §§ 791 – 794a

164.    This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, et seq. and 29 U.S.C. §§ 791 – 794, et seq., and it implementing regulations.

165.    Defendant FDC is a program or activity receiving federal financial assistance.  29 U.S.C. § 794.

166.    Defendant FDC excludes Plaintiffs and the Plaintiff Class—all qualified individuals with disabilities—from participation in, and denies those individuals the benefits of programs or activities, solely by reason of the individuals' disabilities. 29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a).

167.    Defendant FDC subjects Plaintiffs and the Plaintiff Class—all qualified individuals with disabilities—to discrimination. 29 U.S.C. § 794(a).

168.    Defendant FDC denies Plaintiffs and the Plaintiff Class—all qualified handicapped persons—the opportunity accorded others to participate in programs or activities. 28 C.F.R. § 42.503(b)(1).

169.    Defendant FDC utilizes criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of Defendant's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

170.    Defendant has known about the violations noted herein but has failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiffs and the Plaintiff Class.

171.    As a direct and proximate cause of this exclusion, Plaintiffs and the Plaintiff Class have suffered and continue to suffer from harm and violation of their RA rights.  These harms will continue unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand the following relief:

A.    An order certifying this case as a class action, with the class defined under Rule 23(b)(2) as all current and future prisoners in FDC custody who have been, or will be, diagnosed with chronic HCV.

B.     A judgment declaring that the Defendant has exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class and have violated Plaintiffs and the Plaintiff Class's right to be free from Cruel and Unusual Punishment, as secured by the Eighth Amendment to the U.S. Constitution;

C.    A judgment declaring that Defendant has violated the rights of Plaintiffs and the Plaintiff Class under the Americans with Disabilities Act and the Rehabilitation Act;

-43-

D.      A preliminary and permanent injunction ordering Defendant to, among other things, 1) immediately provide direct-acting antiviral medications to Plaintiffs Carl Hoffer, Ronald McPherson, and Roland Molina, 2) immediately place Plaintiff Carl Hoffer on a liver transplant list, and 3) develop and adhere to a plan to provide direct-acting antiviral medications to all FDC prisoners with chronic HCV, consistent with the standard of care;

E.      A preliminary and permanent injunction requiring Defendant to, among other things, 1) properly screen, evaluate, monitor, and stage FDC prisoners with HCV (including screening for liver cancer where appropriate); 2) provide routine opt-out testing for HCV to all FDC prisoners; 3) develop and adhere to a policy allowing FDC prisoners with chronic HCV to obtain liver transplants if needed; and 4) modify the exclusions from HCV treatment based on life expectancy and time remaining on sentence to reflect an appropriate individual assessment;

F.      An order enjoining Defendant from taking any action to interfere with Plaintiffs' right to maintain this action, or from retaliating in any way against Plaintiffs for bringing this action;

G.      An order retaining jurisdiction over this matter to ensure that the terms of any injunction are fully implemented;

H.     An award of Plaintiffs' attorneys' fees, costs, and litigation expenses under 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 1988; and

I.     Such other relief as the Court may deem equitable and just under the circumstances.

Respectfully submitted,

Randall C. Berg, Jr., Esq.
Fla. Bar No. 0318371
*RBerg@FloridaJusticeInstitute.org*
Dante P. Trevisani, Esq.
Florida Bar No. 72912
*DTrevisani@FloridaJusticeInstitute.org*
Erica Selig, Esq.
*ESelig@FloridaJusticeInstitute.org*
Florida Bar No. 120581
FLORIDA JUSTICE INSTITUTE, INC.
100 S.E. 2nd Street
3750 Miami Tower
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)

By:   *s/Randall C. Berg. Jr.*
       Randall C. Berg, Jr., Esq.

       *s/Dante P. Trevisani*
       Dante P. Trevisani, Esq.

       *s/Erica Selig*
       Erica Selig, Esq.

***Attorneys for Plaintiffs***

-45-

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
## Tallahassee Division

---

CARL HOFFER,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
RONALD MCPHERSON, and⠀)
ROLAND MOLINA,⠀⠀⠀⠀⠀⠀⠀)
individually and on behalf⠀⠀⠀⠀)
of a Class of persons⠀⠀⠀⠀⠀⠀)
similarly situated,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No.
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
JULIE L. JONES, in her⠀⠀⠀⠀⠀)
official capacity as Secretary of the⠀)
Florida Department Corrections,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

---

## <u>DECLARATION OF CARL HOFFER</u>

I, Carl Hoffer, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is Carl Hoffer.  I have reviewed the Verified Complaint set forth above and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Date: <u>May 10, 2017</u>                                  *s/ Carl Hoffer*
                                                          Carl Hoffer

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

| | |
|---|---|
| CARL HOFFER, <br> RONALD MCPHERSON, and <br> ROLAND MOLINA, <br> individually and on behalf <br> of a Class of persons <br> similarly situated, <br><br>     Plaintiffs, <br><br> v. <br><br> JULIE L. JONES, in her <br> official capacity as Secretary of the <br> Florida Department Corrections, <br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. |

## DECLARATION OF RONALD MCPHERSON

I, Ronald McPherson, pursuant to 28 U.S.C. § 1746, make this Unsworn

Declaration Under Penalty of Perjury, and declare that the statements made below

are true, and state:

My name is Ronald McPherson.  I have reviewed the Verified Complaint set

forth above and I find the facts contained therein which pertain to me to be true and

accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Date: <u>May 10, 2017</u>                    <u> *s/Ronald McPherson*</u>
                                             Ronald McPherson

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | |
|---|---|
| CARL HOFFER, ) | |
| RONALD MCPHERSON, and ) | |
| ROLAND MOLINA, ) | |
| individually and on behalf ) | |
| of a Class of persons ) | |
| similarly situated, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| JULIE L. JONES, in her ) | |
| official capacity as Secretary of the ) | |
| Florida Department Corrections, ) | |
| ) | |
|     Defendant. ) | |
| ) | |

## <u>DECLARATION OF ROLAND MOLINA</u>

I, Roland Molina, pursuant to 28 U.S.C. § 1746, make this Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

My name is Roland Molina. I have reviewed the Verified Complaint set forth above and I find the facts contained therein which pertain to me to be true and accurate to the best of my knowledge and belief.

I understand that a false statement in this declaration will subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Date: <u>May 10, 2017</u>                    <u>*s/ Roland Molina*</u>
                                                      Roland Molina