# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

CARL HOFFER,             )
RONALD MCPHERSON, and  )
ROLAND MOLINA,        )
individually and on behalf    )
of a Class of persons       )
similarly situated,         )
                            )
      Plaintiffs,        )
                            )
v.                       ) Case No.  4:17-cv-00214-MW/CAS
                            )
JULIE L. JONES, in her     )
official capacity as Secretary of the )
Florida Department Corrections,  )
                            )
      Defendant.       )
_____)

## MOTION FOR PRELIMINARY INJUNCTION

The Florida Department of Corrections (FDC) is refusing to provide life-saving medications to thousands of incarcerated people with hepatitis C.  This policy, practice, and custom has resulted in the suffering and probable death of numerous prisoners, and puts thousands of others at serious risk of experiencing liver failure, cancer, and death—even though the standard of care requires immediate treatment with medications that will cure almost all hepatitis C patients with little to no side effects.  Unless required by this Court to provide these medications, Defendant will continue to ignore these prisoners' serious medical needs.  Thus,

Plaintiffs hereby move for preliminary injunctive relief, and seek an order declaring that Defendant's actions violate the Eighth Amendment to the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act, and requiring Defendant to promptly provide these lifesaving medications to all prisoners with chronic hepatitis C.

## Factual Background

### *Hepatitis C*

Hepatitis C is a blood borne disease caused by the hepatitis C virus (HCV). Koziel Dec., D.E. 10-1, ¶ 9.  The virus causes inflammation that significantly impairs liver function and damages the liver's crucial role in digesting nutrients, filtering toxins from the blood, preventing disease, and making possible essentially all metabolic processes in the body.  *Id*. at ¶ 10.  HCV is the leading cause of liver disease and liver transplants in the United States.  *Id*. at ¶ 14.

HCV can be either acute or chronic.  In people with *acute* HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure.  *Id*. at ¶ 21. *Chronic* HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure.  Fifty-five to eighty-five percent of infected people will develop chronic HCV.  *Id*.

People with chronic HCV develop *fibrosis* of the liver, a process by which healthy liver tissue is replaced with scarring.  *Id*. at ¶ 10. When scar tissue begins to

take over most of the liver, this extensive fibrosis is termed *cirrhosis*. *Id*. ¶ 11. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 15-30% will develop cirrhosis in a 20-year timeframe. *Id*. at ¶ 22; CDC Hepatitis C Overview, D.E. 10-2, at 3.

Cirrhosis causes additional painful complications—many of which occur before cirrhosis—including widespread itching, arthritic pain throughout the body, kidney disease, jaundice, bruising, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines which can burst), abdominal ascites (the accumulation of fluid), mental confusion, lymph disorders, and extreme fatigue. *Id*. at ¶ 11. Cirrhosis accompanied by serious complications is known as *decompensated* cirrhosis. Left untreated, these complications can cause death, often from infection, bleeding, and fluid accumulation. *Id*. at ¶¶ 23-24, 27.

Once cirrhosis has occurred, it is generally not reversible. *Id*. at ¶ 45. Even though the liver may heal to some degree if the virus is eliminated by treatment, the patient may still experience serious complications, and will likely still need a liver transplant as a long-term solution. *Id*.

Unfortunately, the consequences of HCV can be devastating: Roughly 19,000 people die of HCV-caused liver disease every year in the United States. Koziel Dec. ¶ 14. In fact, HCV caused more deaths in 2013 than 60 other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis. *Id*. at ¶ 26.

### Hepatitis C in Prison

As of August 8, 2016, the FDC has identified 4,797 prisoners with HCV.  *Id*. at ¶ 52.  But, because FDC does not conduct routine opt-out testing for HCV, this number is almost certainly inaccurate.  National estimates suggest that between 16% and 41% of the United States jail and prison population has HCV, translating to between 14,700 and 40,184 FDC prisoners.  *Id*. at ¶¶ 19 & 52.  Moreover, at least 165 FDC prisoners have died of chronic liver disease, cirrhosis, and other diseases of the digestive system since 2013.  FDC Inmate Mortality, D.E. 10-4.  Because HCV is the most common cause of liver disease, the majority of these deaths were likely due to HCV.   Koziel Dec. ¶ 14.

### Standard of Care for HCV

Before 2011, the standard treatment for HCV, which included the use of interferon and ribavirin medications, only worked for roughly one third of patients, caused serious side effects that were often worse than HCV symptoms, and required treatment for up to 48 weeks.  *Id*. at ¶ 38.  In 2011, however, the Food and Drug Administration (FDA) began approving new oral medications for HCV, called direct-acting antiviral (DAA) drugs.  At first they were designed to work in tandem

with the old treatment regime, but beginning in 2013, the FDA started approving DAA medications that can be taken alone.[1]

These medications have truly revolutionized the way HCV is treated. They cure 90-95% of patients with all types of HCV, have virtually no side effects, and can be taken as a once-daily pill for a mere 12 weeks. *Id*. at ¶ 39. The benefits of treatment with DAA drugs also include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, improvement in cirrhosis, reduction in severe side effects, a substantial reduction in the risk of liver cancer and liver-related mortality, and a dramatic increase in quality of life. *Id*. at ¶ 43.

In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases (AASLD) and the Infectious Diseases Society of America (IDSA) formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org. *See* HCV Guidance,

---

[1] The currently approved DAA medications include Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazprevir), and Epclusa (sofosbuvir/velpatasvir). Koziel Dec. at ¶ 39.

D.E. 10-5. The Centers for Disease Control and Prevention (CDC) encourages health care professionals to follow the HCV Guidance.[2]

Given the dramatic and undisputed benefits of DAA medications, the medical standard of care, expressed through the HCV Guidance, is to immediately treat all patients with chronic HCV with DAA medications, regardless of the type of HCV or the stage of the patient's disease. HCV Guidance at 30-31; Koziel Dec. ¶ 40. A specific corollary to this standard is that health care providers should not withhold treatment because the patient is asymptomatic or shows no evidence of fibrosis. *Id*. In fact, the Florida Agency for Health Care Administration (AHCA), which is responsible for administering the Florida Medicaid program, recently confirmed that treatment for all adults with HCV is the standard of care, and specifically eliminated any requirement that there be any evidence of fibrosis before covering treatment. AHCA Letter re Hep C Medicaid Coverage (Ex. 1).

It is also important that treatment be provided timely—i.e., as soon as the diagnosis is confirmed—because the treatment may be less effective for patients with more advanced stages of the disease. Koziel Dec. ¶¶ 45-46. Once a patient has decompensated cirrhosis, it may not be reversible, even if the virus is eliminated with treatment. For such patients, the only true cure is a liver transplant. *Id*.

---

[2] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, *Hepatitis FAQs for Health Professionals*, available at https://www.cdc.gov/hepatitis/hcv/hcvfaq.htm#d1 (last accessed May 20, 2017).

**_Screening, Diagnosis, and Monitoring of HCV_**

Testing for HCV can be done with a simple blood draw. Anyone with a risk factor should be offered testing, including individuals who have ever been incarcerated and anyone born between 1945 and 1965. *Id*. at ¶ 17.

Although the standard of care is to treat all persons with chronic HCV with DAA drugs, it is still useful to determine the progression of fibrosis and/or cirrhosis to choose the appropriate DAA drug, to treat other conditions or complications a person may be experiencing, to screen for liver cancer, to advise patients about contraindications and drugs to avoid, and to determine whether liver transplantation is necessary. *Id*. at ¶ 41.

Healthcare providers use a combination of several methods, along with an evaluation of the patient's symptoms, to determine the progression of HCV. *Id*. at ¶ 28. Some of these methods include a liver biopsy, the APRI (AST to Platelet Ratio Index)[3] score, and a blood test called the FIB-4. *Id*. at ¶¶ 29-33. Standard ultrasounds or sonograms of the liver are notoriously unreliable indicators of fibrosis level, and should not be relied upon for that purpose. *Id*. at ¶ 36. Unfortunately, there is no one blood test, scan, or symptom that will accurately determine the extent of liver damage. *Id*. at ¶ 28. For many tests (including the APRI score), abnormal

---

[3] This score is a ratio derived by comparing the patient's level of an enzyme in the blood called aspartate aminotransferase (AST) with the usual amount of AST in a healthy person's blood and the patient's platelet count. *Id*. at ¶ 32.

results can accurately predict fibrosis or cirrhosis—and therefore should be taken as a sign of advanced disease—but normal results in isolation cannot be interpreted as the absence of fibrosis or cirrhosis. *Id.* at ¶¶ 31, 37.

Once cirrhosis has developed, two other monitoring aspects must be followed: liver cancer screening and transplant evaluation. Patients with cirrhosis must be given a twice yearly alfa fetoprotein (AFP) screen to check for evidence of liver cancer, which has a very dismal prognosis if not detected early. *Id.* at ¶ 35. Such patients must also be properly evaluated for liver transplantation, which may be the only way to preserve their health and life.

### *FDC's Unlawful Policy of Denying Hepatitis C Treatment*

Despite the clear agreement in the medical community that all persons with chronic HCV should be treated with DAA drugs, Defendant has a policy, practice, and custom of not providing DAA medications to prisoners with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of prisoners with HCV. Although Defendant has a written policy governing HCV treatment, in practice almost no prisoners receive DAA medications. HSB 15.03.09, D.E. 10-6. In fact, despite the fact that Defendant knows of at least 4,797 patients with chronic HCV—and very likely knows the number is actually between 14,700 and 40,184—as of July 6, 2016, Defendant has treated *only five* with DAA drugs. Beard Email, D.E. 10-7.

Although the written policy states that "all patients with chronic HCV infection may benefit from treatment," it does not actually require treatment for anyone. HSB 15.03.09. Rather, the HSB recommends treatment based on priority levels defined by certain lab tests or scores that generally prioritize those with advanced fibrosis or cirrhosis. As discussed below, however, the policy is neither adequate, nor is it followed. In practice, the FDC has set up a sham system that delays and denies treatment to everyone but the sickest patients—who, ironically, are the ones for whom the treatment may be less effective—until the patients are released, dead, or can no longer benefit from the treatment without a liver transplant. Plaintiffs seek an end to this unconstitutional conduct.

### ***The Effects on Plaintiffs and the Plaintiff Class***

<u>Plaintiff Carl Hoffer</u>

Plaintiff Carl Hoffer was diagnosed with chronic HCV in 1999 while in FDC custody. Verified Complaint, D.E. 1, ¶ 93. The disease has caused his liver to fail, and as a result he has end stage liver disease. Mr. Hoffer uses a wheelchair because the swelling and pain is so bad that it hurts him to walk or sometimes even just to sit. *Id*. at ¶ 103. He has suffered from swelling in his feet, ankles, calves, knees, thighs, testicles, and stomach. At one point, his shins were cracked and leaking white liquid. *Id*. at ¶ 97. He had developed severe ascites, and required paracentesis—inserting a needle into his abdomen—to drain the fluid, requiring a

multiple-week hospitalization.  *Id*. at ¶¶ 98-101.  Mr. Hoffer also has problems remembering names, facts, and people, a result of encephalopathy, a symptom of HCV.  *Id*. at ¶ 103.

His symptoms continue to worsen and he is now in liver failure.  He will likely die without the DAA medications and being placed on a liver transplant list. Koziel Dec. ¶ 62a.  Multiple FDC doctors have told Mr. Hoffer that they would recommend treatment for him for HCV. Despite all of this, all of Mr. Hoffer's grievances requesting treatment have been denied.  FDC's response to Mr. Hoffer's latest grievance, signed April 11, 2017, by the FDC Health Services Director, states that his "treatment is being deferred at this time until it becomes clinically indicated." Hoffer Grievance Denial, D.E. 10-8; Verified Complaint ¶ 105.  Although Mr. Hoffer is so sick that he now qualifies as "Priority 1" for HCV treatment under FDC's own guidelines, he continues to be denied treatment. He will continue to suffer, and will likely die of liver disease, unless he receives DAA medications and a liver transplant.

<u>Plaintiff Ronald McPherson</u>

Plaintiff Ronald McPherson is incarcerated in the FDC system and has been diagnosed with chronic HCV.  Verified Complaint ¶¶ 108, 113.  He also has HIV, for which he receives medications and which is well-controlled.  *Id*. at ¶ 113.  Mr. McPherson experiences acute weakness, dizziness, chest pains, muscular spasms,

nausea, and memory loss.  *Id*. at ¶ 116.  He is anemic and bruises easily.  He passes out occasionally and has a dangerously low platelet count.  He has difficulty eating due to his medical condition.   His lab tests and medical records indicate that he has cirrhosis, and is likely in liver failure.  *Id*. at ¶¶ 116, 121; Koziel Dec. ¶ 62b.

Beginning in May of 2014 and continuing through the present, Mr. McPherson has filed numerous grievances and appeals, complaining about his HCV related symptoms, and requesting treatment. They have all been denied, despite the fact that multiple FDC medical staff members have recommended that he receive DAA medications. Verified Complaint ¶¶ 115-119.  The delay in treating Mr. McPherson's HCV has likely caused cirrhosis of his liver and has significantly decreased the possibility that the DAA drugs will be effective. *Id*. at ¶ 116; Koziel Dec. ¶ 62b. He may not survive his five-year prison sentence. Despite Mr. McPherson qualifying for HCV treatment under FDC's own guidelines, he continues to be denied treatment. He will continue to suffer, and his liver disease will continue to advance, unless he receives the DAA drug treatment.

<u>Plaintiff Roland Molina</u>

Plaintiff Roland Molina is incarcerated in the FDC system and has been diagnosed with chronic HCV.  Verified Complaint ¶¶ 125, 130.  He has suffered from abnormally low platelet levels since at least 2013. *Id*. at ¶ 131.  This has caused surface bleeding, a very painful condition accompanied by red blotches just

underneath his skin.  *Id*.  He is jaundiced and easily fatigued, and suffers from numbness, extreme pain, and discoloration in his legs, feet, and toes.  *Id*. at ¶¶ 136-37.  A nurse told Mr. Molina that he has cryoglobulinemia, a complication of HCV. *Id*.  His lab tests indicate that he likely has cirrhosis.  Koziel Dec. ¶ 62c.

Despite Mr. Molina qualifying for HCV treatment under FDC's own guidelines, he continues to be denied treatment.  Verified Complaint ¶¶ 133-135.  He will continue to suffer, and his liver disease will continue to advance, unless he receives the DAA drug treatment.

\* \* \*

Thousands of FDC prisoners are similarly situated.  Their illnesses will continue to advance, and they will continue to be subjected to an unreasonable risk of serious damage to their health and well-being, unless this Court enjoins Defendant's unlawful conduct.

## Argument

A preliminary injunction should issue if a plaintiff demonstrates that (1) there is a substantial likelihood of success on the merits; (2) the plaintiff will suffer irreparable injury if the injunction is not issued; (3) the threatened harm to the plaintiff outweighs any potential harm to the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest.  *Bellsouth Telecomms., Inc. v.*

*MCI Metro Access Transmission Servs*., *LLC*, 425 F.3d 964, 968 (11th Cir. 2005).

All four factors weigh in Plaintiffs and Plaintiff Class's favor.

## I.  Plaintiffs Have a Substantial Likelihood of Success on the Merits

### A.  Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Eighth Amendment Claim

Prison officials violate the Eighth Amendment when they act with deliberate

indifference to serious medical needs.  *Farmer v. Brennan*, 511 U.S. 825, 828

(1994).  This inquiry has two components.  First, the plaintiff must have an

objectively serious medical need.  Second, the plaintiff must show that the officials

acted with deliberate indifference; that is, the officials had subjective knowledge of

a risk of serious harm, yet disregarded that risk with more than mere negligence.

*Farrow v. West*, 320 F.3d 1235, 1243-35 (11th Cir. 2003).  Both prongs are satisfied

here.

#### i.  Plaintiffs and the Plaintiff Class Suffer from a Serious Medical Need

"A serious medical need is one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Gilmore v. Hodges*, 738 F.3d 266,

274 (11th Cir. 2013) (quotations/citations omitted).  A condition can also qualify if

the condition, when "left unattended, 'pos[es] a substantial risk of serious harm.'"

*Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quoting *Farmer*, 511 U.S.

at 834).  Moreover, a serious medical need exists "if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (quotation/citation omitted).  *See also Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008) (medical need is serious if "a delay in treating the need worsens it").

Plaintiffs and Plaintiff Class's condition easily satisfies these standards.  They have been—or will be—diagnosed with HCV, a condition that doctors have said requires monitoring and treatment. Koziel Dec. ¶¶ 15, 62-63.  The need for treatment is also obvious to a layperson.  Chronic HCV causes inflammation and scarring of the liver that is accompanied by serious complications, ranging from internal bleeding to live cancer.  *Id*. at ¶ 11. There is also a substantial risk of death—patients with decompensated cirrhosis have a mere 50% survival rate over five years.  *Id*. at ¶ 25.  Thus, it would be obvious to a layperson that a condition with such symptoms and risk of serious complications is one that requires treatment.

Consistent with this notion, the Eleventh Circuit has found that hepatitis C qualifies as a serious medical need.  *See Loeber v. Andem*, 487 F. App'x 548, 549 (11th Cir. 2012) ("That Hepatitis C presents a serious medical need is undisputed."); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) ("HIV and hepatitis meet either of the[] definitions" of a serious medical need and "defendants wisely do not deny that [Plaintiff] has serious medical needs.").  Numerous other courts have

reached the same conclusion.  *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (allegation that removal of HCV medication was "endangering [the plaintiff's] life" sufficient to establish serious medical need); *Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 1968317, at *5 (W.D. Mo. May 11, 2017) ("Plaintiffs allege that they have been diagnosed with HCV, which the Eighth Circuit has characterized as being unquestionably a serious medical problem.") (quotation/citation omitted); *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *11 (M.D. Pa. Jan. 3, 2017) ("Chronic hepatitis C constitutes a serious medical need."); *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("Case law also recognizes that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis.").  *See also Ibrahim v. District of Columbia,* 463 F.3d 3, 7 (D.C. Cir. 2006) (hepatitis C presents "imminent danger" of "serious physical injury").

Although Plaintiffs have amply shown that they have already suffered from serious harms, they need not even show that to prove an Eighth Amendment claim. Rather, it is sufficient for a plaintiff to show that he has been exposed to conditions "that pose an unreasonable risk of serious damage to his future health."  *Helling v. McKinney*, 509 U.S. 25, 35 (1993).  *See also Brown v. Plata*, 131 S. Ct. 1910, 1925, n. 3 (2011) (affirming system-wide relief for Eighth Amendment violation predicated on "deficiencies in the provision of medical and mental health care that,

taken as a whole, subject sick and mentally ill prisoners in California to 'substantial risk of serious harm'"); *Board. v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) ("The Eighth Amendment protects a detainee not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health.") (emphasis in original).

Here, by failing to treat HCV, Defendant has subjected Plaintiffs and the class members to the substantial and unreasonable risk of irreversible cirrhosis, liver disease, liver cancer, and death. In the same way that "a prison inmate . . . [can] successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery[,]" a prisoner can complain about the failure to treat HCV without waiting for his liver to fail. *Helling*, 509 U.S. at 35. It is not necessary or sensible to wait until a class member develops these serious complications—rather, an injunction is necessary to prevent them.

Plaintiffs and the class members have serious medical needs.

### ii.    Defendant Has Acted with Deliberate Indifference

The second prong requires a plaintiff to show that prison officials acted (or failed to act) with deliberate indifference; that is, they subjectively knew of and disregarded a risk of serious harm with more than mere negligence. *Gilmore*, 738 F.3d at 274. The Supreme Court has equated this standard with recklessness,

meaning a plaintiff need not show that the defendant intended to subject the plaintiff to harm.  *Farmer*, 511 U.S. at 836.

The Eleventh Circuit has summarized the myriad ways in which officials can be deliberately indifferent, including: 1) knowledge of a serious medical need and a failure or refusal to provide care; 2) delaying treatment for non-medical reasons; 3) grossly inadequate care; 4) a decision to take an easier but less efficacious course of treatment; or 5) medical care that is so cursory as to amount to no treatment at all. *Baez v. Rogers*, 522 F. App'x 819, 821 (11th Cir. 2013).  *See also Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir. 1997) ("[A]n official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate."); *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) ("A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference.").

Here, Defendant has been deliberately indifferent under nearly every formulation of the standard.  Defendant is aware that Plaintiffs and the Plaintiff Class are suffering from untreated HCV, as evidenced by Plaintiffs' repeated complaints of pain and difficulties, both to medical staff and in grievances, which have been appealed to the Defendant Secretary.  Further, Defendant knows of at least 4,797 prisoners with HCV, and also knows the number is likely between 14,700 and

40,184.  But Defendant has simply refused to provide DAA medications, as *only five* patients have received them as of July 2016. *See* Beard Email. Defendant has caused a complete denial of readily available treatment, and has done so despite knowing the serious risks faced by the class members.  In fact, since 2013, the year the FDA approved DAA medications that cure HCV, at least 165 FDC prisoners have died of chronic liver disease, cirrhosis, and other diseases of the digestive system. FDC Inmate Mortality.  Most of these deaths were likely due to chronic HCV.  Koziel Dec. ¶ 14.  Defendant's actions amount to clear deliberate indifference.

Further, Defendant has made the express "decision to take an easier but less efficacious course of treatment" by monitoring infected patients but doing nothing until irreversible damage occurs.  *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999).  That is treatment "so cursory as to amount to no treatment at all," *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985), and amounts to grossly inadequate care.  Koziel Dec. ¶ 63.  Defendant has an obligation to provide readily available treatment that will prevent serious liver damage and death, rather than simply delaying treatment indefinitely.  *See McElligott*, 182 F.3d at 1255 ("Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours."); *Farrow*, 320 F.3d at 1246 ("[A] defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference.").

Applying the above legal standards, one court has granted a preliminary injunction ordering a prison system to treat an HCV-positive prisoner with DAA medications, holding that failure to do so was deliberate indifference to the prisoner's serious medical needs. *Abu-Jamal*, 2017 WL 34700, at *20. The court found that the prison's policy, which did not permit treatment unless a prisoner had advanced fibrosis or cirrhosis, "present[ed] a conscious disregard of a known risk that inmates with fibrosis, like Plaintiff, will suffer from hepatitis C related complications[.]" *Id*. at *11. "Simply put, Defendants, pursuant to DOC policy, deliberately chose a course of monitoring over treatment for non-medical reasons and are allowing Plaintiff's condition to worsen while his liver function and his health continues to deteriorate." *Id*. at *14. The FDC's actions here are identical.

Likewise, another court has recently found, in a case nearly identical to this one, that a prison system's refusal to provide DAA medications to prisoners with chronic HCV stated a claim for deliberate indifference, where the prison had treated only five of the approximately 4,736 HCV-infected prisoners. *Postawko*, 2017 WL 1968317, at *6-10 ("However, despite this awareness [of the standard of care], Defendants follow a policy or custom that categorically denies DAA drug treatment to inmates with chronic HCV.") Other courts have also concluded that failing to provide DAA treatment to prisoners with chronic HCV may constitute deliberate indifference to serious medical needs. *See Allah v. Thomas*, No. 16-3103, 2017 WL

568313, at *3 (3d Cir. Feb. 13, 2017) (reversing dismissal of Eighth Amendment claim and finding that failure to provide DAA medications to prisoner stated claim for deliberate indifference to serious medical need); *Horton v. Guzman*, No. 16 C 741, 2017 WL 1233028, at *3 (N.D. Ill. Apr. 4, 2017) (denying motion to dismiss and finding plaintiff who was denied DAA drugs and a liver transplant evaluation stated a claim for deliberate indifference); *King v. Henry*, No. 6:15-CV-17, 2016 WL 5024228, at *8 (S.D. Ga. Sept. 16, 2016), *report and recommendation adopted*, 2016 WL 6272386 (S.D. Ga. Oct. 25, 2016) ("Eleventh Circuit precedent has long made clear that a prison official's failure to provide a prisoner treatment for his Hepatitis C violates the Eighth Amendment"); *Shabazz v. Schofield*, No. 3:13-CV-00091, 2016 WL 4177085, at *4 (M.D. Tenn. Aug. 8, 2016), *report and recommendation adopted*, 2016 WL 4480132 (M.D. Tenn. Aug. 25, 2016) (denying prison officials' motion for summary judgment on claim for failure to provide DAA medications); *Bernier v. Trump*, No. 16-CV-00828 (APM), 2017 WL 1048053, at *7 (D.D.C. Mar. 17, 2017) (denying motion to dismiss Eighth Amendment claim where prisoner sought DAA medications); *Reid v. Clarke*, No. 7:16-CV-00547, 2017 WL 706352, at *5 (W.D. Va. Feb. 22, 2017) (same).

Defendant has no justification for departing from the standard of care—immediate treatment for all prisoners with chronic HCV, regardless of their symptoms or level of fibrosis—and therefore failure to follow it is deliberate

indifference.  As Plaintiff's expert, the medical community, the HCV Guidance, and the Florida Agency for Health Care Administration all agree, using the level of fibrosis to determine whether to provide treatment is dangerous, inappropriate, and withholds treatment from those who would benefit the most from it.  Koziel Dec. ¶ 53; HCV Guidance; AHCA Letter.

But even assuming that it were appropriate to implement a prioritization schedule, FDC's attempt is still woefully inadequate in numerous ways.  *First*, contrary to expert recommendations, the FDC does not perform routine opt-out testing for HCV, thus remaining deliberately ignorant of the true number of infected prisoners.  Koziel Dec. ¶ 51.  Not having this information makes truly accurate and effective prioritization impossible.  *Second*, the policy doesn't require offering treatment to anyone—it merely describes priority levels, but doesn't say whether and when to begin treatment for patients within those levels.  *See* HSB 15.03.09. *Third*, the policy uses strict numerical cutoffs to determine priority levels—ignoring other symptoms and evidence of fibrosis—rather than using a holistic evaluation of all signs and symptoms, which excludes numerous patients with advanced forms of HCV from treatment.  Koziel Dec. ¶¶ 28, 54.  Specifically, the policy relies heavily on the APRI score, but an APRI score within normal limits cannot rule out fibrosis or cirrhosis.  *Id*. at ¶¶ 32, 54-55.

*Fourth*, assuming using numerical cutoffs were appropriate, the FDC has set them at such extraordinarily high levels that it precludes treatment for all but the sickest patients. *Id*. at ¶¶ 55, 63c. Level 1 ("highest priority") contains people with decompensated cirrhosis, Level 2 ("high priority") contains people with APRI scores above 2.0, Level 3 ("intermediate priority") contains people with APRI scores from 1.5 to 2.0, and Level 4 ("routine priority") contains everyone else with HCV. HSB 15.03.09. The highest priority level is reserved for patients with decompensated cirrhosis—the highly symptomatic, most advanced patients who almost certainly need liver transplants and for whom the medications will be less effective. And the APRI scores for the remaining levels are set incredibly high: Studies show that an APRI score of 0.5 is consistent with significant fibrosis, 1.0 is consistent with cirrhosis, and 2.0 indicates an extremely advanced stage of the disease. Koziel Dec. ¶¶ 32, 57. Thus, the FDC's attempt to "diagnose" advanced fibrosis has purposely eliminated from treatment consideration all but the most advanced cases of cirrhosis. *Id*. at ¶ 55.

*Fifth*, the FDC is not even following its own policy. Using the policy's inappropriate cutoffs, roughly 225 prisoners have an APRI score above 2.0, 393 have an APRI score above 1.5, 702 have an APRI score above 1.0, and 1,771 have an APRI score above 0.5. *Id*. at ¶ 57. But the FDC has treated only five patients. The FDC is thus not even treating the prisoners that it has identified as in need of

treatment. *Sixth*, the policy does not provide for liver cancer screening or transplant evaluation for patients with cirrhosis, both of which are necessary to prevent such patients from dying. *Id*. at ¶¶ 60-61. *Seventh*, the policy precludes treatment for prisoners with less than 18 months remaining on their sentence, when only 6 months (12 weeks of treatment and 12 weeks of follow-up) is required. *Id*. at ¶ 59.

All of these deficiencies result in the denial of treatment of almost all FDC prisoners with HCV with no justification, thereby exhibiting deliberate indifference to their serious medical needs.

Finally, costs cannot justify withholding life-saving medications from incarcerated people.    In fact, the Eleventh Circuit has roundly rejected this argument:

> We do not agree that financial considerations must be considered in determining the reasonableness of inmates medical care to the extent that such a rationale could ever be used by so-called "poor states" to deny a prisoner the minimally adequate care to which he or she is entitled. Minimally adequate care usually requires minimally competent physicians. It may also sometimes require . . . the administration of expensive medicines. . . . We are aware that systemic deficiencies in medical care may be related to a lack of funds allocated to prisons by the state legislature. Such a lack, however, will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment.

*Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (quotations/citations omitted). *See also Ancata*, 769 F.2d at 705 ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment

for inmates."); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) ("Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations."); *Abu-Jamal*, 2017 WL 34700, at *20 ("[T]he economics of providing this [DAA] medication cannot outweigh the Eighth Amendment's constitutional guarantee of adequate medical care."). The FDC cannot withhold life-saving medications because they are expensive.

Plaintiffs and the class members have a substantial likelihood of success on the merits of their Eighth Amendment claim.

### B. Plaintiffs and the Plaintiff Class Have a Substantial Likelihood of Success on the Merits of Their ADA and RA Claims

An ADA claim requires a plaintiff to show that (1) she is a qualified individual with a disability; (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or discriminated against; (3) by reason of a disability. *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (citing 42 U.S.C. § 12132). *See also* 28 U.S.C. § 794(a) (similar standard in Rehabilitation Act). "With the exception of its federal funding requirement, the RA uses the same standards as the ADA." *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005). The FDC is indisputably a public entity that receives federal financial assistance. *See* 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104.

Case 4:17-cv-00214-MW-CAS   Document 11   Filed 05/23/17   Page 25 of 36

### i.   Prisoners with chronic HCV are qualified individuals with a disability

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Although they only need qualify under one prong, Plaintiffs and the class members qualify under all three.

First, chronic HCV is a physiological disorder or condition that affects one or more of the body's systems, including the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore an impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b).[4] This physical impairment substantially limits one or more major life activity, including eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

The term "substantially limits" must be "construed broadly in favor of expansive coverage," and this threshold determination "should not demand

---

[4] "Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, see 42 U.S.C. § 12134(a), the regulations must [be given] legislative and hence controlling weight." *Shotz*, 256 F.3d at 1079–80 (citations/quotations omitted).

-25-

extensive analysis." 28 C.F.R. § 35.108(d)(1)(i)-(ii).   The regulations even list certain conditions—including cancer, diabetes, and HIV—that will virtually always be found to impose a substantial limitation on a major life activity, thus precluding the need for an individual assessment. *Id*. at § 35.108(d)(2).   Chronic HCV is akin to these conditions.   It universally affects liver and gastrointestinal function and thus will virtually always be deemed a disability. Thus, all class members have a qualifying disability, even if asymptomatic. *See Quick v. Tripp, Scott, Conklin & Smith, P.A.*, 43 F. Supp. 2d 1357, 1367–68 (S.D. Fla. 1999) ("[T]he significant limitations placed on [] major life activity . . . due to the Hepatitis C virus, qualifies as a recognized ADA disability") (citing *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998) (finding that HIV is a qualified disability under the ADA)).

Second, Plaintiffs and the class members all have a record of having an impairment that substantially limits one or more major life activity, as they have a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).   The FDC has diagnosed them with HCV, records some of their symptoms in their medical records, and enrolls them in the gastrointestinal clinic, all of which produces records of their impairments.   Verified Complaint ¶ 66.

Third, for the same reasons, Plaintiffs and the class members are regarded by FDC as has having an impairment that substantially limits one or more major life activity, as FDC perceives them as having such an impairment. 42 U.S.C.

§ 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).  *See also* Verified Complaint ¶¶ 66, 91, 111, & 128.  Defendant FDC has subjected them to a prohibited action because of an actual or perceived physical impairment. 42 U.S.C. § 12102(3)(A).

Thus, Plaintiffs and the class members are qualified individuals with a disability.

> ## ii. The FDC has categorically withheld medical services from Plaintiffs and the Plaintiffs Class, and discriminated against them because of their disability.

The ADA forbids public entities from excluding individuals from participation in, or denying them the benefits of, a public entity's services, programs, or activities, or discriminating against them because of a disability.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).  The ADA also requires public entities to provide equal access and enjoyment of all services, 28 C.F.R. § 35.130(b)(1), and prohibits public entities from using criteria or methods that have the effect of subjecting individuals with disabilities to discrimination or that defeat or substantially impair accomplishment of the objectives of any program, service, or activity. 28 C.F.R. § 35.130(b)(3).

Here, the FDC categorically denies HCV-positive prisoners access to medical services—treatment for their HCV—while at the same time not imposing such a ban on prisoners with other disabilities, or non-disabled prisoners.  *See Kiman v. New*

*Hampshire Dep't of Corr.*, 451 F.3d 274, 286-87 (1st Cir. 2006) ("Access to prescription medications is part of a prison's medical services and thus is one of the services, programs, or activities covered by the ADA."); *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes medical services). This categorical ban discriminates against HCV-positive prisoners and denies them medical services because of their disability.

Although many medical-related claims brought by prisoners are not ADA violations, Plaintiffs are not challenging the adequacy of their care, they are alleging that they have been "discriminatorily precluded from access to medical treatment altogether." *Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1241 (D. Colo. 2009).  In a fact, one court recently found, in a case nearly identical to the one at issue here, that the plaintiffs' allegations that a prison system "follows one policy for inmates with chronic HCV and another policy for inmates with other disabilities under which they do receive lifesaving medications" stated an ADA claim. *Postawko*, 2017 WL 1968317, at *13.  *See also Lonergan v. Florida Dep't of Corr.*, 623 F. App'x 990, 994 (11th Cir. 2015) ("[T]he failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist is sufficient for the Plaintiff to plead a prima facie ADA claim."); *Kiman*, 451 F.3d at 287 (outright failure to provide medications for ALS stated ADA claim); *Mitchell v. Williams*, No. 6:15-

CV-93, 2016 WL 723038, at *4 (S.D. Ga. Feb. 22, 2016) ("Plaintiff has plausibly alleged that the Department of Corrections has denied him departmental services, programs, or activities by reason of his having Hepatitis C."); *Payne v. Arizona*, No. CV 09-01195-PHX-NVW, 2012 WL 1151957, at *4 (D. Ariz. Apr. 5, 2012) ("[A] Plaintiff may have a valid claim under the ADA where he can show that Defendant "discriminated against [him] because of his [disability], not by providing him with inadequate care, but by denying him immediate access to prescribed medications.") (quotations/citations omitted); *McNally v. Prison Health Servs.,* 46 F. Supp. 2d 49, 58–59 (D. Me. 1999) (denying prison officials' motion for summary judgment on ADA claim for failure to provide HIV medications).

Unlike prisoners with other diseases, HCV-infected prisoners are categorically refused the treatment that the medical community deems essential. This categorical refusal amounts to an exclusion from medical services and discrimination on the basis of disability, a failure to provide equal access to and enjoyment of medical services, and the use of criteria that result in discrimination and impairment of the objectives of medical services, in violation of the ADA and RA.

Plaintiffs are therefore likely to succeed on the merits of their ADA and RA claims.

## II.   Plaintiffs and the Plaintiff Class Will Continue to Suffer Irreparable Injury in the Absence of a Preliminary Injunction.

In the context of Eighth Amendment claims challenging conditions of confinement, "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1998)).   Moreover, "the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (affirming permanent injunction against FDC Secretary enjoining staff from using chemical agents on certain prisoners).   "'[I]njunctive relief is appropriate to prevent a substantial risk of serious injury from ripening into actual harm.'"   *Id.* at 1318 (quoting *Farmer*, 511 U.S. at 845).

Plaintiffs and the Plaintiff Class face a substantial risk of irreversible cirrhosis, advanced liver disease, liver cancer, and death.   In addition, the class members suffer, or are at risk of suffering, from the associated complications such as widespread itching, arthritic pain, fluid retention, internal bleeding, varices, ascites, mental confusion, and possible death. *See Abu-Jamal,* 2017 WL 34700, at *20 (granting preliminary injunction and finding that prisoner will suffer irreparable harm without DAA medications). The class members will suffer from these irreparable harms without injunctive relief.

**III.    The Harm Suffered by Plaintiffs and the Plaintiff Class Outweighs Any Potential Harm to Defendant**

Defendant will suffer no harm from having to comply with its responsibilities under the Constitution and its own policy.   Financial and administrative burdens cannot outweigh the substantial harms that Plaintiffs continue to suffer.  *See Laube*, 234 F. Supp. 2d at 1252; *Ancata*, 769 F.2d at 705.  On the other side of the equation is Plaintiffs' risk of further suffering, damage to their health, and possible death.  The balance of equities weighs in Plaintiffs' favor.

**IV.    The Public Interest Supports Injunctive Relief**

"[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated." *Laube*, 234 F. Supp. 2d at 1252.  There will be no harm to the public by ensuring that Defendant provides constitutionally adequate medical care.  "In fact, it seems clear . . . that, in the long run, providing decent medical care and housing to inmates would serve to promote the rehabilitative goals of the criminal justice system so as to permit their re-entry into free society as upright and law abiding citizens and to prevent their re-entry into the criminal justice system." *Costello v. Wainwright*, 397 F. Supp. 20, 37 (M.D. Fla. 1975) (granting preliminary injunction ordering many improvements to Florida's prison system).[5]  It serves the public interest to carry out the mandates of the Constitution.

---

[5] This opinion was affirmed, 525 F.2d 1239 (5th Cir. 1976), then vacated in part on rehearing en banc, 539 F.2d 547 (5th Cir. 1976).  That decision was then reversed

## V.    Plaintiffs Should Not be Required to Post Bond

"[I]t is well-established that the amount of security required by the rule is a matter within the discretion of the trial court ... [, and] the court may elect to require no security at all."    *BellSouth*, 425 F.3d at 971 (alteration in original; quotations/citations omitted).   Exercise of that discretion is particularly appropriate where, as here, an action is brought by indigent plaintiffs, *Orantes-Hernandez v. Smith*, 541 F. Supp. 351 (C.D. Cal. 1982), or where issues of public concern or important federal rights are involved.  *See Toussaint v. Rushen*, 553 F. Supp. 1365, 1383 (N.D. Cal. 1983) (waiving bond for class of indigent prisoners).   Thus, Plaintiffs respectfully request that they not be required to post bond.

## VI.    The Proposed Injunction Satisfies the PLRA

For cases "with respect to prison conditions," the Prison Litigation Reform Act (PLRA) states that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).  A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief."  *Id.*

---

by the U.S. Supreme Court, 430 U.S. 325 (1977), and the Fifth Circuit subsequently reinstated the original opinion, 553 F.2d 506 (5th Cir. 1977).

However, the PLRA standard does not create a higher substantive hurdle beyond what already exists for federal court injunctions—it merely requires the Court to make the specific findings. *See Gilmore v. People of the State of California*, 220 F.3d 987, 1006 (9th Cir. 2000) (calling the needs-narrowness-intrusiveness test "a nearly identical standard" to the pre-PLRA standard); *Smith v. Arkansas Dep't of Correction*, 103 F.3d 637, 647 (8th Cir. 1996) (PLRA "merely codifies existing law and does not change the standards for determining whether to grant an injunction").

In any event, the proposed injunction clearly complies with the PLRA.  The relief is narrowly drawn, as the "scope of the remedy" is "proportional to the scope of the violation." *Plata*, 131 S. Ct. at 1940.  It does not require broad reforms to all forms of medical care, but only applies to a specific medical condition to which Defendant has been unconstitutionally responding.  Similarly, the relief extends no further than necessary to correct the harm to the Plaintiff Class and is the least intrusive means necessary to correct the harm, as the proposed injunction merely requires Defendant to follow the prevailing standard of care.  This remedy can be implemented through the channels that Defendant already has in place for providing medical care.

Regarding the public safety and criminal justice component, the PLRA "does not require the court to certify that its order has no possible adverse impact on the public." *Id.* at 1941.  But none will occur here.  No harm to public safety will result

from providing constitutionally adequate medical care.

## **Conclusion**

Thousands of Florida prisoners have been suffering from the symptoms of HCV, and remain at risk for serious future complications, and even death, despite the fact that there is a simple cure for their disease.  Plaintiffs seek a preliminary injunction from this Court requiring FDC to provide these prisoners with the treatment they so desperately need.

WHEREFORE Plaintiffs and the Plaintiff Class respectfully request the following relief:

A.     A preliminary injunction ordering Defendant to 1) immediately provide direct-acting antiviral (DAA) medications to Plaintiffs Carl Hoffer, Ronald McPherson, and Roland Molina, 2) immediately place Plaintiff Carl Hoffer on a liver transplant list, and 3) develop and adhere to a plan to provide DAA medications to all FDC prisoners with chronic HCV.

B.     A preliminary injunction, the specific details of which will be determined at a later date, ordering Defendant to 1) provide routine opt-out testing for HCV to all FDC prisoners;  2) properly evaluate, monitor, and stage FDC prisoners with HCV (including screening for liver cancer where appropriate); 3) develop and adhere to a policy allowing FDC prisoners with chronic HCV to obtain liver transplants if needed; 4) modify the exclusion

from HCV treatment based for time remaining on sentence to reflect an appropriate timeframe; and 5) provide all necessary and appropriate follow-up monitoring and care to FDC prisoners with chronic HCV.

C.     An order waiving the posting of a bond for security.

D.     Such other relief that may be just and equitable.

**Certificate of Attorney Conference.**   Pursuant to N.D. Fla. Local Rule 7.1(B) and (C), Plaintiffs' counsel has conferred with counsel for the Defendant, and is authorized to state that the Defendant opposes the granting of this Motion.

**Certificate of Word Limit.**   Pursuant to N.D. Fla. Local Rule 7.1(F), this motion contains 7,991 words.

Respectfully submitted,

Randall C. Berg, Jr., Esq.
Fla. Bar No. 0318371
*RBerg@FloridaJusticeInstitute.org*
Dante P. Trevisani, Esq.
Fla. Bar No. 72912
*DTrevisani@FloridaJusticeInstitute.org*
Erica Selig, Esq.
Fla. Bar No. 0120581
*ESelig@FloridaJusticeInstitute.org*
FLORIDA JUSTICE INSTITUTE, INC.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida  33131
305.358.2081
305.358.0910 – Fax

-35-

*Attorneys for Plaintiffs*

By:    *s/Randall C. Berg*
         Randall C. Berg, Jr., Esq.


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed today, May 23, 2017, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notifications for this case, including all opposing counsel.

By:    *s/Randall C. Berg*
         Randall C. Berg, Jr., Esq.