# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

CARL HOFFER, et al.,

        *Plaintiffs*,

v.                                **Case No. 4:17cv214-MW/CAS**

JULIE L. JONES, in her official
capacity as Secretary of the
Florida Department of
Corrections,

        *Defendant.*

_____/

## ORDER GRANTING
## MOTION FOR A PRELIMINARY INJUNCTION

The Florida Department of Corrections ("FDC") is charged with the care of over 98,000 inmates. At least 7,000 of those inmates—and perhaps as many as 20,000—are infected with the Hepatitis C virus ("HCV"). The issue in this case is whether FDC is screening, evaluating, and treating HCV-infected inmates in a manner that comports with constitutional requirements.

After holding a five-day hearing (including testimony from expert witnesses, FDC officials, and FDC inmates), this Court finds that FDC has not treated HCV-infected inmates as required by the Constitution. Moreover, although FDC has tried to moot

1

this case by promising to change its practices going forward, this Court finds that a preliminary injunction is necessary to ensure that inmates with HCV receive medical care in a timely manner consistent with constitutional requirements. Accordingly, Plaintiffs' motion for a preliminary injunction is **GRANTED**.

## I. <u>Findings of Fact</u>[1]

### A. <u>Hepatitis C and the Progression of Liver Disease</u>

HCV "is a viral infection, which is spread by exposure to blood or blood products." Pls.' Ex. 28, at 3.[2] The most common way of contracting HCV is through intravenous drug use, but a person can also get infected through tattooing or blood transfusions. *Id.* "The principal consequence of [HCV] infection is infection of the liver, which causes inflammation that in turn may result in scarring of the liver (fibrosis)." *Id.*

---

[1] This Court held a five-day evidentiary hearing on Plaintiffs' motion for a preliminary injunction. The factual statements in this section represent this Court's findings of fact. To the extent this Court cites or quotes exhibits or testimony, it is because this Court finds said exhibits and testimony to be credible and useful references. Many of these factual statements are sourced from the declarations and in-court testimony of the parties' expert witnesses, Dr. Koziel and Dr. Dewsnup. For the most part, the parties' experts were in agreement with each other. Due to the expedited nature of these proceedings, this Court has not obtained certified transcripts of each witness's testimony. Where necessary, this Court has relied on its own notes and recollection of the testimony. Consequently, certain citations do not include pincites.

[2] Plaintiffs' Exhibit 28 is the "First Amended Unsworn Declaration of Dr. Margaret Koziel."

Unlike a scar on your skin, scarring of the liver can have severe consequences. "Liver scarring can significantly impair liver function and damage its crucial role in filtering toxins from the blood, as well as making proteins involved in liver clotting and fighting infections." *Id.* Moreover, liver scarring places patients "at risk of liver failure or liver cancer." *Id.* Liver failure carries with it a host of serious symptoms, including bleeding from any site, fluid accumulation in the legs or abdomen, life-threatening infections, and failure of other organs such as the kidneys. *Id.* Liver cancer is essentially untreatable, and "has a very dismal prognosis." *See id.*

The amount of liver scarring a patient has is usually measured on the METAVIR scale. *Id.* at 7–8. On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis). ECF No. 138, at 166.[3] The rate at which patients progress along this scale differs among the population. Defendant's Exhibit 1 includes a useful flowchart demonstrating this difference in progression:

---

[3] ECF No. 138 is a certified transcript of Dr. Koziel's testimony at the evidentiary hearing.



Def.'s Ex. 1.

As can be seen in the flowchart, about 20–50% of people infected with HCV spontaneously clear the virus within six months of infection. ECF No. 138, at 58. The remaining 50–80% who don't clear the virus are referred to as having chronic HCV. *Id.*

Among those with chronic HCV, about 30% of patients maintain a stable chronic infection, 40% suffer from slow fibrosis progression, and 30% suffer from rapid fibrosis progression. *See* Test. of Dr. Dewsnup.[4] Patients with a stable chronic infection usually only reach F1 (mild fibrosis) as long as they maintain other healthy habits such as abstaining from alcohol. *See* Test. of Dr.

---

[4] According to Dr. Dewsnup, as many 6,000 Florida inmates may suffer from rapid fibrosis progression. *See* Test. of Dr. Dewsnup.

Dewsnup. Patients with a slow fibrosis progression may take upwards of 20 years to reach F4 (cirrhosis). *Id.* Finally, patients with a rapid fibrosis progression may reach cirrhosis within as short a timeframe as one year. *Id.*

The extent of liver scarring a patient has does not necessarily correlate with the symptoms they are suffering. For instance, "[s]omebody can be completely asymptomatic and present with cirrhosis." ECF No. 138, at 51. Nor do "symptoms have anything to do with what the risk is of liver failure." *Id.* at 113.

Once a person reaches F4 (cirrhosis), they are further classified based on whether they are suffering from HCV-related symptoms/complications. A patient with cirrhosis and no related complications is referred to as having compensated cirrhosis. *Id.* at 49. On the other hand, a patient with cirrhosis that is accompanied with complications is referred to as having decompensated cirrhosis. *Id.* The distinction between these two groups is important because their survival rates are markedly different. Whereas the five-year survival rate for someone with compensated cirrhosis is 91%, the five-year survival rate for someone with decompensated cirrhosis is only 50%. Pls.' Ex. 28, at

6–7. Once a person has decompensated cirrhosis "their liver has truly failed." ECF No. 138, at 99. At that point, "the only true curative treatment is a liver transplant." Pls.' Ex. 28, at 11.

      B. <u>Treatment of Hepatitis C</u>

Historically, HCV has been "difficult to treat." *Id.* at 9. One old method of treatment involved the drugs Interferon and Ribavirin. ECF No. 138, at 62–63. That treatment required weekly injections and could take as long as twelve months to complete. *Id.*; Pls.' Ex. 28, at 9. The side effects were "terrible." ECF No. 138, at 62. Taking the treatment was akin to "having the flu for a year." *Id.* "People's hair fell out, they had rashes, they had chest pain, they felt suicidal, [and] some committed suicide." *Id.* at 63. Despite these side effects, doctors still prescribed the treatment when patients had a high level of liver scarring because "the likelihood of getting to cure, which was still only about 30 percent, was better than those terrible side effects." *Id.*

But in late 2013 a new class of drugs known as direct-acting antivirals ("DAAs") were released to market. *Id.* These DAAs proved to be "a revolution in medicine." *Id.* Treatment with DAAs consists of taking a pill once or twice a day. *See id.*; *see also* Pls.' Ex. 28, at 10. The treatment period with DAAs is only about

twelve-weeks long. ECF No. 138, at 64. Moreover, DAAs have "very few" side effects. *Id.* Most importantly, about 95% of patients who take DAAs are cured of HCV. *Id.*

Unfortunately, this revolution in medicine came with a price. DAAs "are very expensive." *Id.* at 74. In September of 2016, a single course of treatment with DAAs cost approximately $50,000 to $75,000. ECF No. 151, at 34.[5] Even though prices have been going down as new DAAs are released, a single course of treatment may still cost $37,000 today. *Id.* at 45.

Despite the high cost of DAAs, the present-day standard of care is to treat chronic-HCV patients with DAAs as long as there are no contraindications or exceptional circumstances. It is inappropriate to only treat those with advanced levels of fibrosis. ECF No. 138, at 66–67, 73; *see also* Test. of Dr. Dewsnup. The HCV Guidance—a resource developed by the American Association for the Study of Liver Diseases (AALSD) and the Infectious Diseases Society of America (IDSA)—recommends giving DAAs to any

---

[5] ECF No. 151 is a certified transcript of a portion of Mr. Reimers's testimony at the evidentiary hearing.

patient with chronic HCV (absent certain contraindications). *See* Pls.' Ex. 6.[6]

C. <u>The Plaintiffs</u>

The named Plaintiffs in this case are Carl Hoffer, Ronald McPherson, and Roland Molina. All three are inmates in FDC custody and are infected with HCV. Mr. Hoffer currently suffers from decompensated cirrhosis, and Mr. McPherson and Mr. Molina have compensated cirrhosis. ECF No. 138, at 136–42.

FDC has known about the Plaintiffs' conditions for years. Mr. Hoffer likely had cirrhosis as early as 2012 and likely developed decompensated cirrhosis "around the midpoint of 2014." *Id.* at 136. Mr. Hoffer needs to be referred for a liver transplant evaluation. *Id.* at 138. Mr. Hoffer should have been treated "as early as 2012 or certainly by 2014." *Id.* at 137.

Mr. McPherson has HIV in addition to having chronic HCV. *Id.* at 139. Doctors realized that Mr. McPherson had cirrhosis during a gallbladder surgery in 2015. *Id.* Mr. McPherson should have been treated as soon as doctors realized he had cirrhosis. *Id.*

---

[6] Plaintiffs' Exhibit 6 is a copy of the HCV Guidance dated September 21, 2017.

Mr. Molina likely had cirrhosis as early as 2013. *See id.* at 141. Although an ultrasound in April of 2016 showed that his liver was normal, doctors failed to account for his enlarged spleen, which is indicative of cirrhosis. *Id.*

All three Plaintiffs have been complaining about their lack of treatment for years. *See* Pls.' Ex. 1; Pls.' Ex. 2; Pls.' Ex. 3.[7] But they could only complain for so long. On May 11, 2017, Plaintiffs initiated this lawsuit against the Secretary of FDC. ECF No. 1. After months of litigating, FDC has finally begun to treat Plaintiffs with DAAs. ECF No. 138, at 136–42.

Even though Plaintiffs are receiving the treatment they want, this case is not yet over. In addition to seeking relief for themselves, Plaintiffs also moved to certify a class of "all current and future prisoners in FDC custody who have been diagnosed, or will be diagnosed, with chronic hepatitis C virus (HCV)." ECF No. 10, at 2. This Court has already granted Plaintiffs' motion for class certification. ECF No. 152. Accordingly, this case may proceed with Plaintiffs seeking relief for the class. *See, e.g.*, *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 968 n.28 (11th Cir. 2008) ("A

---

[7] Plaintiffs' Exhibits 1, 2, and 3 are composites of their FDC administrative grievances and appeals.

class representative can have standing to continuing prosecuting a class action for relief on behalf of the class members even though he has settled his claim against the defendant and his own case is therefore moot."), *abrogation on other grounds recognized by LaCroix v. W. Dist. Ky.*, 627 F. App'x 816, 818 (11th Cir. 2015).

D. <u>FDC's Long and Sordid History of Failing to Treat HCV</u>

Like prison systems in many other states, FDC decided some time ago to outsource its provision of medical care to private contractors. ECF No. 151, at 5. In 2013, those contractors were Corizon and Wexford. *Id.* Under FDC's contracts with Corizon and Wexford, there were two ways that doctors could obtain drugs. Most drugs were listed on an FDC-approved list, referred to as the formulary. *Id.* at 6. Those drugs were readily available to doctors and were paid for directly by FDC. *Id.* Drugs not listed on the formulary had to be specially requested. *See* Test. of Dr. Maier. Specially requested drugs were paid for by Corizon or Wexford. *Id.*

When DAAs came out in late 2013, they were not included on the formulary. ECF No. 151, at 6–7. Nevertheless, Dr. Scott Kennedy (who worked for Corizon at the time) decided to assemble twelve inmates (the "Kennedy 12") with the goal of treating them with DAAs. *See* Test. of Dr. Maier. By the end of 2014, the Kennedy

12 had been assembled and thoroughly evaluated. *Id.* But the Kennedy 12 were never given any DAAs because the necessary funds were not available. *Id.* This was so despite the fact that all twelve inmates showed signs of advanced liver damage. *Id.*

As the years went on, FDC officials recognized that inmates were dying from HCV because they were not being treated. *Id.* (discussing conversations with Dr. Long Do). Similarly, Mr. Reimers, the FDC administrator responsible for overseeing the contractors, recognized that inmates with HCV were not being treated and found the lack of treatment to be unacceptable. *See* ECF No. 151, at 10, 40–43. Again, the reason why inmates weren't being treated was because of a lack of funding. *See id.* at 40.

By mid-2016, FDC had updated its HCV-treatment policy to acknowledge that prescribing DAAs was the standard of care. *See* Def.'s Ex. 8, at 6–7.[8] But again, the funding was not available to treat anyone. In 2015, Mr. Reimers prepared a legislative budget request of $6.5 million to obtain DAAs for the 2016–17 fiscal year, but the request never made it out of FDC (i.e., someone in FDC denied it). *See* ECF No. 151, at 44–45. In 2016, Mr. Reimers

---

[8] Defendant's Exhibit 8 is FDC's HCV-treatment policy dated June 27, 2016.

prepared a $29 million request for the 2017–18 fiscal year, but that too never made it out of FDC. *Id.* at 46–47.

Eventually, Corizon and Wexford's contracts with FDC ended, and FDC began a new contract with Centurion. *Id.* at 7. But the change in contractor did not come with a change in behavior; inmates with HCV were still not being treated. Indeed, to date only thirteen inmates have been treated with DAAs (three of those being the named Plaintiffs in this case).[9] *Id* at 47–48; *see also* Pls.' Ex. 11.[10]

## II. <u>Analysis</u>

Presently before this Court is Plaintiffs' motion for a preliminary injunction. ECF No. 11. To obtain a preliminary injunction, Plaintiffs must clearly show that: (A) they have a substantial likelihood of success on the merits of their claims; (B) an injunction is necessary to prevent irreparable injury; (C) the threatened injury outweighs the harm that an injunction would

---

[9] To put that number in context, FDC knows of at least 7,000 inmates in its custody who have HCV. ECF No. 151, at 52–53. Furthermore, FDC's own expert testified that the true number is likely closer to 20,000. *See* Test of. Dr. Dewsnup.

[10] Plaintiffs' Exhibit 11 is FDC's drug utilization list of DAAs for the period of May 1, 2013 to June 30, 2017.

cause to Defendant; and (D) an injunction would not be adverse to the public interest. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). This Court finds that Plaintiffs have met the necessary requirements.[11]

A. <u>Substantial Likelihood of Success on the Merits</u>[12]

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on convicts. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). The Supreme Court has interpreted this prohibition to encompass "deprivations . . . not specifically part of [a] sentence but . . . suffered during imprisonment." *Id.* at 297. Accordingly, an inmate who suffers "deliberate indifference" to his "serious medical

---

[11] It is not a close call, particularly in light of the testimony of Defendant's own expert.

[12] To determine Plaintiffs' likelihood of success on the merits, this Court must consider the individual elements of each of Plaintiffs' claims. Plaintiffs raise three separate claims about FDC's policies and practices for HCV treatment: (1) deliberate indifference to serious medical needs in violation of the Eighth Amendment; (2) discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"); and (3) discrimination on the basis of disability in violation of the Rehabilitation Act ("RA"). ECF No. 1. This Court finds that Plaintiffs have a substantial likelihood of success on their Eighth Amendment claim; accordingly, this Court will not address Plaintiffs' ADA and RA claims at this stage of the case. *See, e.g., Arval Serv. Lease S.A. v. Clifton*, No. 3:14-cv-1047-J-39MCR, 2014 WL 12614422, at *15 (M.D. Fla. Nov. 21, 2014) ("Because the Court determines that Plaintiffs are entitled to a preliminary injunction based upon [their first claim], the Court need not address the remaining claims at this time.").

needs" may state a claim for a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Plaintiffs argue that FDC's policies and practices for HCV treatment constitute deliberate indifference to their (and the class's) serious medical needs. ECF No. 1, at 37–39. To prevail on this claim, Plaintiffs must show (1) a serious medical need, (2) Defendant's deliberate indifference to that need, and (3) causation between Defendant's indifference and Plaintiffs' injuries. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). This Court finds that Plaintiffs have a substantial likelihood of proving each element.

### 1. *Serious Medical Need*

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." *Id.* "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious

14

harm.'" *Id.* (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Plaintiffs (by diagnosis) and Plaintiffs' class (by definition) all suffer from chronic HCV. As a consequence, Plaintiffs and Plaintiffs' class are faced with substantial risks of serious harm, including, but not limited to, bleeding from any site in the body, accumulation of fluid in the legs or abdomen, life-threatening infections, significant pain or discomfort, organ failure, liver cancer, and death. *See* Pls.' Ex. 28, at 3–4. Accordingly, it is not surprising that Plaintiffs' expert describes HCV as "a serious medical need." *Id.* at 4. Nor should it be surprising that this Court finds chronic HCV to be a serious medical need.[13] *Cf. Loeber v. Andem*, 487 F. App'x 548, 549 (11th Cir. 2012) (unpublished) ("That Hepatitis C presents a serious medical need is undisputed."); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) ("HIV and hepatitis meet either of the[] definitions [of serious medical need]. The defendants wisely do not deny that [plaintiff] has serious medical needs.").

---

[13] Even Defendant conceded that a subclass of HCV-infected inmates have a serious medical need within the meaning of deliberate-indifference jurisprudence.

## 2. *Deliberate Indifference*

To satisfy the deliberate-indifference prong, Plaintiffs must show Defendant's subjective knowledge of a risk of serious harm and Defendant's disregard of that risk by conduct that is more than mere negligence. *See Goebert*, 510 F.3d at 1326–27. There is no question that Defendant has knowledge of a risk of serious harm—Defendant knows that Plaintiffs and Plaintiffs' class are diagnosed with HCV. *Cf. Brown*, 387 F.3d at 1351 (finding that subjective-knowledge requirement was met because "[t]he defendants were aware of [plaintiff's] diagnosis with HIV and hepatitis"). As such, the only issue is whether Defendant has disregarded that risk by conduct that is more than mere negligence.

The Eleventh Circuit has listed several examples of conduct that is considered more than mere negligence:

> (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all.

*Baez v. Rogers*, 522 F. App'x 819, 821 (11th Cir. 2013) (unpublished). According to Plaintiffs, "Defendant has been deliberately indifferent under nearly every formulation of the

16

standard." ECF No. 11, at 17. This Court agrees. The record is replete with evidence to support this conclusion.

This Court has already explained that FDC has a long and sordid history of failing to treat HCV-infected inmates. *See supra*, at 10–12. And this Court finds as a matter of fact that FDC's failure to treat was due to a lack of funding. The record is filled with evidence demonstrating as much[14]:

- Dr. Carl Maier testified extensively about funding issues. *See* Test. of Dr. Maier. In 2014, Dr. Maier worked for Corizon as the medical director at the FDC prison where the Kennedy 12 were being assembled. *Id.* Dr. Maier testified that the reason why the Kennedy 12 weren't given DAAs is because there was no funding. *Id.*

- Mr. Reimers testified about funding issues. In 2015, Mr. Reimers was employed by FDC as the Director of Health Services Administration. ECF No. 151, at 5. Part of his responsibilities at that time was "contract monitoring of Corizon and Wexford." *Id.* During this time, Mr. Reimers spoke with a Wexford official about funding issues related to DAAs. *Id.* at 40–42. Mr. Reimers knew that HCV-infected inmates weren't being treated and told the official that that was "not acceptable." *Id.* Thereafter, Mr. Reimers began trying to specifically procure funds for DAAs, but those requests were denied from within FDC. *Id.* at 44–47.

---

[14] Dr. Whalen testified that there were no funding issues. *See* Test. of Dr. Whalen. This Court finds Dr. Whalen's testimony particularly incredible given other statements he made in sworn declarations. *See* Pls.' Ex. 26, at 3 ("[T]reatment with DAA drugs . . . will be provided as resources are available."); *see also* ECF No. 46-1, at 1 ("Mr. Molina and Mr. McPherson may be eligible for treatment with direct acting antiviral ("DAA") drugs in the first wave of prisoners provided the treatment *pending funding for the drugs*." (emphasis added)).

- Defendant's own expert, Dr. Dewsnup, also testified about funding issues. *See* Test. of Dr. Dewsnup. Dr. Dewsnup is employed by Centurion and is intimately familiar with HCV treatment. *See id.* When Centurion took over medical care for FDC, Dr. Dewsnup encouraged doctors working with FDC to refer HCV-infected inmates for DAA treatment. *Id.* But those doctors were unable to do so because of FDC funding issues.

Here, funding is no excuse for FDC's failure to provide treatment.[15] Accordingly, there is no question that Defendant has been deliberately indifferent the serious medical needs of Plaintiffs and the class. But FDC's past failures do not entitle Plaintiffs to a

---

[15] *See, e.g.*, *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) ("We do not agree that 'financial considerations must be considered in determining the reasonableness' of inmates' medical care to the extent that such a rationale could ever be used by so-called 'poor states' to deny a prisoner the minimally adequate care to which he or she is entitled. . . . We are aware that systemic deficiencies in medical care may be related to a lack of funds allocated to prisons by the state legislature. Such a lack, however, will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates."); *but see Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (Posner, C.J.) ("[T]he civilized minimum [of public concern for the health of prisoners] is a function both of objective need and of cost. The lower the cost, the less need has to be shown, but the need must still be shown to be substantial."); *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) (Alito, J.) ("[T]he deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society."). Of course, this Court recognizes that issues of funding might excuse some delay. For instance, if DAAs were released yesterday, this Court would not expect FDC to wave a magic wand and suddenly treat thousands of inmates overnight. But that is not the case. FDC has had since late 2013 to respond to this problem, and it has only just recently started doing what it should have done years ago.

preliminary injunction. *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . ."). Instead, there must be some evidence of ongoing or future violations. *See id.* at 495–96. Accordingly, this Court must focus on what FDC has promised to do going forward.[16]

In that light, two pieces of evidence are particularly relevant to this Court's analysis. The first is FDC's HCV-treatment policy. The second is a letter sent by Mr. Reimers (FDC's current Director of Health Services) to Centurion.

### a. FDC's Treatment Policy

FDC's treatment policy for HCV is enshrined in an ever-evolving document titled "HSB 15.03.09 Supplement #3." There are four different versions of the policy in the record, the earliest dating back to September 2014. *See* Def.'s Ex. 7; Def.'s Ex. 8; Def.'s Ex. 9; Def.'s Ex. 10.

The most recent version of FDC's policy was created in October 2017.[17] Def.'s Ex. 10. Broadly speaking, it specifies how

---

[16] Of course, this Court can still consider FDC's past violations to place things into context. *Cf. O'Shea*, 414 U.S. at 496 ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.").

[17] Undoubtedly in response to this litigation.

and when doctors should screen, evaluate, and treat inmates with HCV. *See id.* For example, as to screening the policy notes that "[t]he preferred screening test for HCV infection is an immunoassay" and that "[s]creening will be offered to all patients, regardless of risk factors." *Id.* at 2. As to treatment, the policy sets out eligibility criteria and groups patients into four priority levels based on the severity of their conditions and other considerations. *Id.* at 6–8. Generally speaking, patients with the most severe conditions are grouped in "Priority Level 1 – Highest Priority for Treatment," and patients with the least severe conditions are grouped into "Priority Level 4 – Routine for Treatment." *Id.*

When Plaintiffs filed this lawsuit, FDC was operating under an older version of the policy. Plaintiffs identified several shortcomings with the policy at the time, but a number of those shortcomings have been resolved. *Compare* ECF No. 11, at 21–23, *with* Def.'s Ex. 10. Nevertheless, the policy still has shortcomings.

Indeed, Defendant's own expert, Dr. Dewsnup, admitted that the policy needs to be fixed. *See* Test. of Dr. Dewsnup. That admission is significant because Dr. Dewsnup is in charge of drafting FDC's policy. *Id.* That is, after this litigation ensued, FDC hired Dr. Dewsnup not only to serve as an expert witness for

purposes of the hearing before this Court, but also for purposes of guiding and advising FDC's policies and practices for treating HCV. *Id.* Accordingly, this Court finds that Defendant needs to update FDC's policy in light of the shortcomings identified by Dr. Dewsnup at the hearing.

### b. Mr. Reimers's Letter

On October 13, 2017, Mr. Reimers sent a letter on behalf of FDC to the CEO of Centurion (FDC's current medical contractor). Def.'s Ex. 20. The stated purpose of the letter "is to follow-up on a discussion" between Dr. Whalen (FDC's Chief Clinical Advisor) and Dr. Cherry (Centurion's medical director for FDC). *Id.* During that discussion, Dr. Whalen allegedly asked Dr. Cherry "to identify Priority 1 Level patients, and *some* Priority 2 patients, for HCV treatment in accordance with HSB 15.0.3.09 Supplement 3." *Id.* (emphasis added). Mr. Reimers's letter memorializes FDC's intent that those inmates, "once identified as appropriate for treatment, receive DAA medications during Fiscal Year 2017/2018." *Id.* The letter then continues:

> Going forward, we are requesting that you ensure that all patients diagnosed with HCV have been identified and properly prioritized in accordance with HSB 15.03.09 Supplement 3. It is our intent to provide treatment for thee inmates, once properly educated,

21

> screened, and evaluated as appropriate for treatment,
> in accordance with HSB 15.03.09. Supplement 3.

*Id.*

Ostensibly, the letter seem to be an attempt to moot this case.[18] It was drafted less than a week before this Court's hearing, and soon after it was written Defendant moved for a case management conference to discuss the fact that Plaintiffs had received the relief they wanted. *See* ECF No. 128. Whatever FDC's intended effect may have been, the letter does not moot this case.

Indeed, FDC's own expert, Dr. Dewsnup, testified that FDC should be treating many more inmates than what was promised in Mr. Reimers's letter.[19] *See* Test. of Dr. Dewsnup. Dr. Dewsnup also testified that FDC should be treating inmates at a faster rate than what was promised in Mr. Reimers's letter. *Id.* In fact, even if

---

[18] Mr. Reimers, of course, disagrees. According to him, the letter served "to make it clear what the expectations are for Centurion in the short term and in the long term what their requirements are as [FDC's] contractor to provide services for individuals with Hepatitis C." ECF No. 151, at 25.

[19] For instance, Mr. Reimers's letter says that only "some Priority 2 patients" will be treated. Dr. Dewsnup testified that all Priority 2 patients should be treated. *See* Test. of Dr. Dewsnup. In fact, Dr. Dewsnup testified that *more* than just Priority 2 patients should be treated. *Id.* The way FDC has currently worded its Priority 2 class means that even patients with F3 or F4 fibrosis scores might not get treatment under FDC's promise. *Compare* Def.'s Ex. 10, at 7 (requiring APRI score over 2 to qualify), *with* Def.'s Ex, 22, at 5 (explaining that APRI testing generally "lack[s] the power to exclude patients with advanced fibrosis to a statistically significant level").

FDC's promises *were* good enough, Dr. Dewsnup testified that FDC currently lacks the system capacity to be able to accomplish what it has promised. *Id.* Specifically, Dr. Dewsnup testified that FDC needs more practitioners to screen, evaluate, and treat inmates in a timely fashion. *Id.*

This Court agrees with Dr. Dewsnup's conclusions. Since the Kennedy 12 were first assembled in 2014, up to and including of this very litigation, FDC has been extremely slow to respond to the serious issue of treating HCV-infected inmates.[20] Even if FDC were excused for Corizon and Wexford's failures,[21] when Centurion came on board in mid-2016 Dr. Dewsnup specifically told Dr.

---

[20] Plaintiffs filed their complaint on May 11, 2017, and filed their motion for a preliminary injunction on May 23, 2017. Ordinarily, this Court would rule on a motion for a preliminary injunction based on sworn declarations or affidavits so as to resolve the matter as soon as possible. But Defendant wanted a four- or five-day hearing. ECF No. 37, at 2. So this Court set one for the end of August. ECF No. 53. But then Defendant informed this Court that she had not yet retained an expert and wanted to continue the scheduled hearing. ECF No. 59. This Court reluctantly granted a continuance, ECF No. 64, and then did so again due to Hurricane Irma, ECF No. 90. When this Court finally held the hearing on Plaintiffs' motion, it was revealed that Defendant did not hire her expert witness, Dr. Dewsnup, until sometime in August 2017. *See* Test. of Dr. Dewsnup. This delay is significant considering that Dr. Dewsnup is now redrafting FDC's policy and directing FDC how to move forward with treatment. One can only wonder how long Defendant would have kicked the can down the road had Plaintiffs not filed this case.

[21] Which it isn't. *See* Ancata, 769 F.2d at 705 ("The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. This duty is not absolved by contracting with an entity . . . ." (citation omitted)).

Cherry to develop a list of patients with HCV-inmates and to stage them appropriately. *See* Test. of Dr. Dewsnup. Over a year has passed, and the completion of the list and staging process has barely begun.[22] *Id.*

This Court has no doubt that without a court-ordered injunction, FDC is unlikely to treat inmates in a constitutionally appropriate manner. In fact, Defendant's own expert, Dr. Dewsnup, testified that an injunction is necessary for FDC to respond to this problem with the requisite alacrity. *See* Test. of Dr. Dewsnup. This Court finds Dr. Dewsnup's testimony to be credible, and accordingly finds that FDC must comply with the treatment directions and timelines Dr. Dewsnup identified at the hearing with some clarifications.

3. *Causation*

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." *Goebert*, 510 F.3d at 1327. As Secretary of FDC, Defendant is ultimately responsible for FDC's policies and practices. *See*

---

[22] FDC cannot hide behind the excuse that this is a difficult or lengthy process. Dr. Dewsnup testified that inmates with the most advanced liver disease could be quickly and simply identified based on what FDC already knows about their albumin levels and through further testing with proprietary indices. *See* Test. of Dr. Dewsnup.

§ 20.315(3), Fla. Stat. Accordingly, because Plaintiffs' claim is based on inadequacies in FDC's policies and implementation of those policies, the causation element has been satisfied. *Cf. Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[T]he causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights . . . ." (alteration in original) (internal quotation marks omitted)).

### 4. *Conclusion*

Plaintiffs have shown that the class suffers from chronic HCV and that chronic HCV is a serious medical need. Plaintiffs have also shown that Defendant has been deliberately indifferent to the class's serious medical needs. Moreover, Plaintiffs have shown a causal connection between Defendant's deliberate indifference and the class's injuries. Consequently, Plaintiffs have a substantial likelihood of success on the merits of their Eighth Amendment claim.

### B. <u>Whether an Injunction is Necessary to Prevent Irreparable Injury</u>

"[I]njunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'" *Thomas v.*

*Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). "In such circumstances, the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." *Id.* Here, FDC's history of past misconduct leads this Court to believe that future injury is imminent. Specifically, this Court finds that FDC will not treat HCV-infected inmates in an appropriate and timely manner.

If these inmates are not treated, they will undoubtedly suffer irreparable injury. Although DAAs can cure a person of HCV, they do not necessarily reduce the level of fibrosis a person has already suffered. ECF No. 138, at 64. Consequently, it is important to treat patients with HCV as soon as possible so that they can be cured of the virus before their liver becomes significantly diseased. Pls.' Ex. 28, at 11.

C. Whether the Threatened Injury Outweighs the Harm
   that an Injunction Would Cause to Defendant

The only harm facing FDC is that it will have to spend more money than it wants to.[23] Indeed, Defendant identifies no other

---

[23] Defendant argues that any funds required to be spent by FDC are funds taken from providing care to other inmates. ECF No. 31, at 21. But that is no excuse. FDC cannot use its constitutional duty to treat a certain group of inmates as a reason not to treat a different group. *See, e.g.*, *Williams v. Bennett*,

possible harm that could result in this case. *See* ECF No. 31, at 19–21. "The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants." *Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002). Contrarily, Plaintiffs and Plaintiffs' class face great injuries. The record is rife with evidence of the harmful consequences that result from untreated HCV. *See supra*, at 14–15. Accordingly, this Court finds that the threatened injury facing Plaintiffs and Plaintiffs' class outweighs any harm that the injunction would cause to Defendant.

     D. <u>Whether an Injunction is Adverse to the Public Interest</u>

Again, FDC only identifies the financial consequences it will suffer in discussing whether an injunction in this case would be adverse to the public interest. ECF No. 31, at 21–23. On the other hand, the public is undoubtedly interested in seeing that inmates' constitutional rights are not violated. *See, e.g.*, *Laube*, 234 F. Supp. 2d at 1252 ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated . . . .").

---

689 F.2d 1370, 1388 (11th Cir. 1982) ("If . . . a state chooses to operate a prison system, then each facility must be operated in a manner consistent with the constitution.").

Moreover, both parties' experts testified that treating HCV inside prisons may have great impacts on reducing the prevalence of HCV outside prisons. ECF No. 138, at 81; Test. of Dr. Dewsnup. So, if anything, it seems that an injunction in this case would actually *serve* the public interest. *Cf. Costello v. Wainwright*, 397 F. Supp. 20, 37 (M.D. Fla. 1976) ("[I]t seems clear to this Court that, in the long run, providing decent medical care and housing to inmates would serve to promote the rehabilitative goals of the criminal justice system so as to permit their re-entry into free society as upright and law abiding citizens and to prevent their re-entry into the criminal justice system."), *vacated in part on other grounds*, 539 F.2d 547 (5th Cir.), *rev'd*, 430 U.S. 325 (1977).

## III. <u>Conclusion</u>

"Preventable deaths from HCV are occurring within the prison system." Def.'s Ex. 22, at 1. Most of the witnesses who testified before this Court, and even Defendant's own expert, all but admitted that Defendant has been deliberately indifferent to Plaintiffs' (and the class's) serious medical needs.[24] Moreover,

---

[24] When asked whether the standard of care is currently being met by FDC given so few inmates have been evaluated to date, Dr, Dewsnup responded, "I don't believe it's being met at all. I think those numbers that you've just outlined, you know, on their face is a prima facie case that it's not being met." *See* Test. of Dr. Dewsnup.

FDC's promises and plan for the future are simply not good enough. Relying heavily on the testimony of Defendant's expert, Dr. Dewsnup, this Court finds that an injunction is necessary to ensure that Plaintiffs and the class receive timely and appropriate medical care in a manner that complies with the Constitution.

Accordingly, with limited exceptions, this Court is ordering Defendant to ensure that FDC complies with its own expert's recommendations. Specifically, FDC must update its HCV-treatment policy (HSB 15.03.09 Supplement #3) in line with the shortcomings noted by Dr. Dewsnup during the hearing before this Court so that there is a clear plan for doctors and practitioners to follow.[25] Moreover, FDC must formulate a plan to implement its policy by screening, evaluating, and treating inmates in line with the directions and timelines identified by Dr. Dewsnup during the hearing before this Court.[26] To the extent FDC does not have the

---

[25] Indeed, even Mr. Reimers testified that the reason he sent his letter was to make FDC's expectations clear. ECF No. 151, at 25. Similarly, Mr. Reimers had to make FDC's expectations clear when Corizon and Wexford weren't treating anyone. *Id.* at 40–43. Enough is enough. FDC needs to clear up the loosey-goosey language in its treatment policy so that it can no longer hide behind the consequences of its own obfuscations.

[26] As noted by Dr. Dewsnup during his testimony, this includes referring inmates for liver-transplant evaluation where necessary.

system capacity to meet these requirements, it must increase its capacity and outline a timetable for doing so.[27]

As to system capacity, Dr. Dewsnup testified that FDC will likely only be able to evaluate inmates at a rate of 100 per month. *See* Test. of Dr. Dewsnup. To the extent Dr. Dewsnup finds this rate acceptable, this Court disagrees. Dr. Dewsnup testified that, as long as otherwise eligible, inmates with decompensated cirrhosis should be treated immediately, inmates with cirrhosis should be treated within three to six months, and inmates with F2 and F3 fibrosis scores should be treated within a year. *Id.* Moreover, Dr. Dewsnup testified that the balance of the infected inmates, with F1 and F0 fibrosis scores, should continue to be monitored, including restaging labs every six months. This Court agrees with those timelines, and FDC needs to increase its system capacity to be able to satisfy them.[28]

---

[27] Dr. Dewsnup unequivocally stated that to gather the requisite information, screen the inmates, evaluate the inmates, and to begin treatments of the inmates to meet the appropriate standard of care will "require a massive expansion of system capacity." *See* Test. of Dr. Dewsnup. He made plain that a single infectious disease nurse, "Christine," could not update the spreadsheet being used to help prioritize the infected inmates and it would take more than one doctor, himself, to review the data with Dr. Cherry and make recommendations.

[28] Dr. Dewsnup agreed there are ways to speed this process. For example, Defendant could—and should—immediately send the blood of the 500 inmates with the lowest albumin levels for lab work and proprietary testing. *See* Test.

This Court recognizes that these directions are broad. To be clear, this was done at Defendant's request. During closing arguments before this Court, Defendant stated that she wishes to prepare a plan in light of this Court's directions. Accordingly, at this stage this Court is only providing overarching guidance of how it believes FDC should address HCV treatment going forward. This guidance is consistent with the opinions expressed by Dr. Dewsnup during his testimony before this Court. Defendant shall be permitted to provide a more specific plan, and this Court will consider Defendant's plan before entering a preliminary injunction. In so ruling, this Court notes that Defendant must move with "alacrity." This Court will not tolerate further foot dragging. If Defendant needs further direction from this Court with respect to what the proposed plan must contain then Defendant shall contact this Court no later than Monday, November 20, 2017, to schedule a telephonic hearing to be held no later than November 22, 2017. It was been represented to this Court at hearing that Defendant is already in the process of

---

of Dr. Dewsnup. Defendant needs to have a plan and a timetable to do the same for the other 6,500 inmates. This Court recognizes that the labs and proprietary testing costs approximately $400 per inmate but time is of the essence and the urgency is born of delays of the Defendant.

formulating and implementing such a plan. Stated otherwise, Defendant has already had time to refine its plan and marshal resources to address this problem.

Accordingly,

**IT IS ORDERED:**

1. Plaintiffs' motion for a preliminary injunction, ECF No. 11, is **GRANTED**.

2. No later than December 1, 2017, Defendant shall file a plan consistent with the directions this Court listed above. Defendant must include specific timetables. Once this Court issues its injunction, it will require Defendant to file updates to make sure such benchmarks are met.

**SO ORDERED on November 17, 2017.**

                          **s/Mark E. Walker**
                          **United States District Judge**