## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CARL HOFFER, et al.,**

> **Plaintiffs,**

**vs.**                                      **Case No.: 4:17-cv-214-MW/CAS**

**JULIE L. JONES,**

> **Defendant.**

_____/

## DEFENDANT'S MOTION TO CONVERT PRELIMINARY INJUNCTION TO A PERMANENT INJUNCTION AND FOR SUMMARY JUDGMENT

Defendant, Julie L. Jones, sued in her official capacity as the Secretary of the Florida Department of Corrections (FDC), moves this Court to convert the preliminary injunction D.E. 185, as re-issued D.E. 226, and as modified, D.E. Nos. 214, 218, 236, and 243, to a permanent injunction, and to issue a summary judgment.  In support, Defendant relies on the following:

## MEMORANDUM OF LAW

## I.  INTRODUCTION

In October 2017, this court held an evidentiary hearing on Plaintiffs' motion for preliminary injunction.  Among the issues before the court were whether, with regard to Plaintiffs' Eighth Amendment claim, Plaintiffs and the Plaintiff class

suffer from a serious medical need, and whether the FDC acted with deliberate indifference to that need.  During the hearing, FDC fully presented evidence through both testimony and documents, to oppose the Plaintiffs' claims.  However, on November 17, 2017, despite that opposition, this court granted the Plaintiffs' motion for a preliminary injunction (the "November 2017 Order), and on December 13, 2017, this court entered a Preliminary Injunction.  In its November 2017 Order, this court found in favor of the Plaintiffs on almost all issues presented.

At this point, Defendants move this court to convert the Preliminary Injunction to a Permanent Injunction, or to enter a Summary Judgment. .   As to the issues that this Court has already resolved in favor of the Plaintiffs, the FDC no longer wishes to contest them.  Hence, a further evidentiary hearing on those issues would not be of any benefit.   As to the few, limited issues for which this Court has not previously found in favor of the Plaintiffs,  a summary judgment should be rendered in favor of the Defendant.  Even if summary judgment  is denied, there will be a limited number of issues that this Court will need to resolve at a final hearing, which will greatly  limit the necessary discovery over the next

two (2) months, and will substantially reduce the amount of time necessary for the final hearing.[1]

Further discovery is not necessary to determine the rights and obligations of the parties.  Nonetheless, Plaintiffs have continued to pursue exhaustive discovery, including seeking a large volume of additional email production from FDC and Centurion of Florida, LLC ("Centurion"), FDC's health service vendor, in response to four requests for production of documents, and subpoenas.  Plaintiffs have also served Rule 30(b)(6), Fed. R. Civ. P., notices to FDC and Centurion, seeking testimony from the FDC on 71 separate topics, and from Centurion on 53 separate topics.   A significant number of these topics are Plaintffs' attempts to go back over factual issues that were previously testified to during depositions or at the October evidentiary hearing.  Moreover, these same topics are related to factual and legal issues that Defendant does not contest to this court.   Plaintiffs also continue to request updates to the extensive number of paragraphs in the four requests for production, and the several sets of interrogatory questions.

At this point, Defendant is seeking to focus its employee time and department resources"), on monitoring inmates with acute hepatitis C ("cHCV")

---

[1] And the parties have previously agreed that the evidence received at the hearing on the preliminary injunction is part of the trial record and need not be repeated at trial.  [Transcript of the November 1, 2017 hearing, pages 2-3]

who do not need immediate or short term treatment, and providing direct acting
anti-viral medication ("DAA") to those that need them.

The undisputed facts below are drawn largely from this Court's Findings of
Facts in the Order Granting Motion for Preliminary Injunction issued on November
17, 2017.  D.E. 153.  To the extent that additional or different facts are stated,
Defendant has provided updated or current information relating to the status of
efforts to monitor and treat inmates with chronic Hepatitis C.

## II.  STATEMENT OF UNDISPUTED FACTS
### 1.  Chronic Hepatitis C

HCV "is a viral infection, which is spread by exposure to blood or blood
products." Pls.' Ex. 28, at 3.[2] The most common way of contracting HCV is
through intravenous drug use, but a person can also get infected through tattooing
or blood transfusions. *Id*. "The principal consequence of [HCV] infection is
infection of the liver, which causes inflammation that in turn may result in scarring
of the liver (fibrosis)." *Id*.

1.    "Liver scarring can significantly impair liver function and damage its
crucial role in filtering toxins from the blood, as well as making proteins involved
in liver clotting and fighting infections." *Id.* Moreover, liver scarring places
patients "at risk of liver failure or liver cancer." *Id.*

---

[2] References to Exhibits herein are to the exhibits for the hearing on Plaintiffs'
Motion for Preliminary Injunction, unless otherwise stated.

2.      The amount of liver scarring a patient has is usually measured on the METAVIR scale. *Id.* at 7–8. On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis). D.E. 138 (testimony of Dr. Koziel), at 166.  The rate at which patients progress along this scale differs among the population. The following is a useful flowchart demonstrating this difference in progression:



Def.'s Ex. 1.

3.      As can be seen in the flowchart, about 20–50% of people infected with HCV spontaneously clear the virus within six months of infection. D.E. No. 138, at 58. The remaining 50–80% who don't clear the virus are referred to as having chronic hepatitis C ("cHCV"). *Id.*

4.      Among those with cHCV, about 30% of patients maintain a stable chronic infection, 40% suffer from slow fibrosis progression, and 30% suffer from rapid fibrosis progression. See D.E. 158 (Testimony of Dr. Dewsnup) at 55. Patients with a stable chronic infection usually only reach F1 (mild fibrosis) as long as they maintain other healthy habits such as abstaining from alcohol. *See Id.* at 55.  Patients with a slow fibrosis progression may take upwards of 20 years to reach F4 (cirrhosis). *Id.* Finally, patients with a rapid fibrosis progression may reach cirrhosis within as short a timeframe as one year. *Id.* at 65.

5.      The extent of liver scarring a patient has does not necessarily correlate with the symptoms they are suffering. For instance, "[s]omebody can be completely asymptomatic and present with cirrhosis." D.E 138, at 51. Nor do "symptoms have anything to do with what the risk is of liver failure." *Id.* at 113.

6.      Once a person reaches F4 (cirrhosis), they are further classified based on whether they are suffering from HCV-related symptoms/complications. A patient with cirrhosis and no related complications is referred to as having compensated cirrhosis. *Id.* at 49. A patient with cirrhosis that is accompanied with complications is referred to as having decompensated cirrhosis. *Id.* The distinction between these two groups is important because their survival rates are markedly different. Whereas the five-year survival rate for someone with compensated cirrhosis is 91%, the five-year survival rate for someone with decompensated

cirrhosis is only 50%. Pls.' Ex. 28, at 6–7. Once a person has decompensated cirrhosis "their liver has truly failed." D.E. No. 138, at 99. At that point, "the only true curative treatment is a liver transplant." Pls.' Ex. 28, at 11.

## 2. <u>Treatment of cHCV</u>

7.      Historically, cHCV has been "difficult to treat." Id. at 9. One old method of treatment involved the drugs Interferon and Ribavirin. D.E. 138, at 62–63. That treatment required weekly injections and could take as long as twelve months to complete. *Id*.; Pls.' Ex. 28, at 9. The side effects were "terrible." D.E. 138, at 62. Despite the terrible side effects, doctors still prescribed the treatment when patients had a high level of liver scarring because "the likelihood of getting to cure, which was still only about 30 percent, was better than those terrible side effects." *Id.*

8.      But in late 2013 a new class of drugs known as direct-acting antivirals ("DAAs") were released to market. *Id.* These DAAs proved to be "a revolution in medicine." *Id*. Treatment with DAAs consists of taking a pill once or twice a day. *See id*.; *see also* Pls.' Ex. 28, at 10. The treatment period with DAAs is only about twelve-weeks long. D.E. 138, at 64. Moreover, DAAs have "very few" side effects. *Id.* Most importantly, about 95% of patients who take DAAs are cured of HCV. *Id*.

9.      Unfortunately, this revolution in medicine came with a price. DAAs "are very expensive." *Id*. at 74. In September of 2016, a single course of treatment

with DAAs cost approximately $50,000 to $75,000. D.E. 151, at 34 (testimony of Tom Reimers). Even though prices have been going down as new DAAs are released, a single course of treatment may still cost as much as $37,000 or more. *Id.* at 45.

10.     Despite the high cost of DAAs, the present-day standard of care is to treat cHCV patients with DAAs as long as there are no contraindications or exceptional circumstances. It is inappropriate to only treat those with advanced levels of fibrosis. D.E. 138, at 66–67, 73; *see also* Test. of Dr. Dewsnup. The HCV Guidance—a resource developed by the American Association for the Study of Liver Diseases (AALSD) and the Infectious Diseases Society of America (IDSA)—recommends giving DAAs to any patient with chronic HCV (absent certain contraindications). *See* Pls.' Ex. 6.

11.     There has been no showing that delaying treatment with DAAs for inmates with fibrosis scores of F0 or F1, until they reach F2, will cause harm to those inmates so long as they are not co-infected with HIV.  Science shows that the first measurable risk of rapid progression to end stage liver disease begins when the patient reaches F2.  D.E. 185, Exh. B, p. 3.  Inmates with a fibrosis score of F2 will be prioritized for treatment within two (2) years of the determination that they have a fibrosis score of F2.  D.E. 185 & 214.

12.     Inmates who are coinfected with HCV and HIV should be treated with DAAs regardless of their fibrosis score.  D.E. 158, at 190; D.E. 138, at 111-112. These inmates should be treated with DAAs within a year of diagnosis, regardless of their fibrosis stage.  D.E. 217 p. 4.

### 3.  **The Named Plaintiffs**

13.     The named Plaintiffs in this case were Carl Hoffer, Ronald McPherson, and Roland Molina. Mr. Hoffer completed treatment with DAAs in November 2017.  D.E. 204-2, Par. 3.  However, he has died. D.E. 269-1, Par. 5. Mr. McPherson also completed treatment with DAAs, and was released from prison after that treatment. *Id.* at Par. 6.  Mr. Molina remains an inmate in FDC custody.  He completed treatment with DAAs and his post-testing indicates that he has achieved a sustained virologic response (SVR), which means that the cHCV virus is no longer detected in his blood.  *Id.* at Par. 76.  At one time, Mr. Hoffer suffered from decompensated cirrhosis, and Mr. Molina had compensated cirrhosis. D.E. 138, at 136–42.

14.     Mr. Hoffer likely had cirrhosis as early as 2012 and likely developed decompensated cirrhosis "around the midpoint of 2014." *Id*. at 136.

15.     The referral of inmates for liver transplant evaluation may involve the use of a MELD (Model for End Stage Liver Disease) score.  The MELD scoring system is used to measure illness severity for the allocation of livers to transplant

to adults.  Mr. Hoffer was referred for a liver transplant evaluation on January 10, 2018.  D.E. 204-2, Par. 13.  In the months prior to his referral, his MELD score varied from 16, based on October 31, 2017 laboratory work to 9, based on December 11, 2017 lab work.  The December 11th MELD score was calculated after he completed treatment for cHCV using DAAs.  However, based on laboratory specimens taken on January 9, 2018, it was determined that Mr. Hoffer's MELD score had reached 17, and he was referred to the Mayo Clinic's Transplant Center that very day.  *Id.* Par. 11-13.

16.    Mr. Molina likely had cirrhosis as early as 2013. D.E. 138, at 141.

17.    Both Mr. Hoffer and Mr. Molina complained about their lack of treatment with DAAs, without effect. See Pls.' Ex. 1; Pls.' Ex. 3.7.  Therefore, they initiated this lawsuit against the Secretary of FDC. D.E. 1. FDC began treating the named Plaintiffs with DAAs in Fall 2017.  D.E. 138, at 136–42.

## 4.  Contracted Health Care

18.     FDC uses private contractors to provide medical services to inmates. D.E. 151, at 5.  In 2013, those contractors were Corizon and Wexford.  *Id.*  Under FDC's contracts with Corizon and Wexford, there were two ways that doctors could obtain drugs.  Most drugs were listed on an FDC-approved list, referred to as the formulary.  *Id.* at 6.  Those drugs were readily available to doctors and were paid for directly by FDC.  Id.  Drugs not listed on the formulary had to be specially

requested.  See D.E. 179 (testimony of Dr. Maier), p. 25.  Specially requested drugs were paid for by Corizon or Wexford.  *Id.*

19.     When DAAs came out in late 2013, they were not included on the formulary.  D.E. 151, at 6-7.  The reason inmates weren't being treated with DAAs was because of a lack of funding. *See id.* at 40.

20.     By mid-2016, FDC had updated its HCV-treatment policy to acknowledge that prescribing DAAs was the standard of care. *See* Def.'s Ex. 8, at 6–7.  But again, the funding was not available to treat inmates who required DAAs.

21.     Eventually, Corizon and Wexford's contracts with FDC ended, and FDC began a new contract with Centurion. *Id.* at 7. But the change in contractor did not come with an immediate change in how inmates with cHCV were treated. As of November 1, 2017, only 13 inmates had been treated with DAAs. *Id. at* 47– 48; see also Pls.' Ex. 11.

22.     On November 17, 2017, an Order Granting Motion for Preliminary Injunction was issued.  The Order set out the guidelines for a Preliminary Injunction which would follow.   D.E. 153.  On December 13, 2017, after affording Defendant the opportunity to provide a plan of complying with the Order Granting Motion for Preliminary Injunction and affording the Parties an opportunity to comment on the plan, the Court issued an Order Entering a Preliminary Injunction (Order).  D.E. 185.

23.     The Order requires that FDC report on a number of metrics, most of which are designed to measure compliance with the Order.  Relevant to this motion, as of March 20, 2018, FDC had identified 5,119 inmates who have cHCV. A total of 3,701 inmates have been staged to determine the extent of their liver fibrosis.  As many as 156 inmates have refused staging.  D.E. 269-2, Par. 6.

24.     As of March 20, 2018, 1,169 inmates had been both staged and evaluated for potential treatment with DAAs.  The evaluation process involves reviewing such things as their release date, other medical history, and contraindications.   Of those inmates who were both staged and evaluated, 938 inmates have a fibrosis score of F4, 161 inmates have a fibrosis score of F3, 48 inmates have a fibrosis score of F2, 10 have a fibrosis score of F1, and 12 have a fibrosis score of F0.  Fifty-eight inmates have decompensated cirrhosis.  *Id.* at Par. 7.  Significantly, 759 inmates were being treated with DAAs, as of March 20, 2018; 75 inmates have completed treatment with DAAs.  Twenty (20) inmates have refused treatment.  However, there is still a great deal of work to be done both in terms of monitoring inmates with HCV, and providing DAA treatment for inmates with fibrosis scores of F2, F3 and F4.  *Id.* at Par. 8.

**5.  Monitoring**

25.  Defendant, through Centurion, continues to evaluate inmates known to have cHCV so that all inmates covered by the Court's December 13, 2017, Order

who have a fibrosis score of F4 are evaluated by April 30, 2018; all such inmates with a fibrosis score of F3 are evaluated by September 30, 2018; and all such inmates with fibrosis score of F2 are evaluated by September 30, 2019.  D.E. 269-1, Par. 8.

25.     Inmates known or determined to have cHCV are enrolled in the Gastrointestinal Clinic ("GC") where their monitoring and evaluation includes an examination every six months.  These inmates will receive proprietary indices and/or elastography every six months, and they will receive an abdominal ultrasound every six months if they are at fibrosis stages 2-4. D.E. 175, Exh. A, pp. 6-8. For those who are at fibrosis stages 0-1, they will receive an examination every six to twelve months in the GC; laboratory testing every six months; and the proprietary indices and/or elastography every 12 months. *Id.*

26.     Moreover, all those inmates known or determined to have cHCV receive counseling regarding the disease, including the staging of treatment with DAAs, and the availability of peer-to-peer counseling. D.E. 175, Exh. A, page 8.

27.     As of March 20, 2018, Centurion has tested 21,021 inmates for cHCV.  This number includes 2,330 inmates who were tested more than once. D.E. 269-2, Par. 5.

## III.  LEGAL ARGUMENT

## 1.  Standard for Summary Judgment

Summary judgment is appropriate when there is no genuine dispute of material fact.  The burden is on the movant to demonstrate that there is no genuine dispute of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Dewit v. UPS Ground Freight, Inc.*, 1:16CV36-MW/CAS, 2017 WL 4875721, at *1 (N.D. Fla. Aug. 2, 2017) A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248; *Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365, 1368 (N.D. Fla. 2015).  "'Material' facts are those that might affect the outcome of the case under the governing substantive law."  *Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365, 1368, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.  "The purpose of Rule 56 is to avoid the expenditure of judicial time and to avoid trials when the facts are not in dispute insofar as they are material to the lawsuit." *Klinge v. Lutheran Charities Ass'n of St. Louis*, 523 F.2d 56, 61 (8th Cir. 1975).

## 2.  Converting a Preliminary Injunction to a Permanent Injunction

It is appropriate to convert a preliminary injunction to a permanent injunction, even when one party opposes the request, if there is no triable issue of fact.  *Citibank (S. Dakota) N.A. v. Nat'l Arbitration Council, Inc.*, No. 304CV1076J32MCR, 2006 WL 2691528, at *4 (M.D. Fla. Sept. 19, 2006); *U.S. v.*

*McGee*, 714 F.2d 607 (6th Cir. 1983).  While normally an evidentiary hearing is required before an injunction may be issued, such a hearing is not necessary if no triable issues of fact are involved.  *McGee*, 714 F.2d at 613.  A request to convert a preliminary injunction to a permanent injunction may be brought before the Court on a motion for summary judgment.  *U.S. v. Prater*, No. 8:02-CV-20520T-23MSS, 2005 WL 2715401 (M.D. Fla. Sept. 23, 2005); *U.S. v. Fifty Below Sales & Marketing*, No. 06-1112 ADM/RLE, 2007 WL 3313147 (D. Minn. Nov. 5, 2007); *Backpage.com LLC v. Cooper*, No. 3:12-cv-00654, 2013 WL 1249063 (M.D. Tenn. Mar 27, 2013).

Procedurally, on the filing of a motion seeking to convert a preliminary injunction to a permanent injunction, some courts have issued an order to show cause, giving the opposing party an opportunity to show cause why a further evidentiary hearing is required.  *U.S. v. McGee*, 714 F.2d 607; *U.S. v. Welti*, No. C-1-02-243, 2003 WL 21770852 (S.D. Ohio Jun. 10, 2003).

As discussed further above and below, since there are no issues of material fact remaining, summary judgment should be issued as outlined below, and the preliminary injunction as modified by subsequent court orders, D.E. Nos. 214, 218, 236, and 243, should be converted to a permanent injunction.  No further evidentiary hearing is required prior to issuance of the permanent injunction.

Importantly, it is provided in 18 U.S.C. § 3626(2) that in any civil action with respect to prison conditions in which the court enters an order for preliminary injunctive relief, the preliminary injunctive relief shall automatically expire 90 days after its entry, unless the court makes certain findings and makes the order final. By granting the instant motion, this Court can make final the order granting preliminary injunctive relief.

**3.  Standard for Permanent Injunction**

To obtain permanent injunctive relief, Plaintiffs must demonstrate actual success on the merits, that there is no adequate legal remedy for the violation of the right, that irreparable injury will result if the injunction does not issue, and that the injunction is not against the public interest. *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir. 2010).

**A.   Actual Success on the Merits**

**(1).  Eighth Amendment Claims**

As this Court has stated:

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on convicts. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). The Supreme Court has interpreted this prohibition to encompass "deprivations ... not specifically part of [a] sentence but ... suffered during imprisonment." Id. at 297. Accordingly, an inmate who suffers "deliberate indifference" to his "serious medical needs" may state a claim for a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

D.E. 153 at p. 13.

### (a). Serious Medical Need

Regarding whether the Plaintiffs and Plaintiff class have a serious medical

need, the Court has stated:

> Plaintiffs (by diagnosis) and Plaintiffs' class (by definition) all suffer
> from chronic HCV. As a consequence, Plaintiffs and Plaintiffs' class
> are faced with substantial risks of serious harm, including, but not
> limited to, bleeding from any site in the body, accumulation of fluid in
> the legs or abdomen, life-threatening infections, significant pain or
> discomfort, organ failure, liver cancer, and death. See Pls.' Ex. 28, at
> 3–4. Accordingly, it is not surprising that Plaintiffs' expert describes
> HCV as "a serious medical need." Id. at 4. Nor should it be surprising
> that this Court finds chronic HCV to be a serious medical need.

*Id.* pg. 15.  While the actual risk of experiencing the type of harm referenced by the

Court becomes measurable and increases once one has a fibrosis score of F2 or

higher (unless the inmate is co-infected) the Court has concluded that cHCV

constitutes a serious medical need.  Defendant does not dispute this.  Only two

areas of dispute remain:  (1) whether for inmates with fibrosis scores of F0 (no

fibrosis) and F1 (mild fibrosis), the Eighth Amendment standards require only

monitoring with appropriate and timely lab work as adequate treatment for cHCV;[3]

and (2) whether the use of "opt in" testing for cHCV violates Eighth Amendment

standards.

---

[3] This first concern applies to inmates who do not otherwise fall within the Priority
Levels 1 and 2 as stated in HSB 15.03.09 Supplement #3, D.E. 175-2.

As discussed further below, the Eighth Amendment does not require treatment of inmates with cHCV and fibrosis scores of F0 and F1 using DAAs and the Eighth Amendment does not require FDC to initiate "opt out" testing for HCV.

### (b).  The Deliberate Indifference Standard of Review

Regarding the deliberate indifference standard, this Court has previously summarized the legal standard, and found in favor of the Plaintiffs.  See D.E. 153 at pp. 16-17.  Defendant incorporates that finding herein.

This Court has found that the failure to treat inmates with cHCV was due to lack of funding.  *Id.* at 17-18.  Defendant does not contest the court's finding. However, regarding inmates who have a fibrosis score of F2, even the State of Oregon, where Dr. Dewsnup oversees treatment of inmates with cHCV, has only just begun to treat inmates with a fibrosis score of F2 in January 2018.  D.E. 158 at pp. 73-74 & 200-201.  Given the status of the law regarding treatment of cHCV, Defendant can hardly be faulted for not treating inmates with fibrosis scores of F2 sooner.  Nonetheless, Defendant agrees that inmates with fibrosis scores F2 should receive treatment.

### (c).  The Deliberate Indifference Standard and F0 and F1

Inmates with fibrosis scores of F0 and F1 are another matter.  While Plaintiffs point to the HCV Guidance:  Recommendations for Testing, Managing, and Treating Hepatitis C, developed by the American Association for The Study of

Liver Diseases and the Infectious Diseases Society of America, which recommends

that all individuals with cHCV (with a few exceptions) be treated with DAAs,

neither that document nor any other evidence presented suggests that individuals

with fibrosis scores of F0 and F1 suffer any increased risk of harm by virtue of

having to wait for DAA treatment until they have a fibrosis score of F2 (unless

they are co-infected or meet other criteria set forth in the HSB 15.03.09

Supplement #3, D.E. 175-2, in which event they are treated sooner).  The risk for

rapid progression to end stage liver disease does not become measurable for

inmates with fibrosis scores of F0 and F1 until the patient reaches F2.  D.E. 185 p.

20.[4]  As noted above, the deliberate indifference standard under the Eight

---

[4] The Hepatitis C Virus Infection Management Plan adopted by the Court with some revisions, states:

> The rapid accumulation of data since 2013 regarding hepatic fibrosis and progression to end stage liver disease (decompensated cirrhosis and hepatocellular carcinoma or primary liver cancer) has indicated that **the risk for rapid progression within one year begins to be measurable when the patient reaches F2**. There is an ~0.5% and ~1.0% one year risk of progressing to hepatocellular carcinoma and decompensated cirrhosis, respectively, once the patient can be staged as F2 (Whether this is due to underestimation of the actual stage with present staging methods or represents very rapid progression of hepatic fibrosis is unknown). The best data continues to indicate that risks of progression in one year to hepatocellular carcinoma or decompensated cirrhosis.in the patient with F3 and F4 fibrosis is 1%, 2% or 1.5-2%, 4%, respectively.

D.E. 185 p. 20 (emphasis added).

Amendment is not the same as a negligence standard.  Courts have described Plaintiffs' burden to show deliberate indifference in various ways.  One court described the need for proof of "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need <u>and</u> (b) harm caused by the indifference." *King v. Calderwood*, 2016 WL 4771065 *5 (D. Nev. 2016) (emphasis added). Another required a showing that "Plaintiff's health is at serious risk due to the lack of treatment which is medically necessary."  *Shabazz v. Schofield*, No. 3:13-0091, 2015 WL 5036919 *2 (M.D. Tenn. Aug. 26, 2015), report and recommendation approved, 2016 WL 540727 (M.D. Tenn. Feb. 11, 2016).  In *Bernier v. Obama*, 201 F. Supp. 3d 87, 89-91 (D.D.C. 2016), the Court stated:  "Plaintiff must allege 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs,'" *citing to Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  In the qualified immunity context, the Eleventh Circuit has required that the actions or omissions of Defendants actually cause harm to the inmate.  *See, e.g., Gilmore v. Hodges*, 738 F.3d 266, 276 (11th Cir. 2013) (finding that evidence sufficient to show that officers acted with deliberate indifference to inmate's medical need, and their actions harmed the inmate).

For the most part, those cases where a potential violation has been found by courts include inmates with fibrosis scores of F2 or higher, or the presence of other signs or symptoms suggesting more significant liver damage.  *Abu-Jamal v.*

*Wetzel,* No. 3:16-CV-2000, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017) (testimony that Plaintiffs is likely to have a Metavir score of F2 or 2.5); *Allah v. Thomas*, 2016 WL 3258422, at *5 (E.D. Pa. 2016), *affirmed in part, vacated in part, remanded in part*, 679 Fed.Appx. 216 (3d Cir. 2017) (inmate sought new Hepatitis C treatment based on allegations that his liver was deteriorating, he was having pain in his liver area, he was feeling tired all the time, and he was experiencing yellowing of the skin).

In fact, it is only very recently that courts have found that the Eighth Amendment applies to claims for DAAs by inmates with a fibrosis score of F2. *See, e.g., Bernier v. Obama*, 201 F.Supp. 3d 87 (D.D.C. 2016) (finding that federal Bureau of Prisons prioritization of inmates for DAA treatment did not violate Plaintiff's Eighth Amendment rights, where Plaintiff had Stage 2 fibrosis and was assigned a priority 3 ranking); *Binford v. Kenney*, No. 4:14-cv-5103-SAB, 2015 WL 6680272 (E.D. Wash. Nov. 2, 2015) (court found no Eighth Amendment claim for inmate with a fibrosis score of F2, who had previously been treated with interferon unsuccessfully, but sought treatment with DAAs); *Taylor v. Rubenstein*, No. 3:15-CV-120 (GROH) ,2016 WL 7912800 (N.D. W.V. Dec. 1, 2016), report and recommendation adopted, 2017 WL 282420 (Jan. 20, 2017) (finding no Eighth Amendment violation for not providing Hepatitis C treatment to inmates with stage 2 fibrosis),

In contrast, other cases, involving asymptomatic conditions or fibrosis scores lower than F2 have resulted in a finding of no liability. *Smith v. Corizon, Inc.*, No. JFM-15-743, 2015 WL 9274915 (D. Md. Dec. 17, 2015) (medical records showed inmate was essentially asymptomatic except for occasional reports of abdominal discomfort); *Hankins v. Russell*, 4:15CV697, 2016 WL 5689892 (E.D. Mo. Oct. 3, 2016) (all tests indicated stage 1 fibrosis and liver within normal limits); *Shabazz v. Schofield*, No. 3:13–0091, 2015 WL 5036969 (M.D. Tenn. Aug. 26, 2015) (inmate's liver enzyme levels indicate that his liver is functioning as it should and in the same range as persons that do not have Hepatitis C).

While the "standard of care" may r*ecommend* that Hepatitis C should be treated in all persons with the diagnosis, that does not mean that treatment of only inmates who have a fibrosis score of F2 or higher will result in harm or serious risk of harm under the Eighth Amendment. And to require treatment of inmates who have a fibrosis score of F0 (no fibrosis) is wholly inconsistent with the requirements of the Eighth Amendment. To provide that the Eighth Amendment mandates treatment of inmates who may be completely asymptomatic and who have no fibrosis would convert the Eighth Amendment from a prohibition against cruel and unusual punishment, to a vehicle to obtain drugs and treatment of choice. This is particularly inappropriate when the evidence currently available does not

show any measurable higher risk of death for individuals with fibrosis levels of F0 or F1.  See Deposition of Dr. Dewsnup at p. 130.

And, in several cases, the courts have found that monitoring of the type that has been ordered by this court on preliminary injunction, is sufficient "treatment" for individuals with HCV who have fibrosis scores of F0 or F1.  *See, e.g., Bernier v. Obama*, 201 F.Supp. 3d 87 (D.D.C. 2016) (finding no deliberate indifference in Federal Bureau of Prison's decision that Plaintiff, who had a fibrosis score of F2 and an APRI score of 1.5 to less than 2, was not eligible for  priority treatment with Harvoni, but prison monitored Plaintiff's condition for any changes); *Smith v. Corizon, Inc.*, No. CV JFM-15-743, 2015 WL 9274915 (D. Md. Dec. 17, 2015) (noting that inmate who was "essentially asymptomatic" was repeatedly seen by prison nurses, P.A.s, and physicians for his chronic conditions, including HCV); *King v. Calderwood*, No. 16-91-HRW2016 WL 4771065 (D. Nev. 2016), *aff'd sub nom. King v. Cox*, 692 Fed. Appx. 398 (9th Cir. 2017) (noting that inmate was enrolled in a Chronic Disease Clinic where his APRI and liver function levels were monitored every six months); *Hankins v. Russell,* 4:15CV697 HEA, 2016 WL 5689892 *(E.D. Mo. 2016) (noting that Plaintiff "is closely monitored and it is clear that Defendants will take necessary action if Plaintiff's condition worsens to the point that Hepatitis C therapy is needed"); *Fitch v. Blades,* No. 1:15-cv-00162-BLW-CWD, 2016 WL 8118092 (D. Idaho Oct. 27, 2016) (finding that inmate who

was monitored regularly in a chronic care clinic and was prioritized like all other HCV patients, did not demonstrate deliberate indifference); *Taylor v. Rubenstein*, No. 3:15-CV-120 (GROH) ,2016 WL 7912800 (N.D. W.V. Dec. 1, 2016), *report and recommendation adopted*, 2017 WL 282420 (Jan. 20, 2017) (finding no Eighth Amendment violation where Plaintiff's bloodwork was slightly elevated but stable, Plaintiff had stage II fibrosis, and Plaintiff was monitored every six months).

For all of the foregoing reasons, the Court should find that members of the Plaintiff class with fibrosis scores of F0 or F1 have failed to demonstrate a serious risk of harm if they must wait unless and until they have a fibrosis score of F2 before being treated with DAAs, so long as they are being monitored consistent with the FDC policy as modified by the Court.  This conclusion is reinforced by the testimony of Plaintiffs' own expert witness, who when pressed by the Court, conceded that:

> I really don't have pushback on the F3s and F4s since the time they came out, because everybody recognizes that those are the people you can cannot delay on. Earlier stages, I do try to reassure people, I'm going to keep careful tabs on you, I'm not going to let you get to that point, I'm really going to continue to work with you to try to get you treatment. . .

D.E. 138, p. 92.

For all of the foregoing reasons, the Court should find that the deliberate indifference standard is not met for individuals with fibrosis scores of F0 and F1,

so long as they are being monitored consistent with the Court's Preliminary Injunction, they are not co-infected with hepatitis B or HIV, and their condition has not changed such that their fibrosis score is F2 or greater.

### (d).  The Deliberate Indifference Standard and "opt out" testing

Plaintiffs have cited to no legal authority in this proceeding for the proposition that the decision to use "opt in" as opposed to "opt out" testing somehow amounts to deliberate indifference to a serious medical need.  And no Plaintiff testified that he had any difficulty securing testing to determine whether he had HCV.  For these reasons, Plaintiffs' claim regarding "opt out" testing should be dismissed.

Several courts have found no Eighth Amendment violation for failing to test for contagious diseases like HIV and Hepatitis, when there was merely a risk that an inmate might have HIV or Hepatitis.  *See, e.g., Myers v. Maryland Div. of Corrections*, 782 F.Supp. 1095 (D. Maryland 1992) (finding no Eighth Amendment violation to the extent that the Maryland DOC provided testing for HIV on request); *Haynes v. Williams*, 4:16CV00812-BSM-JJV, 2017 WL 1903156, at *3 (E.D. Ark. Feb. 14, 2017), report and recommendation adopted, 4:16-CV-00812 BSM, 2017 WL 1903113 (E.D. Ark. May 9, 2017) (finding no Eighth Amendment violation where Plaintiff inmate got a letter saying he should

be tested for Hepatitis as soon as possible because it was a "high risk," but he was not tested); *Feigley v. Fulcomer,* 720 F.Supp. 475, 478 (M.D. Pa. 1989) (finding no deliberate indifference to a serious medical need due to a failure to test inmates routinely for HIV, when inmate claimed the mere "possibility that he may contract a fatal disease from a fellow inmate or prison employee"); *Doe v. Wigginton*, 21 F.3d 733, 738–39 (6th Cir. 1994) (finding no deliberate indifference to a serious medical need in the absence of a showing that there was a strong likelihood that the prisoner was inflicted with a serious illness, in this instance HIV; in this case, the FDC policy provided for testing for HIV if there was a presumptive history of exposure to the disease); *Jordan v. Caffey*, No. CV 15-0594-PHX-DGC, 2015 WL 2345849, at \*4 (D. Ariz. May 15, 2015) (no deliberate indifference where inmate requested and was denied a blood test for hepatitis or HIV, but he did not identify why he believed he needed such a test and did not allege a heightened risk of exposure to either disease); and *Fear v. CDCR Employees at San Quentin*, 3:14-CV-05473-LB, 2015 WL 2395871, at \*5 (N.D. Cal. May 19, 2015) (no Eighth Amendment violation for failing to perform HIV testing, where test was ordered but not performed.

In an Eleventh Circuit case that dealt with mandatory testing for HIV, albeit in the context of a privacy claim, the Court recognized that there are two different approaches to screening for contagious diseases like HIV:

> 1. mass screening, segregation of seropositives who pose behavioral risks, notification to correctional staff, and education on AIDS; or
>
> 2. focusing prevention efforts on mandatory AIDS education and intensive efforts to identify and control predatory inmates and those engaging in high-risk behavior (without mass HIV screening), together with strict confidentiality of medical information.

*Harris v. Thigpen*, 941 F.2d 1495, 1516 (11th Cir. 1991).  The first approach dealt with mandatory screening, while the second dealt with voluntary screening and education without segregation of inmates.  While the Court found that mandatory screening did not violate a right to privacy, it did not decide that either approach was necessarily better than the other.  On balance, Defendant has opted for a voluntary testing approach.  Consistent with the policy that has been adopted by the Court, Defendant also provides training and education on cHCV to inmates.  Nothing about this approach violates the Eighth Amendment.

And FDC's policy regarding testing allows testing at a number of different points in the process.  D.E. 158, pp. 43-46.  Also, of significance to the Eighth Amendment claim relating to testing, no Plaintiff alleges that the opt in method of testing for HCV resulted in a denial or delay in the determination that he had cHCV.

For all of these reasons, Defendant does not contest that they are entitled to treatment with DAAs, to the extent that the class members have fibrosis scores of F2 and higher or are co-infected with HIV or other specified conditions. Similarly,

Defendants do not contest Plaintiff's claims that Defendant was not adequately monitoring all inmates with cHCV prior to the preliminary injunction.  Defendant further does not contest Plaintiffs claim that inmates with cHCV with decompensated cirrhosis should be referred to a Transplant Center for evaluation. However, Plaintiffs have not demonstrated success on the merits with respect to their Eighth Amendment claims that inmates with fibrosis scores of F0 and F1 must be treated with DAAs or that all inmates should have opt out testing for HCV.

### (2).  ADA and Rehabilitation Act claims

While a claim that Defendant has refused to treat Plaintiffs' disabilities may be actionable under the Americans with Disabilities Act, depending on the allegations, *see Stafford v. Wexford of Indiana, LLC,* No. 1:17-cv-00289-JMS-MJD, 2017 WL 4517506 (S.D. Ind. Oct. 10, 2017), Plaintiffs have not demonstrated success on the merits as it relates to their ADA claim that inmates with fibrosis scores of F0 and F1 are entitled to treatment with DAAs.

To prove a violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., as to all of the plaintiff class, Plaintiffs must show:  (1) that each is a qualified individual with a disability; (2) that each has been excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated by the entity, by reason of the

disability. *Schiavo ex rel. Schindler v. Shiavo*, 403 F.3d 1289, 1298 (11th Cir. 2005) (*citing Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir.2001)).  Title II defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications ..., meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Flournoy v. Culver*, 534 Fed. Appx. 848, 852 (11th Cir. 2013); 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases, so courts address both claims together. *See e.g.*, *Gervarzes v. City of Port Orange*, No. 6:12-cv-1126-Orl-37DAB, 2013 WL 610456 (Feb. 19, 2013).  The ADA and the Rehabilitation Act are ``similar in substance'' and, with the exception of the Rehabilitation Act's federal funding requirement, ``cases interpreting either are applicable and interchangeable." *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998); *Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir.2000) ("Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases.").

A disability is a physical or mental impairment that substantially limits one or more major life activities, or having a record of such an impairment, or being regarded as having such an impairment. *Flournoy v. Culver*, 534 Fed. Appx. 848, 852 (11th Cir. 2013); 42 U.S.C. § 12102(1).

A "physical impairment" means "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."  29 C.F.R. § 1630.2(h)(1).

> "Major life activities" include, but are not limited to:
>
> (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and
>
> (ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

29 C.F.R. § 1630.2(i).

"An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section."

29 C.F.R. § 1630.2.

Plaintiffs cannot prove that class members with cHCV and fibrosis levels of F0 or F1 have a disability which substantially limits a major life activity. "Whether Hepatitis C is a disability within the meaning of the ADA depends upon how that impairment affects a specific plaintiff in a particular case." *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 305 (S.D.N.Y. 2003) (citing *Quick v. Tripp, Scott, Conklin & Smith, P.A.,* 43 F.Supp.2d 1357, 1367. (S.D.Fla.1999). And,

> This "individualized inquiry" conforms with both the standard set forth by the Supreme Court, . . . as well as with common sense because, although Hepatitis C is a serious illness, some people are more badly affected than others. Thus, the relevant question is not whether Hepatitis C ordinarily limits the reproductive and sexual activities of those infected with the virus. Instead, a court must focus on whether the plaintiff has produced evidence that he suffers from such limitations. If the plaintiff fails to meet that evidentiary burden, his Hepatitis C will not be considered a disability under the ADA, regardless of whatever medical generalizations can be made about the harms often associated with that condition.

*Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d at 305. Thus, for each inmate with cHCV and a fibrosis score of F0 or F1, an individualized inquiry is needed to determine how cHCV affects them. This cannot be done in gross, as Plaintiffs propose in this class action. For example, an inmate with a fibrosis score of F0 (meaning no fibrosis), may not have <u>any</u> adverse impact on bodily functions or other major life activities. Given the lack of individualized evidence of how

Plaintiff class members with fibrosis scores of F1 or F0 are affected by their cHCV, Plaintiffs' class claims predicated on failure to treat with DAAs under the ADA must be dismissed as to those individuals with fibrosis scores of F1 or F2.

In light of the foregoing, Plaintiffs' ADA claims involving class members with fibrosis scores of F0 and F1, who claim an entitlement to treatment with DAAs should be dismissed without prejudice to them pursuing those claims in separate suits, where they would offer individualized evidence of how their cHCV affects them.  For the same reason, Plaintiffs' Rehabilitation Act claims should be dismissed without prejudice.

### B.  Remaining Prerequisites for Class Relief

As to those claims described above for which Plaintiffs have demonstrated success on the merits, Defendant does not contest that the other requirements for issuance of a permanent injunction are met.  For those claims where Plaintiffs have not demonstrated a success on the merits, it is unnecessary to discuss the remaining requirements for injunctive relief.

## IV.  CONCLUSION

For the foregoing reasons, the Court should issue an order converting the existing preliminary injunction to a permanent injunction, dismiss with prejudice Plaintiffs' claims regarding opt out testing, and dismiss without prejudice the

claims that members of the Plaintiff class who have fibrosis scores of F1 or F0 are entitled to DAA treatment.

## CERTIFICATE OF WORD LIMITATION

In accordance with N.D. Fla. Loc. R. 7.1(F), the number of words in the memorandum, which excludes the case style, signature block, and certificates (conference, word limitation, and service) is 7484.

*/s/ Albert J. Bowden*
Albert J. Bowden

Respectfully submitted,

**PAMELA JO BONDI**
**ATTORNEY GENERAL**

*/s/ Albert J. Bowden*
Albert J. Bowden
Special Counsel
Florida Bar No.: 802190
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida  32399-1050
(850) 414-3300, Ext. 4716
(850) 488-4872 (Fax)
al.bowden@myfloridalegal.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been electronically

served by the Court's CM/ECF systems on counsel for this 8th day of May 2018.

/s/ *Albert J. Bowden*
Albert J. Bowden