## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

CARL HOFFER,                        )
RONALD MCPHERSON, and               )
ROLAND MOLINA,                      )
individually and on behalf          )
of a Class of persons               )
similarly situated,                 )
                                    )
    Plaintiffs,              )
                                    )
v.                                  )   Case No.  4:17-cv-00214-MW/CAS
                                    )
JULIE L. JONES, in her              )
official capacity as Secretary of the )
Florida Department Corrections,     )
                                    )
    Defendant.               )
_____ )

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Carl Hoffer, Roland Molina, and Ronald McPherson, for themselves and on behalf of the class they represent, hereby move for summary judgment.  The facts, as established at the preliminary injunction hearing, found by the Court, conceded by Defendant, and exposed through further discovery, clearly demonstrate that the Florida Department of Corrections (FDC) has been deliberately indifferent to the serious medical needs of Florida prisoners with the hepatitis C virus (HCV), in violation of the Eighth Amendment.  The evidence also shows that Defendant has violated these prisoners' rights under the Americans with Disabilities Act (ADA)

and the Rehabilitation Act (RA).  There is no genuine dispute of material fact, and judgment should issue as a matter of law.

The Court has already entered preliminary injunctive relief, finding that Plaintiffs were likely to succeed on the merits of their Eighth Amendment claim. Defendant has conceded all of the issues on which the Court made findings in the preliminary injunction order and has requested that the injunction currently in place be made permanent and a final judgment be entered against the Department. Plaintiffs agree that a permanent injunction should be entered against Defendant; however, there are a number of issues that are still in dispute, and several forms of relief that Plaintiffs are requesting that are not currently required by the preliminary injunction.

Finally, several facts have emerged through discovery that were unknown at the time of the preliminary hearing and are necessary for a full understanding of how the FDC has approached HCV over the years, and may therefore affect the types of relief that may be necessary to prevent future violations.  In fact, in several respects, FDC misrepresented several key facts to Plaintiffs and this Court.  In order to correct the record and provide important context, Plaintiffs provide a full recitation of the facts below.[1]

---

[1] Plaintiffs believe the record supports summary judgment at this point, but as discovery is ongoing, they reserve the right to supplement the record should relevant information come to light. Moreover, a Timeline of Events (ECF 340-32) is attached to assist the Court.

# I. Statement of Facts

Plaintiffs adopt all the Court's factual findings, ECF 153, and paragraphs 1 through 22 of Defendant's statement of facts, for purposes of this Motion, with the following additions noted below.  ECF 270 at 4-11.

## A.    FDC's History of Failing to Treat HCV

### 1.    High-Level FDC Officials Were Aware of the Importance of DAAs

High-level FDC officials[2] responsible for health services knew about direct-acting antivirals (DAAs) when the FDA first approved the medications in 2013.  *See* E1145, E14761-14803 (ECF 340-12). In fact, on December 9, 2013, Dr. Ogunsanwo received an email announcing the approval of Sovaldi, and forwarded it to Whitfield, Do, and Reimers, as well as Corizon and Wexford executives, saying "Here we go again with these expensive Hep C meds!!"  E 38581 (ECF 340-12).  Reimers, Whalen, and Do all testified that they became aware of DAAs in late 2013 or early 2014.[3]  **Reimers Hrg. Tr. (10/20/17) at 9:15-18** (ECF 340-22); Whalen Hrg. Tr. at

---

[2] Tom Reimers was Director of Health Services Administration from 2011 to 2016, then became Director of Health Services.  Reimers Dep. at 9:24 - 10:24 (ECF 340-10).  He is the top health care official for the FDC.  Dr. Timothy Whalen was Region 2 medical director for Corizon from June 2014 to January 2016, when he was hired by FDC as the Director of Medical Services, and eventually became Chief Clinical Advisor.  Whalen Hrg. Tr. 87:25 – 99:7 (ECF 340-21).  He is the final clinical authority for the FDC. Dr. Olugbenga Ogunsanwo was Assistant Secretary for Health Services from 2011 to 2016. Ogunsanwo Dep. at 13:4-25 - 14:19 (ECF 340-8). Dr. Long Do was Director of Medical Services from 2013 to December 2015. Do Dep. at 15:6-22 (ECF 340-7). Stephen Whitfield has been the FDC's Pharmaceutical Services Director since 2010. Whitfield Dep. at 15:25 – 16:3 (ECF 340-9).

[3] Plaintiffs and Defendant agreed that certain portions of previous transcripts would be used as the FDC's 30(b)(6) testimony.  *See* Stipulation (ECF 340-31).  Those transcripts are indicated in **bold.**

92:2-13 (ECF 340-21); Do Dep. at 26:2-4, 26:14 – 27:6 (ECF 340-7). Even the FDC

Secretary was aware of the importance of DAAs and their cost. **Ogunsanwo Dep.**

**at 26:19 – 27:1** (ECF 340-8). FDC policymakers also became aware, in June of

2014, that the federal Bureau of Prisons started using the new DAAs. E 14668 –

14689, E 14715 – 14735 (ECF 340-12).

> 2.   FDC Officials Knew of the Number of Prisoners with HCV and that
>       Almost None Were Being Treated

Up through the preliminary injunction hearing, the FDC maintained that it did

not know the number of prisoners with HCV or the number receiving treatment. *See*

Whalen Dep. at 59:12-14 (ECF 340-11) (claiming he doesn't know how many FDC

inmates have HCV); *id*. at 140:2-7 (claiming he doesn't know how many received

DAAs this year or last); Whalen Hrg. Tr. at 100:8-14 (ECF 340-21) (claiming he

didn't know how many inmates had HCV when he started or the day of his

testimony); ***id*. at 100:15-24** (claiming he didn't know how many inmates received

DAAs until four days before the hearing); Reimers 10/20/17 Hrg. Tr. at 24:5-8 (ECF

340-22) (didn't know the number of inmates treated with DAAs until the lawsuit);

*id*. at 52:10-12 (unaware of how many FDC inmates with HCV until discovery

request in this lawsuit). However, a review of the emails produced in discovery

shows that this was simply not true. The FDC knew of this information much earlier.

In January 2015, Dr. Ogunsanwo and Tom Reimers requested an update from Stephen Whitfield about HCV treatment.[4]  On January 20, 2015, Whitfield sent them a document with a question, "How many inmates possible have Hepatitis C Infection in the Department?"  E 14953 – 14954 (ECF 340-12). The answer in the document was that there were 5,272 in the GI Clinic, that there was an estimated HCV prevalence of 16% to 40%, and that there were 8,884 possible "baby boomer" inmates with HCV.  *Id.*  Dr. Ogunsanwo and Dr. Do also testified that they were aware of the number of HCV-infected prisoners. Ogunsanwo Dep. at 32:1-11 (ECF 340-8); Do Dep. at 27:19 – 28:5 (ECF 340-7).

The relevant FDC policymakers also knew, as early as February 2015, that almost no inmates were being treated for HCV.  On February 3, 2015, the Association of State Correctional Administrators (ASCA) sent around a survey to all its members (including the FDC Secretary), requesting information about each state's approach to HCV.  E 10043 – 10045 (ECF 340-12).  Dr. Ogunsanwo quickly assembled the data and returned the survey, which was filled out by Whitfield,

---

[4] The issue arose even before that, in mid-2014, when the Kennedy 12 were evaluated.  Plaintiffs agree with and adopt the Court's discussion of the Kennedy 12.  ECF 153 at 10-11.  To the extent that it was in dispute, Plaintiffs would only add that that FDC officials knew of and approved the plan to evaluate the Kennedy 12.  *See* E 77720, E 77065, E 77530 – 77531 (ECF 340-15); **Maier Dep. at 39:3-21** (ECF 340-2).  In fact, Dr. Kennedy asked Dr. Ogunsanwo whether he could use RMC for the treatment program and Ogunsanwo approved.  **Ogunsanwo Dep. 45:12 – 46:6** (ECF 340-8).

copying Reimers and Do.  E 10043.  The survey revealed the following information:

The FDC does track the number of prisoners infected with HCV.  E 10046.  There

were 5,272 prisoners currently infected with HCV.  E 10047.  And critically, **the**

**number of prisoners receiving any type of HCV treatment was only 5**.  *Id.*  Not

only that, but the FDC admitted that **it did not plan to expand HCV treatment in**

**the near future because of costs**.  E 10052.  Thus, contrary to representations made

in previous testimony, all the FDC high-level medical officials responsible for health

care policy—Ogunsanwo, Reimers, Do, and Whitfield—knew as early as February

3, 2015 that there were thousands of HCV-infected prisoners, that only 5 had been

treated, and that there were no plans to expand the treatment in the future because it

was too expensive.[5]  In October 2015, the finalized results of the survey were sent

to the Secretary, notifying her as well.  E 2964 – 2965; E 38457 - 38459-0038 (ECF

340-12).[6]

---

[5] Whalen became aware since at least February 2016.  *See infra* & E 11317 – 11319 (ECF 340-12).  In addition, Tom Reimers was also informed about the lack of treatment at some point in 2015, when he was informed by Nick Little of Wexford that Wexford was not treating anyone with DAAs.  Reimers Hrg. Tr. (10/20/17) at 40:4 – 42:2 (ECF 340-22); Reimers Dep. at 21:4-14 (ECF 340-10).  *See also* Reimers Dep. at 21:16-20 ("I knew they were not treating anybody at that time.").  He shared that conversation with Dr. Ogunsanwo.  *Id.* at 42:21-25.  Nothing was done in response.

[6] The FDC also knew that many HCV patients were very sick.  *See* E 54448 – 54450 (ECF 340-13) (November 2015 email from Dr. Ogunsanwo acknowledging the importance of getting medications for the sickest patients, noting that "we have many bordering on cirrhosis already").

Another survey was conducted by the ASCA in May 2016. Secretary Jones received the survey and forwarded it to Dr. Ogunsanwo, who asked Whitfield to respond. E 29184 – 29196 (ECF 340-12). He again confirmed that there were **7,652** HCV-positive prisoners in FDC custody, and **only 1** had received any type of drug treatment for it. *Id. See also* FDC 30(b)(6) Dep. at 51:16-20 (ECF 340-6) (FDC knew that Wexford and Corizon were treating a "relatively small number" of inmates); **Maier Dep. at 57:8-18** (ECF 340-2) (Dr. Do knew no one was being treated).

The FDC also knew through public records responses. In July 2015, the FDC received a public records request for the number of prisoners with HCV, and the numbers receiving treatment. The FDC's press secretary sent the request to Dr. Ogunsanwo, who sent it to Reimers, who sent it to Whitfield asking him to pull the data. E 5336 – 5337 (ECF 340-12). Whitfield responded on July 7, 2015, to Reimers, Ogunsanwo, and the press secretary, stating, "**We currently have one patient receiving Harvoni. In FY 14-15, we treated four patients with Harvoni, Sovaldi, or Viekira**." E 54468 – 54469 (ECF 340-13) (emphasis added).

In February 2016, another reporter asked about the number of patients with HCV and whether treatment was being provided. Whitfield again confirmed—copying Ogunsanwo and Whalen—that in 2015, only five patients were treated with DAAs. E 11317 – 11319 (ECF 340-12). This email also contained another red flag:

-7-

Mysteriously, the FDC's total spending on HCV medications plummeted after the advent of DAAs, from $2,722,956 in 2013, to $569,628 in 2014, to $288,299 in 2015. *Id.* Instead of treating HCV-infected prisoners at a level that would have reached the previous year's spending, FDC treated no one and pocketed the savings.

Top FDC policymakers were also aware of the sheer number of complaints and grievances that were being submitted about HCV. From January 2014 through May 2017, top Health Services staff received at least 102 HCV grievances[7] (almost all of which were denied), and at least 31 complaints from family members or outside agencies about HCV treatment.[8] On November 30, 2016, as part of an inquiry from a concerned citizen about an inmate who was not receiving Harvoni, Whalen asked Whitfield how many inmates were currently being treated for HCV. Whitfield responded: one. E 54403 (ECF 340-13).

In May 2015, Plaintiff Ronald McPherson filed an informal grievance over his lack of treatment for HCV. The response he received at the institution is telling: "There is no treatment at this time for <u>any</u> inmate with Hep C." E 68662 (ECF 340-14) (emphasis in original). Mr. McPherson then sent that response to the Correctional Medical Authority (CMA), which sent the grievance to Dr.

---

[7] For a sample of those, see E 64302, E 77323, E 77422, E 77427, E 78077 – 78099, E 63897, E 77174 – 77189, E 77116 – 77123, E 53394, E 54105, E 54114 – 54128, E 76641, E 73704, E 63035, E 73864 (ECF 340-12, 340-13, 340-14). Plaintiffs can provide the remainder if needed.

[8] For a sample of those, see E 63486, E 63940, E 76645 – 76655 (ECF 340-14, 340-15). Plaintiffs can provide the remainder if needed.

Ogunsanwo, who forwarded it to Daniel Cherry and JM Courtney (Corizon's VP of Operations), saying "This is apparently the second time the CMA will be appalled by the staff member's response.  Please address."  E 68661 (ECF 340-14).[9]

The issue of HCV treatment was repeatedly brought to FDC officials' attention in other ways.  The contractors raised it: On April 24, 2015, Dr. Kennedy of Corizon emailed Dr. Ogunsanwo, saying, "I need your help regarding treatment of hepatitis C. I have identified several urgent candidates that I would like to start on treatment shortly." E 8669 (ECF 340-12).  Dr. Ogunsanwo forwarded the email to Do, Reimers, and Whitfield.  *Id*. On June 2, 2016, Dr. Robert Brooks, Centurion's then-statewide medical director, requested a meeting between top FDC and Centurion officials to "better understand the HCV dilemma." E 38560 – 38576 (ECF 340-12).

On June 22, 2016, Dr. Ogunsanwo received an article about Blue Cross of Florida being required to change its policy and provide coverage for DAAs, and forwarded it to the General Counsel's Office, Reimers, Whalen, and Whitfield.  His only comment: "Oh boy…"  E 38552 – 38555 (ECF 340-12).  *See also* E 49598, E 49599-0015 (ECF 340-13).  On December 6, 2016, Dr. Cherry emailed Whalen saying, "This Hepatitis C stuff is getting crazy. Just got a message from a site that

---

[9] In January 2016, a doctor at an institution responded to a grievance by saying there was no medication available to treat HCV.  E 54133 (ECF 340-13).  Dr. Ogunsanwo felt this response was not appropriate.  *Id.*

an inmate's family is willing to pay for hep c treatment." E 71969 (ECF 340-14). Whalen responded, "We get them all the time offering this." E 71987 (ECF 340-15). In January 2017, Whalen was asked, "I was told in this emergency contract no was being treated for Hep C. Is that true?" E 50594 (ECF 340-13). He responded, "We are treating what we can." *Id. See also* E 37140 (ECF 340-12).

### 3.    FDC Decides to Indefinitely Wait-List Patients Rather than Treat Them

Rather than ensuring that FDC prisoners actually received DAAs, the FDC and its contractors instructed their providers not to treat their HCV patients, but rather to simply add their names to a central log. As early as January 2014, Corizon had created a Hep C committee to review prisoners for treatment, E 78065 (ECF 340-15), and as early as April 2014, Corizon had created a Hep C log, and instructed their providers to fill it out with their patients' information. E 63863 – 63866-002, E 63064 (ECF 340-14).

Nothing changed when Centurion took over the contracts. Despite the fact that FDC officials claimed many times—both to this Court and to Plaintiffs—that a) HCV treatment decisions were completely within Centurion's discretion, b) FDC was relying on Centurion to submit prescriptions with Drug Exception Request forms, and c) FDC would have filled them; all of that was untrue. *See* Opening Statement Hrg. Tr., at 8:2-4 (ECF 340-17) ("The simple fact of the matter is that Centurion doctors were not sending DAA prescription requests to the department.");

*id*. at 9:17-20 ("[T]he department was simply not aware Centurion was failing to fully follow the Hepatitis C health services bulletin."); Reimers Hrg. Tr. (10/23/17) at 71:12 – 72:11 (ECF 340-21) (Centurion manages and approves the DER process); Whalen Hrg. Tr. at 101:15-18 (ECF 340-21) (Centurion determines who needs DAAs); Whalen Dep. at 76:20 – 77:1 (ECF 340-11) (up to Centurion to present patients to FDC); Reimers Hrg. Tr. (10/23/17) at 73:13-24 (ECF 340-21) (FDC never tried to interfere with Centurion's treatment decisions); Ogunsanwo Dep. at 25:24 – 26:3 (ECF 340-8) ("[I]t's not my responsibility to determine who be treated. It's the responsibility of the care provider in their clinical judgment to decide whether somebody needed to be treated, or not.").

In reality, **the FDC instructed Centurion** to keep patients on a log and await instruction on treatment, rather than actually treating individual patients. FDC 30(b)(6) Dep. at 36:10 – 37:24 (ECF 340-6). At some point in May or June of 2016, when Centurion took over the contract, Dr. Jeff Keller, Centurion's Chief Medical Officer, met with Dr. Ogunsanwo to discuss how to treat HCV. *Id*. at 37:25 – 38:25. Dr. Keller asked how many patients Centurion could treat, and Dr. Ogunsanwo imposed a limit of 10 to 20 per year, although Dr. Keller wanted to treat more. *Id*. at 38:7-18. However, soon thereafter, Dr. Ogunsanwo informed Dr. Robert Brooks, Centurion's then-statewide medical director for Florida, that Centurion could not

treat **anyone** for HCV because there was no funding. *Id.* at 40:1-13. The supposed

DER process was not happening. *Id.* at 36:25 – 37:5. Indeed,

> [t]he Department decided who was going to be treated; so usually the
> treatment came top-down rather than bottom-up. We would get a call
> from Dr. Whalen or Dr. O, and say that, "You should treat this patient.
> Treat this -- a certain patient. Treat that patient."

*Id.* at 37:7-12; *see also id.* at 41:18-21. The FDC decided on this approach. *Id.* at

37:20-23. Dr. Ogunsanwo told Dr. Daniel Cherry the same thing when he started as

Centurion's statewide medical director. Cherry Dep. at 18:9-21 (ECF 340-4). Thus,

contrary to the representations made to this Court and to Plaintiffs, it was not up to

Centurion. It was up to the FDC.

This is consistent with Dr. Dewsnup's testimony that Centurion wanted to

treat more people, Dewsnup Dep. at 184:18 – 185:5 (ECF 340-5), but the FDC was

refusing to fund it. Dewsnup Hrg. Tr. at 26:4-25 (ECF 340-19). Still, Dr. Dewsnup

told Centurion to complete the staging process for patients on the HCV list, but that

did not happen. *Id.* at 150:15 – 151:25. Dr. Whalen himself told Dr. Cherry there

was no funding for DAAs.[10] Whalen Hrg. Tr. at 103:15 – 104:11 (ECF 340-21).

---

[10] Dr. Whalen's testimony on the interplay between the FDC and Centurion was particularly
egregious. At his September 25, 2017, deposition, Whalen claimed that he had no reason to believe
that Centurion was not following the HCV policy, even though Centurion was only treating 2
inmates. Whalen Dep. at 109:23 – 110:12 (ECF 340-11). But at the preliminary injunction
hearing, Whalen testified that, at his September 14, 2017 meeting with Dan Cherry—11 days
before the deposition—he already believed that Centurion was not following the policy. Whalen
Hrg. Tr. 108:19 – 109:21, 144:19 – 145:5 (ECF 340-21). This was not Dr. Whalen's only lack of
candor to the Court. *See* ECF 153 at 17 n. 14.

This testimony is backed by numerous emails documenting that this centralized approach—listing without treatment—was the FDC's approach to HCV under both the Corizon/Wexford and Centurion eras, with the FDC retaining approval on whom to treat. *See* E 77568 (ECF 340-15) (February 2014 showing HCV treatment required high-level approval); E 53299 – 53301 (ECF 340-13) (September 2015 email from Whalen stating that if an inmate was on the list, there was nothing more that could be done); E 75368 – 75369 (ECF 340-15) (June 2016 email exchange involving Whalen, Ogunsanwo, Brooks, Love, and Keller, showing high-level decision on whether to treat one inmate); E 63609 (ECF 340-14) (June 2016 email from Dr. Brooks to Dr. Ogunsanwo acknowledging the list was not a waiting list to receive DAAs); E 42138 (ECF 340-13) (September 2016 email from Centurion regional medical director referencing "special committee" and "Hep C log"); E 71958 (ECF 340- 14) (December 2016 email from Whalen to Cherry directing him to start treatment for a patient). *See also* E 73339; E 73047 (ECF 340-15); Cherry Dep. at 22:8-10 (ECF 340-4).

Similarly, a December 5, 2016 Centurion quarterly report emailed to FDC shows numerous examples of Centurion officials instructing their providers not to individually treat HCV, but to simply enter the patient's name on a log for a

committee to review.[11]  *See* E 71948, 71949-0029, -0038, -0050, -0091, -0094, -0096, -0107, -00140, -00146, -0148, -0153 (ECF 340-14).   This process was "common knowledge."  Cherry Dep. at 21:21-22 (ECF 340-4).

### 4.   Legislative Budget Requests

In June 2015, the FDC began to put together a budget request for $6.5 million to treat 100 patients for Fiscal Year 2016-17.[12]  E 54459 – 54461 (ECF 340-13).  On July 1, Reimers emailed a draft Legislative Budget Request (LBR) to Dr. Ogunsanwo and Steve Whitfield for edits and approval, and Ogunsanwo responded with his edits.  E 38649 – 38652 (ECF 340-13).  The LBR stated: "The Department has no funding to provide treatment to inmates with Hepatitis C who meet current national treatment criteria. Inmates with Hep C are at very high risk for developing Cirrhosis and Liver Cancer if left untreated, and they can also spread the Hep C virus to others.  . . . The newer medications are more efficacious, regardless of the

---

[11] This approach was coupled with efforts to prevent other doctors from actually prescribing the drugs.  For instance, on August 26, 2016, a formal grievance reached the FDC's Office of Health Services about HCV treatment, including a consult report from an outside gastroenterologist, Dr. Shah. When Dr. Whalen saw it, he forwarded it to Dr. Ogunsanwo saying, "Please have a look at the GI consult and Dr. Shah's comment at the bottom," and later, "I wanted to make sure that you [sic] aware first."  E 61535 – 61537 (ECF 340-13).  Whalen then forwarded the report to Dr. Cherry, saying "Please note Dr Shah's comment at the bottom of his consult."  E 61378 (ECF 340-13).  Cherry responded, "Wish he wouldn't make statements like that."  *Id.* Dr. Shah's statement?  "This patient will develop hepatoma/GI bleeding if Hep C is not cured—Needs Harvoni order."  E 61405 (ECF 340-13).

[12] The FDC's fiscal year begins on July 1 and ends June 30.  Reimers Dep. at 76:11-16 (ECF 340-10).  The FDC submits its Legislative Budget Requests in the fall of the preceding year, and begins preparing them well before that.  *Id.* at 78:3-7.

genotype and stage of the disease, and have fewer side effects. **Failure to treat the eligible inmates puts the Department at risk of litigation, including class action suit**." E 54647 – 54650 (ECF 340-13) (emphasis added). But clearly, the Department didn't take this risk seriously, as it decided not to request the money, after a discussion between Dr. Ogunsanwo and the Secretary. FDC 30(b)(6) Dep. at 207:15-22 (ECF 340-6).

In July 2016, the FDC began to develop another LBR for fiscal year 2017-2018. Whalen recommended to Reimers that the FDC request funding for DAAs. Whalen Hrg. Tr. at 107:7-13 (ECF 340-21). An initial draft of the LBR essentially repeated the language from the previous years. E 54470 – 54474 (ECF 340-13). It requested roughly $29 million to treat 500 patients. *Id.* The final budget narrative also stated, "The Department estimates that approximately 500 inmates are at highest risk and are in need of the new medications, with fibrosis still a criterion for treatment eligibility." E 60382 – 60386 (ECF 340-13). But again, the Department ultimately decided not to request the funds. FDC 30(b)(6) Dep. at 217:5-7 (ECF 340-6).

In June 2017 (after this case was filed but before the hearing), the FDC initially created a proposal asking for $24,349,200 to treat 500 high risk inmates. E 29366 – 29373 (ECF 340-12). The proposal reiterated the warnings from previous years' drafts, but added a citation to a case requiring that Medicaid follow the

community standard of care and not make treatment decisions based on fibrosis levels.  E 29369 (ECF 340-12).  Because the case was pending, decisions on this LBR were delayed.

In August 2017, the Secretary drafted a memo to the Governor attempting to justify the budget request, referencing the upcoming preliminary injunction hearing. E 104942 – 104972 (ECF 340-15). She noted that the FDC "was not expected to win" the hearing, and that getting in front of the issue was important so that "**we [FDC] set the rules and standards of treatment and not the court. (testing every inmate)**[.]"  E 104959 (emphasis in original).

In December 2017, the Court entered the preliminary injunction.  Because of it, the Department ultimately request roughly $21 million using the "back of budget" process—meaning it was requested to be allocated for the current fiscal year in which the request was made (FY 17-18)—and another roughly $14 million for the upcoming fiscal year (FY 18-19).[13]  FDC 30(b)(6) Dep. at 229:7-21 (ECF 340-6). Those amounts were approved by the Legislature. *Id*. at 226:15-17.  It is unclear whether these amounts will be sufficient to treat all the necessary HCV patients.

---

[13] The FDC's representative originally testified that the request was $46 million to treat 2,747 patients.  *Id*. at 218:15-20 (ECF 340-6).  He later corrected those figures after reviewing the relevant documents.  The actual amount requested is roughly $35 million, so presumably it would be used to treat substantially less than 2,747 patients.

5.    Revisions to HSB 15.03.09

The FDC has gone through several versions of Health Service Bulletin (HSB) 15.03.09, supplement #3, which covers HCV.  Nearly all of them showed the FDC's disregard for the importance of ensuring proper treatment for HCV patients.  For instance, the September 2014 version of the policy did not reference DAAs, even though they had been on the market since December 2013.  **Do Dep. at 33:6 – 34:1** (ECF 340-7).  In fact, it took until June of 2016—two and half years after the release of DAAs—for the policy to reference them.  *Id*. at **35:16 – 37:3**.

In December 2016, the FDC undertook a legal review of their HCV policy. E 50601 (ECF 340—13).  Even the FDC's own attorneys noted that the policy was not up to par with the standard of care. On January 4, 2017, a lawyer in the FDC's Office of General Counsel warned that the HSB "resemble[d] the April 2016 FBOP guidelines on HEPC assessment and treatment[,]" but that, "[i]n October 2016, FBOP made significant revisions to its approach and treatment of HEPC with the issuance of new clinical guidelines."  *Id*.  She attached notes to the policy, which specifically recommended changing a testing recommendation from "inmates with risk factors for HCV" to "all sentenced inmates."  E 50603 – 50614 (ECF 340-13). She also specifically recommended an "opt out" approach to testing, E 50603, and recommended adding the risk factor "born between 1945 and 1965."  E 50604.  She also recommended adding language explaining that inmates with high priority but

-17-

insufficient time remaining on their sentence may be considered for treatment if they will have medications and care upon release. E 50608. The FDC Health Services representative forwarded the lawyer's comments to Whalen and Tina Harrell (the FDC's Clinical Contract Monitor for Public Health).  E 50671 (ECF 340-13). On January 6, 2017, Ms. Harrell responded, "Reviewed and agree with notes presented." *Id.*  But the FDC rejected all of them and a new version went into effect in April 2017.[14]

## B.    Other Relevant Facts

### 1.    Deaths from HCV

FDC acknowledges that, from January 2013 through June 2016, at least 115 prisoners died with the primary cause of death as Hepatitis C.  E 25602 (ECF 340-12).  The number was 174 through July 2017. ECF 108-1.  FDC's expert admits that preventable deaths are still occurring within the prison system because of non-treatment of HCV.  Dewsnup Dep. at 44:20 – 45:20 (ECF 340-5).  A "substantial portion" of those could have been prevented with DAAs.  *Id*. at 46:6-10.  Prisoners have also died as a result of not receiving a liver transplant.  Maier Dep. at 96:4-6 (ECF 340-2).

---

[14] Incredibly, Dr. Whalen—the FDC's top physician and final clinical authority—wasn't even involved.  He doesn't know who updated the policy or why it was changed.  Whalen Hrg. Tr. at 124:7-23 (ECF 340-21).

2.     The Named Plaintiffs

Plaintiffs agree with and adopt the Court's findings with respect to the three named Plaintiffs (ECF153 at 8-9).  Defendant has conceded these facts.  ECF 270 at 9-10.  However, although Defendant has conceded the relevant facts for Mr. Hoffer and Mr. Molina, Defendant omits mention of Mr. McPherson.  As the Court found, Mr. McPherson had HIV, had known cirrhosis since at least 2015, exhausted his administrative remedies, and should have been treated much earlier. ECF 153 at 8.  Further, Mr. Hoffer died on March 21, 2018, after waiting for months to be taken to a transplant center.  He never received the evaluation.  *See* FDC 30(b)(6) Dep. at 163:25 - 164:3, 166:1-19 (ECF 340-6).

3.     Standard of Care for HCV

This Court has already found that the "standard of care is to treat chronic-HCV patients with DAAs as long as there are no contraindications or exceptional circumstances."  ECF 153 at 7.  Defendant appears to concede this.  ECF 270 at 2. This is the standard that should be pursued in a correctional setting.  **Dewsnup Dep. at 108:4-10** (ECF 340-5).  As Defendant's expert testified (**Dewsnup Hrg. Tr. at 121:21 – 122:14** (ECF 340-19)) and Defendant conceded (FDC 30(b)(6) Dep. at 56:11-15 (ECF 340-6)), based on the sheer numbers alone (thousands of prisoners with HCV and only 13 treated over three-and-a-half years) the FDC was violating

this standard of care, and was deliberately indifferent to the serious medical needs of prisoners with HCV. *See also* Maier Hrg. Tr. at 85:9-17 (ECF 340-18).

## II. Argument

### A.    Eighth Amendment Claim

The Court has found, and FDC has conceded (ECF 270 at 2), liability for Plaintiffs' Eighth Amendment claim, and therefore Plaintiffs will not repeat their arguments on this count, which they adopt from their Motion for Preliminary Injunction briefings (ECF 11, 36). Defendant also concedes that the requirements for a permanent injunction are met.  ECF 270 at 32.  The aspects of this claim that Defendant does dispute (routine opt-out testing and the treatment of inmates at F0/F1) will be discussed in the section on the scope of the injunction, below.

### B.    Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) Claims

Plaintiffs have already extensively briefed this issue in the Motion for Preliminary Injunction (ECF 11 & 36), and their Response to Defendant's Motion to Dismiss (ECF 20), and will not repeat those arguments in full here.  Moreover, Defendant appears to concede that Plaintiffs' ADA and RA claims are viable with respect to inmates at F2, F3, and F4, and only disputes the claims with respect to

those at F0 and F1.[15]  ECF 270 at 28.  Further, the only dispute seems to be whether those at F0 and F1 can qualify as having a disability en masse.  They can.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Although they only need qualify under one prong, Plaintiffs and the class members qualify at least under the first two.

First, the term "substantially limits" must be "construed broadly in favor of expansive coverage," and this threshold determination "should not demand extensive analysis."  28 C.F.R. § 35.108(d)(1)(i)-(ii).  The regulations list certain conditions—including cancer, diabetes, and HIV—that will virtually always be found to impose a substantial limitation on a major life activity, thus precluding the need for an individual assessment.  *Id.* at § 35.108(d)(2).  Chronic HCV is akin to these conditions.  It universally affects liver and gastrointestinal function and thus will virtually always be deemed a disability. Thus, all class members—including those at F0 and F1—have a qualifying disability, even if asymptomatic.

Second, Plaintiffs and the class members all have a record of an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).  The FDC has

---

[15] Plaintiffs are briefing both the Eight Amendment and ADA/RA claims with these concessions in mind, in an effort to conserve judicial resources.  But they reserve the right to fully brief the issue should that become necessary.

diagnosed them with HCV, records some of their symptoms in their medical records, and enrolls them in the gastrointestinal clinic, all of which produces records of their impairments.

Thus, class members at F0 and F1 can all be deemed qualified individuals with a disability, regardless of their symptoms.   And FDC has discriminated against them by categorically denying them access to medical services because of that disability, while not imposing such restrictions on patients with other disabilities. For example, FDC provides HIV medication regardless of disease progression. **Whalen Hrg. Tr. at 118:10-19** (ECF 340-21).   There is no restriction for past intravenous drug use or tattooing in prison, *id*. **at 118:25 – 119:5**, nor are there prioritization tables for HIV.   *Id*. **at 120:23-25**.   If the doctor believes HIV medications are needed, the inmate is prescribed them. *Id*. *See also* **Whalen Dep. at 75:9-13** (ECF 340-11).   Not so with HCV.   The class members have thus been "discriminatorily precluded from access to medical treatment altogether." *Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1241 (D. Colo. 2009).   *See also Postawko v. Missouri Dep't of Corr.,* No. 2:16-CV-04219-NKL, 2017 WL 1968317, at *13 (W.D. Mo. May 11, 2017) (denying motion to dismiss ADA count in prison HCV class action).

In sum, all class members, even those at F0 and F1, have succeeded on their ADA and RA claims. Moreover, given that Defendant has conceded that permanent

injunctive relief is appropriate, the four requirements for a permanent injunction are satisfied for this claim as well. *See Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (four requirements are 1) irreparable injury; 2) remedies at law inadequate; 3) balance of hardships weighs in favor; and 4) no disservice to the public interest).

### III. The Scope of the Injunction

#### A.    The Court's Authority

A District Court has the power to issue any order necessary to ensure compliance with an injunction.  "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."  *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).  *See also Hutto v. Finney*, 437 U.S. 678, 687 (1978) ("In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation.").

Plaintiffs agree that judgment should be entered against the Defendant, that the current preliminary injunction should in large part be entered as a final judgment, and that Defendant should be ordered to comply with its HCV policy.  However, there are other types of relief that Plaintiffs are seeking, many of which are in the form of changes to the current policy, as described below.  Given the FDC's history of deception, avoidance of responsibility, and stubborn unwillingness to provide

proper treatment, this additional relief is necessary to protect the class members'
constitutional rights and ensure that FDC cannot avoid properly treating HCV.

## B.    The Relief Requested

Plaintiffs request the following additional forms of relief:

### 1.    Routine Opt-Out Testing and Identifying Current Inmates with HCV

Currently, the FDC is using an "opt-in" method of HCV testing:  patients are
asked if they want the HCV test and only receive it if they respond affirmatively.
*See* HSB 15.03.09, p. 6, ¶ F.1 (ECF 340-23); FDC 30(b)(6) Dep. at 25:5-18 (ECF
340-6).  This is in contrast to an "opt-out" system, where patients are told they are
going to be tested for HCV (among other things), and must affirmatively request to
be excluded.  Defendant should be ordered to switch to an opt-out system because
the FDC is severely undercounting the number of prisoners with HCV.

After six months of allegedly aggressive education efforts, the number of
prisoners with HCV identified by the FDC has dwindled from 7,000 to 5,613, a mere
5.8% of all FDC prisoners.  ECF 153 at 1; ECF 314 at 2. But Defendant knows that
this number is wrong.  National estimates suggest that between 16% and 41% of the
United States jail and prison population has HCV, translating to between 14,700 and
40,184 FDC prisoners.  Koziel Dec. (ECF 10-1) at ¶¶ 19 & 52.  *See also* Whalen
Hrg. Tr. (10/23/17) at 88:3 – 89:12 (ECF 340-21) (15-40% is a fairly close estimate).
Defendant believes the best estimate for Florida is around 20%.  **Dewsnup Dep. at**

-24-

**41:10 – 42:17** (ECF 340-5). *See also* FDC 30(b)(6) Dep. at 234:15-21 (ECF 340-6); E 14953 - 14954 (ECF 340-12). This Court likewise found that "as many as 20,000" Florida prisoners are infected with HCV.  ECF 153 at 1.  Moreover, at least 6,000 of those are in the rapid progression group—i.e., their liver disease will likely advance very quickly, resulting in irreversible organ damage and possible death. Dewsnup Hrg. Tr. at 70:23 – 71:2 (ECF 340-19).

Defendant's system is clearly not working, as FDC has missed somewhere between 13,987 and 33,587 prisoners with HCV.  While Dr. Dewsnup testified that an opt-in system could work, he stressed the need to pair it with adequate peer-to-peer education.  Dewsup Hrg. Tr. at 46:10-19 (ECF 340-19).  But FDC's education program is available at just two prisons.  FDC 30(b)(6) Dep. at 71:4-8 (ECF 340-6). And FDC doesn't know whether materials are given out as part of that program, how many peer educators have been trained to date, or how many inmates have participated in it.  *Id.* at 197:9-18.

Thus, Defendant knows that there are thousands more prisoners in its care who are infected with HCV and are at serious risk of damage to their health, but has deliberately remained ignorant of their identities, thereby ensuring they will never receive treatment.  This "head-in-the-sand" approach amounts to clear deliberate indifference. *See, e.g., Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

Moreover, the AASLD now unequivocally recommends that all jails and prisons use routine opt-out testing. *See* HCV Testing and Treatment in Correctional Settings (ECF 340-16). In addition, the Federal Bureau of Prisons (BOP) has been using routine opt-out testing since 2016, see BOP HCV Guidelines (ECF 341-1), FDC's own lawyers recommended it in January 2017, E 50603 (ECF 340-13), and at least three other states where Centurion operates use it: Massachusetts, Minnesota, and New Mexico. Centurion 30(b)(6) Dep. at 129:7-13 (ECF 340-3); Mass. Policy (ECF 340-27); Minn. Policy (ECF 340-29); NM Policy (ECF 340-30). New Mexico's policy specifically notes that 41% of its prison population has been diagnosed with HCV because they test every inmate. NM Policy at 1. Routine opt-out testing is also used in at least fifteen other state systems. Beckman Article and Appendix at 1895 (ECF 340-1).

Routine opt-out testing is "highly cost-effective." HCV Testing and Treatment in Correctional Settings at 3 (ECF 340-16). Defendant estimates that the cost of implementing a routine opt-out testing program would be only about $400,000 per year, at $9.10 per test. FDC 30(b)(6) Dep. at 231:10-25 (ECF 340-6). A FibroSure for those who test positive costs a mere $28. *Id*. at 232:9-16. Thus, while cost is generally no defense to an Eighth Amendment violation, cost is not

even an issue here.[16]  And Defendant already uses routine opt-out testing for a battery of blood tests at reception.  *Id.* at 22:15 – 23:7; *id.* at 24:6-11.  It would not be burdensome to simply add HCV to that list.

In sum, Plaintiffs respectfully request that this Court order the Defendant to provide routine opt-out testing for HCV at intake.  However, this only covers the prisoners entering prison in the future.  To properly identify the existing prisoners with HCV, an aggressive notice campaign must be undertaken, with the FDC posting notices in every prison explaining the risk factors and consequences of HCV, the purpose of the staging process, what the treatment entails, the lack of side effects, the likelihood of cure, and encouraging prisoners to report to sick call to obtain testing.  No co-payment should be charged for this visit.  Plaintiffs request that this be ordered as well.

2.    Elastography

Currently, the FDC is using the FibroSure-plus-ultrasound method of estimating fibrosis levels.  But this method has significant inaccuracies: The FibroSure is only accurate about 70% of the time, and while it is better at identifying

---

[16] Numerous studies have shown that routine opt-out testing is the most cost-effective method of diagnosing prisoners with HCV, both in terms of getting the most prisoners to agree to testing on the first request and also saving money on HCV treatment in the long run.  *See, e.g.*, Interventions to increase testing, linkage to care and treatment of hepatitis C virus (HCV) infection among people in prisons: A systematic review, at 7 (ECF 340-26); Universal opt-out screening for hepatitis C virus (HCV) within correctional facilities is an effective intervention to improve public health, at 2 & 5-6 (ECF 340-33).

patients who have no fibrosis (F0) or very advanced fibrosis (F4), it is much less accurate at measuring patients in the middle of the spectrum. Koziel Dec. ¶ 3 (ECF 340-34). Thus, the FDC is likely erroneously "under-staging" a significant number of patients; that is, they are staged at F1 or F2 but in reality should be F3 or F4. *Id*. at ¶¶ 3-5. *See also* Dewsnup Hrg. Tr. at 98:11-13 (ECF 340-19) (the FibroSure plus ultrasound approach is the "down and dirty" method). The follow-up standard ultrasounds are simply not sensitive enough to significantly improve accuracy. Koziel Dec. ¶ 6 (ECF 340-34).

Elastography, on the other hand, is currently the most accurate method of estimating fibrosis. *Id*. at ¶ 4. It is more accurate than the FibroSure, Cherry Dep. at 48:15-22 & 54:3-7 (ECF 340-4), and it will almost certainly identify many more patients with advanced fibrosis who were erroneously under-staged. When Oregon started using elastography, the proportion of patients they found with cirrhosis doubled, Dewsnup Hrg. Tr. at 168:3-16 (ECF 340-19), and they discovered that everyone they had identified as F2 was actually F3 or F4. *Id*. at 201:3-10. The FDC's own policy acknowledges that "elastography modalities have been shown to be reliable in detecting advanced hepatic fibrosis, are cheaper, easily repeated for serial monitoring, and thus long-term outcomes may be accurately predicted." HSB 15.03.09 p. 7 n. 2 (ECF 340-23). Moreover, elastography is used in four Centurion-operated prisons: Massachusetts (Centurion 30(b)(6) Dep. at 118:21-24 (ECF 340-

3)), New Hampshire (*id.* at 120:4-10); Minnesota (*id.* at 120:21 - 121:1), and Vermont (*id.* at 129:14-17).

In October 2017, Dr. Dewsnup was hoping that elastography would come to all Florida prisons in 6-12 months.  Dewsnup Hrg. Tr. at 98:9-10 (ECF 340-19).  But FDC is not currently using it. FDC 30(b)(6) Dep. at 128:17-20 (ECF 340-6). There are nonspecific plans to explore obtaining one machine per region, and then using them only on patients who don't present with perfect concordance among their tests. *Id.* at 128:21 – 129:9.

The FDC should be ordered to start using elastography within a reasonable time, preferably within 4 to 6 months.  Ideally, elastography should be used on every patient.  Koziel Dec. ¶ 6 (ECF 340-34). However, at least initially, it should be used on those who are initially staged at F0, F1, or F2, because F3s and F4s have already been identified as having advanced fibrosis with no further confirmation necessary. For those at F0 – F2, though, there is a significant risk that they have been "under-staged," and should therefore receive elastography to confirm.  As a final alternative, at the very least FDC should be ordered to use elastography on the patients who don't present with perfect concordance, as the FDC is planning to do.[17]

---

[17] Plaintiffs wish to be clear that none of this should delay the staging deadlines.  If the Court finds that delaying staging for a significant number of patients would be unavoidable, Plaintiffs would prefer the order preserve the status quo until the FDC develops the capacity to use elastography without delaying the staging process.

3.    Treatment for Inmates at F0 and F1

The treatment of inmates at F0 and F1 is intimately related to the use of elastography, as will be explained below.  Currently, inmates at fibrosis stage F0 and F1 are not eligible for treatment; they are merely monitored.  As the Court found, this is not consistent with the standard of care, which is to treat everyone with HCV, regardless of fibrosis level.  ECF 153 at 7.  Indeed, Defendant has conceded that "[i]t is inappropriate to only treat those with advanced levels of fibrosis."  ECF 270 at 8. While the risks to F0 and F1 patients may not be measurable at this time, there is still a risk, Dewsnup Hrg. Tr. at 161:3-6 (ECF 340-19), and it is inevitable that the guidelines will eventually be revised to recommend treatment for such patients while in prison.  Dewsnup Dep. at 27:18-23 (ECF 340-5).

The only reason why FDC is electing not to provide treatment is due to the cost of treatment, which is per se deliberate indifference.  *See Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991).  Were this any other disease, FDC would proceed according to the standard of care.  And the costs are decreasing. *See* FDC 30(b)(6) Dep. at 213:18 – 214:14 (ECF 340-6) (FDC anticipating "significant" discounts through Medicaid rebates); *id*. at 268:7-12 (FDC getting an "aggressive discount" for Merck-brand DAAs).

Although the court ordered only monitoring for F0 and F1 inmates in the preliminary injunction, that injunction was designed to quell an emergency and get

treatment to the thousands of inmates with seriously advanced fibrosis. Going forward, the objective should be getting everyone treatment. Thus, in the final injunction, the Court should order the FDC to treat inmates at F0 and F1 within one to two years.

It is important to note that the risk of F0 and F1 patients developing advanced fibrosis would lessen significantly if they were receiving accurate monitoring in the form of regular elastography. Dewsnup Hrg. Tr. at 161:21-25 (ECF 340-19). With elastography, there would be heightened confidence that the F0/F1 group contains only "true" F0s and F1s, and that the F2s, F3s, F4s, and rapidly progressing patients have all been screened out. But without elastography, there is always a significant risk that someone staged initially at F0 or F1 will nonetheless suffer from serious liver damage because they were actually at F2 or F3. Thus, an alternative to treatment for all F0s and F1s, at least initially, would be monitoring with elastography every six months to ensure they are properly staged. Koziel Dec. ¶ 6 (ECF 340-34).

### 4. Informed Refusals and Proper Education

As of May 20, 2018, 112 inmates refused to participate in the staging process and 47 refused treatment. ECF 314 at 2 & 3. Those are incredibly high numbers given the 95% cure rate, absence of side effects, and devastating consequences of the disease. The only logical inference is that the vast majority of these patients

were not fully informed of the above information.   Indeed, Centurion acknowledges that most inmates are not educated about hepatitis C, either about the disease or the treatments.   Centurion 30(b)(6) Dep. at 77:1-7 (ECF 340-3).   In fact, at least three prisoners who refused staging did so because they were not told of the new treatment regimen and were not even told what the blood draw was for.   ███ Dec. (ECF 340-35); ███ Dec. (ECF 340-36); ███ Dec. (ECF 340-37).   They've been having their blood drawn for years with no treatment to show for it, and when they were asked to have their blood drawn again without any explanation, they refused, assuming it was pointless.   *Id.*   All of them would have consented had they been given the proper information.   *Id.*

Although FDC claims to be providing education on these topics, clearly it is not happening or not working.   *See* FDC 30(b)(6) Dep. at 71:4-8 (ECF 340-6) (peer-to-peer education only at two institutions); *id.* at 197:9-18 (FDC doesn't know how many inmates have been trained or educated).   Thus, a section should be added to the policy requiring an explanation to anyone who refuses staging or treatment of, at least, a) the consequences of HCV, b) the availability, lack of side effects, and efficacy of the new medications, c) the staging process, and d) whether and when they will receive treatment.

5.     Shortening the Staging Deadline and Requiring Reliance on the Most Serious Test Result

Currently, patients must be staged within 90 days of confirming they have chronic HCV.  HSB 15.03.09 at p. 6, ¶ F.2 (ECF 340-23).  The deadline was originally 60 days, but it was lengthened to 90 at Defendant's request.  ECF 242, 243.  But further discovery has demonstrated that the deadline should actually be shortened to 30 days.  The significance of this is that the treatment deadlines run from the staging date, so the later the official staging, the later the treatment will occur.

Staging is simply determining a patient's fibrosis level (F-score).  To do this, the FDC is relying almost exclusively on the FibroSure.  FDC 30(b)(6) Dep. at 118:22 – 119:10 (ECF 340-6).  It only takes five days from the initial blood draw to get the results.  *Id.* at 117:10 – 118:17.  Thus, everyone can be staged—at least initially—within five days.[18]   At that point, some patients will receive routine ultrasounds, including all inmates F2 and above (see ECF 242-2 ¶ 8 and HSB 15.03.09, p. 6, ¶ F.4 (ECF 340-23)), although this is done mostly as a routine screening tool for cancer or other comorbidities, not for staging.  Cherry Dep. at 48:4-5 (ECF 340-4).  *See also* Dewsnup Dep. at 76:3-6 (ECF 340-5) ("But

---

[18] That's five days from the blood draw.  But because the FibroSure is done automatically in response to a positive HCV test—a "reflex" test—the staging is actually completed nearly simultaneously as the confirmation of chronic HCV.  FDC 30(b)(6) Dep. at 42:8-17 (ECF 340-6).

remember, the ultrasound is not used to estimate. It's not used to estimate staging. It's used to rule out occult portal hypertension and cirrhosis."); Dewsnup Hrg. Tr. at 75:17-19 (ECF 340-19).

In addition, inmates whose tests and exams do not show "concordance" are given ultrasounds. FDC 30(b)(6) Dep. at 119:1-10 (ECF 340-6). That is, if there is a discrepancy between an inmate's FibroSure score and his other lab values (or his symptoms), an ultrasound will be performed as another way to assess fibrosis. *Id.* But importantly, standard ultrasounds should never be used to decrease a patient's F-score; they should only be used to increase it. Dewsnup Dep. at 73:4 – 76:8 (ECF 340-5); Dewsnup Hrg. Tr. at 76:12-15 (ECF 340-19) ("[T]he abdominal ultrasound, rather, is a fail-safe on the Predictive Index. It helps you make sure you're not leaving people out."); *id*. at 162:9-17 ("The ultrasound could be completely normal and a patient could have cirrhosis. It's the other way around that we're using it.").[19] If a patient's FibroSure shows F-4 cirrhosis, for example, an ultrasound is necessary to rule out liver cancer, but it won't change the patient's F-score—so there is no reason to delay assigning an "official" stage to this patient—and his treatment deadline should start to run from that initial staging determination.

---

[19] Contrary to what Dr. Cherry represented in his declaration, ECF 242-2 ¶ 7, the EGD is not part of the staging process. It is only used to diagnose varices or other gastrointestinal bleeding. Cherry Dep. at 50:20 – 51:4 (ECF 340-4).

Thus, all inmates can be initially staged within five days. Although some may need ultrasounds, in most cases this is just a routine screening to rule out comorbidities. It only takes up to a month to have an ultrasound performed. FDC 30(b)(6) Dep. at 136:12-17 (ECF 340-6). In the few cases where it is used to truly obtain a more accurate staging estimate, the only possible change to the F-score will be to increase it, at which point those patients' F-scores can simply be amended and their treatment deadlines accelerated accordingly. *See* Mass. Policy at 13 (ECF 340-27) (requiring staging within one month). But there is no reason why the vast majority of patients cannot simply be staged initially within 30 days. The policy should be revised to require staging within 30 days of confirmation of chronic HCV and, if an ultrasound is recommended, it must be performed within 60 days of the initial staging, and the F-score must be amended, if indicated, within 75 days of the initial staging.

Finally, although this seems to be FDC's current practice, it should be explicit in the policy that—consistent with Dr. Dewsnup's recommendation—FDC must rely on the test, exam, or study indicating the highest fibrosis level. That is, if one indicator shows F3 but another shows F2, FDC must stage the patient at F3.

6.      The Treatment Deadlines Should Be Shortened and Made Mandatory

Currently, the policy states that inmates in Priority 1 "should" receive treatment within 0-6 months, and those in Priority 2 "should" receive treatment

within 12 months.  HSB 15.03.09 p. 9 ¶ I.4(a)&(b) (ECF 340-23).  First of all, the policy should be edited to clarify that these are mandatory deadlines, not aspirational goals.  This is how the FDC says it is treating them.  FDC 30(b)(6) Dep. at 82:14-19 (ECF 340-6).

Second, the deadlines should be shortened.  Priority 1 inmates should be treated within three months, and Priority 2 inmates should be treated within 6 months.  *See* Mass. Settlement at ¶¶ 29-31 (ECF 340-28).  The only reason for the longer deadlines is because the FDC did not have the system capacity or funding to treat patients at a faster rate.  Moreover, FDC was required to identify, stage, and treat a large backlog of inmates at one time, which it has done so far.  Now that the backlog has been addressed, the numbers should come down.  When they do, there is no reason why treatment should not be provided as quickly as possible.

Some patients can rapidly progress to more advanced fibrosis within one year.  Dewsnup Hrg. Tr. at 65:3-11 (ECF 340-19). And deaths will continue to occur without aggressive action.  *Id*. at 15:20-25.   There is a serious risk in any further delay.   Thus, the treatment deadlines should be shortened to 3 and 6 months, respectively.

7.     <u>F0, F1, and F2 Inmates Should Be Re-staged Every 6 Months</u>

Currently, the policy requires inmates who are F0, F1, and F2 to receive laboratory testing every six months, but only re-staged with proprietary indices (i.e.,

the FibroSure) every year. HSB 15.03.09 p. 7 ¶ H.4 (ECF 340-23). These patients should instead be re-staged every 6 months, as both Dr. Dewsnup and Dr. Koziel recommended.  Dewsnup Hrg. Tr. at 161:21-23 (ECF 340-19); Koziel Dec. ¶ 6 (ECF 340-34). Their bloodwork is already being drawn every 6 months, and there is therefore no reason not to add the FibroSure to that slate of tests.  As Dr. Dewsnup testified, it is incredibly important that these individuals be monitored very closely to ensure that they are not rapidly progressing to cirrhosis.  Dewsnup Hrg. Tr. at 161:1-20 (ECF 340-19).

8.    The Exclusion for Time Remaining on Sentence

Currently, the policy excludes from treatment anyone who does not "have sufficient time remaining on their sentence in the Department of Corrections to complete pre-treatment evaluation, a course of treatment (lasting between 8-24 weeks) and post treatment SVR assessment at 12 weeks after treatment is completed, in order for patient education and system efficiencies to be evaluated (generally, this requires approximately 12-18 months)."  HSB 15.03.09 p. 10 ¶ J.1 (ECF 340-23). First, the FDC has been applying this exclusion to require only that there be enough time to complete a course of treatment and get a post-treatment assessment of SVR, and the decision is being made at the time of evaluation, after staging has been completed.  FDC 30(b)(6) Dep. at 121:11-15 (ECF 340-6).  So the ambiguous

language about requiring 12-18 months and that it includes the pre-treatment evaluation should be deleted.

Second, there is no clinical reason to require the patient to have enough time remaining to assess for SVR. In fact, exceptions to the policy have been made several times (including for Mr. McPherson); that is, inmates were approved for treatment even though they did not have enough time remaining to complete a post-treatment SVR assessment while in prison. Cherry Dep. at 62:6 – 63:7 (ECF 340-4); FDC 30(b)(6) Dep. at 172:3-14 (ECF 340-6). If a patient can complete the course of treatment, or close to it, the Department's desire to verify whether its systems are working is not a sufficient reason to withhold the medication.

Thus, this portion of the policy should be amended to clarify that the inmate must only have enough time remaining to complete a course of treatment, and give discretion to the committee to approve an inmate if arrangements can be made for the inmate to obtain the remaining medications outside of prison. *See, e.g.,* Mass. Policy at 13 (ECF 340-27); BOP Policy at 9 (ECF 341-1). This was recommended by the FDC's lawyer. E 50608 (ECF 340-13). Making this change would have a tremendously positive impact, as the permanent exclusion for insufficient time remaining on sentence was by far the most prevalent exclusion. Of the 230 inmates rendered ineligible, roughly 172 were deemed ineligible under this section. ECF 314-1. Several already had cirrhosis.

9.    <u>Referrals to Health Clinics for Those Being Released</u>

Relatedly, these individuals (who were deemed ineligible based on insufficient time remaining on their sentence) should be referred to community health centers to obtain treatment and testing. The Department considers this to be "excellent practice[,]" but does not do it.  FDC 30(b)(6) Dep. at 121:17-22 (ECF 340-6).  The FDC is currently exploring doing it in one community.  *Id*. at 122:1-15; E 95002 (ECF 340-15).

The FDC should be required to do it.  They already employ prerelease planners that do this very thing for inmates with HIV and other medical conditions that require continuity of health care.  *See* HSB on Prerelease Planning (ECF 340-24); HSB on Prelease Planning (mental health) (ECF 340-25).

10.    <u>The Exclusion Based on High Risk Behavior</u>

The policy currently excludes from treatment anyone who does not "demonstrate willingness and an ability to adhere to a rigorous treatment regimen and to abstain from high risk behaviors while incarcerated."  HSB 15.03.09 p. 10 ¶ J.1 (ECF 340-23).  There are several problems with this.  First, it is vague.  *See* Dewsnup Hrg. Tr. at 159:18-22, 160:5-13 (ECF 340-19).

Second, not all infractions should result in automatic exclusions; an inmate should only be excluded if the infraction, combined with the patient's clinical history, shows that the patient cannot adhere to a DAA treatment regimen (taking

one pill a day).   Right now, the policy is being applied to render ineligible someone who has gotten into a fight or was smoking synthetic marijuana (K2).  FDC 30(b)(6) Dep. at 123:15 – 124:5 (ECF 340-6).  But neither fighting nor smoking K2, on their own, have any bearing on whether a patient will show up to the pill line every day. Not only can someone using drugs or alcohol still achieve SVR, Dewsnup Hrg. Tr. at 162:18-20 (ECF 340-19), but alcohol and drug use have no measurable effect on achieving SVR.  *Id*. at 162:21 – 163:14.  If FDC is going to exclude someone under this requirement, it must demonstrate how the behavior actually shows that the prisoner cannot come to the pill line every day.  Smoking K2 once or getting into a fight doesn't show that, particularly if the prisoner has a history of successfully taking medication.

In fact, other state prison systems do not defer DAA treatment based on vague behavioral infractions.  The Massachusetts policy has no exclusions for drug use or behavioral issues, and specifically notes that "evidence of current IV drug use shall not be an automatic exclusion from treatment."  Mass. Policy at 13 (ECF 340-27). *See also* Minn. Policy at 5 (ECF 340-29).

Thus, the policy should be amended to delete the exclusion based on high risk behaviors.  It should be made clear that any exclusion for failing to demonstrate a willingness to adhere to the treatment regimen must be based on recent, identified,

relevant, and documented behavior.  If the behavior involved breaking a prison rule, the Disciplinary Report must be identified.

The policy should also be amended to clarify that these are temporary ineligibilities, not permanent exclusions, and the ineligibility period should be for a period of no more than three months, at which point the patient should be reevaluated.  The FDC is already treating this requirement as a temporary exclusion, and as a general rule patients are ineligible for a period of 6 months.  FDC 30(b)(6) Dep. at 123:15 – 124:10 (ECF 340-6). Section J.3 of the policy now contains general language on this subject, but the process and time limit should be made explicit in the policy.  And the language in J.3 implying that patients can be excluded for vague things like "chronic disciplinary issues" or "chronic behavioral management issues" should be deleted.

11.  Clarifying MELD Score Calculation and Liver Transplant Policy

The FDC's liver transplant policy appears on page 13 of the HSB.  HSB 15.03.09 p. 13 ¶ P (ECF 340-23).  It should be amended in several respects.  First, decompensation should be defined as the presence of encephalopathy, ascites, bleeding varices, or jaundice.  *See* FDC 30(b)(6) Dep. at 85:8-17 (ECF 340-6).[20] Second, it should be clarified to state that patients will be referred if they have **any**

---

[20] *See also* U.S. Dep't of Veterans Affairs, Viral Hepatitis, *What is decompensated cirrhosis?* Available at https://www.hepatitis.va.gov/patient/complications/cirrhosis/decompensated.asp. Last visited June 20, 2018.

**one** of the listed items. Third, the policy should require that MELD scores be calculated every 30 days (and then as often as directed by the transplant center), and that referral must be made within 30 days of any one of the triggering events. Currently MELD scores are only calculated every three months. *Id.* at 17:21 – 18:3.

This is necessary to avoid what happened with Carl Hoffer. His MELD score was calculated as 16 on October 31, 2017, but he inexplicably was not referred to a transplant center. ECF 204-2 ¶ 5; FDC 30(b)(6) Dep. at 165:18-20. Three months later, in December, his MELD score dropped to 9.[21] ECF 204-2 ¶ 5. On January 5, 2018, Plaintiffs filed a Motion requesting that he be referred for transplantation, and on January 9 his MELD score was re-calculated to be 17. *Id.*; ECF 199. Had Plaintiffs not filed their Motion, Mr. Hoffer's referral would likely have been delayed even further, until March—the month in which he died. Clearly, MELD scores can fluctuate from month to month, and when someone's HCV is this advanced, timing is critical.

Finally, the policy should require the FDC to promptly comply with the transplant center's request for records and other information, and to promptly transport the inmate to and from the transplant center. This process did not go smoothly for Mr. Hoffer, and the FDC does not know why it did not properly occur.

---

[21] FDC claims it doesn't know what would happen if the MELD score initially went above 15, but then dropped below 15 (i.e., whether the transplant referral would be rescinded). FDC 30(b)(6) Dep. at 18:25 – 19:17 (ECF 340-6). Clarification is needed.

FDC 30(b)(6) Dep. at 166:1-22 (ECF 340-6).  And there are still no written referral agreements with any transplant center, further reducing the likelihood of a smooth process.  *Id*. at 269:16 – 270:2.

12.    Clarify Exclusion for Life Expectancy

Currently, inmates are rendered ineligible for treatment if they do not "have a life expectancy sufficient to achieve benefit from HCV viral eradication."   HSB 15.03.09 p. 10 ¶ J.1 (ECF 340-23).  According to the FDC, this is one of the more subjective criteria. FDC 30(b)(6) Dep. at 122:21 – 123:4 (ECF 340-6).   That subjectivity should be reined in, and the policy should state that a patient is only ineligible if he or she has a life expectancy of less than 18 months.  The BOP, Massachusetts, and Minnesota all have policies that specify just that.  BOP Policy at 9 (ECF 341-1); Mass. Policy at 13 (ECF 340-27); Minn. Policy at 5 (ECF 340-29).

13.    Correcting the Risk Factors

Page 1 of Defendant's HCV policy lists risk factors for HCV.  HSB 15.03.09, p. 1 ¶ A.2 (ECF 340-23).  The list omits being born between 1945 and 1965, previous incarceration, and HIV.  Defendant's expert has admitted numerous times that these should be included, following the recommendation of the CDC and AASLD. Dewsnup Dep. at 141:2-12 (ECF 340-5); Dewsnup Hrg. Tr. at 171:9-21 (ECF 340-19) (it was an "oversight" not to include birth between 1945-1965); *see also* BOP HCV Policy at 6 (ECF 341-1)(listing being born between 1945 and 1965 and HIV

-43-

as risk factors); Mass. HCV Policy at 6 (ECF 340-27) (same).  Failure to include these factors reduces the number of people to whom testing will be offered and who will request testing, because they won't know they are at risk.  This becomes particularly important if opt-out testing is not performed.  Defendant should correct this oversight.

14.    <u>Monitoring</u>

Defendant's monthly status reports to the Court are helpful in monitoring the implementation of the Order, but they are not sufficient for Plaintiffs to adequately ensure that Defendant is in compliance.  Thus, Plaintiffs request that Defendant's monthly status report be modified so that it includes the following information: the total number of inmates who a) have been screened/tested for HCV, b) have been identified as having chronic HCV, c) have been identified as having chronic HCV and have been staged (which must be further broken down by stage, including F0, F1, F2, F3, F4, decompensated cirrhosis, and those with HIV), d) have been submitted to the Hepatitis C Committee for evaluation (which must be further broken down by stage, including F0, F1, F2, F3, F4, decompensated cirrhosis, and those with HIV), e) have begun treatment with DAAs, f) have completed treatment with DAAs, g) have achieved a sustained virologic response (SVR), h) have not achieved SVR, and i) have been deemed (temporarily or permanently) ineligible for treatment with DAAs along with the specific reason for ineligibility.  The reporting must also

certify, in the report following each deadline, that FDC has complied (or not complied) with the applicable deadlines for prisoners known to have chronic HCV in December 2017.

Plaintiffs also request that Defendant provide to Plaintiffs a) updated versions of any spreadsheet kept by FDC, any medical contractor, or private prison contractor that lists patients with HCV (including those who have been diagnosed, evaluated, staged, considered for treatment, begun treatment, refused, deemed ineligible, etc.). The FDC should ensure that the lists contain, at least, the following information: a) the names and DC numbers of everyone who has been diagnosed with chronic HCV, b) the date on which the diagnosis was confirmed, c) the date on which staging was completed, d) the prisoner's F-score, e) whether the prisoner has HIV, f) the prisoner's assigned Priority level, g) the date on which the prisoner's name was submitted to the Hepatitis C Committee for evaluation, h) the date treatment was initiated, i) the date treatment was completed, and j) whether it was successful.  The lists must also include: a) the names and DC numbers of anyone deemed (temporarily or permanently) ineligible for treatment, and the specific reason for it, b) the names and DC numbers of anyone who has refused staging, and c) the names and DC numbers of anyone who has refused treatment.

Plaintiffs also request that FDC be required to receive complaints from Plaintiffs' counsel about compliance with the order—both for general issues and

complaints regarding specific inmates—investigate, and promptly take corrective action and respond to Plaintiffs' counsel. Defendant should be required to provide to Plaintiffs all documentation (disciplinary reports, grievances, etc.) associated with any prisoner deemed temporarily or permanently ineligible for treatment and with any prisoner who refuses staging or treatment (including signed refusal forms). Finally, any future changes to the HCV policy should be submitted to the Court for comment by Plaintiffs and approval by the Court.

## IV. The Proposed Injunction Satisfies the PLRA

For cases "with respect to prison conditions," the Prison Litigation Reform Act (PLRA) states that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.*

However, the PLRA standard does not create a higher substantive hurdle beyond what already exists for federal court injunctions—it merely requires the Court to make the specific findings. *See Gilmore v. People of the State of California*, 220 F.3d 987, 1006 (9th Cir. 2000) (calling the needs-narrowness-intrusiveness test "a nearly identical standard" to the pre-PLRA standard); *Smith v. Arkansas Dep't of*

-46-

*Correction*, 103 F.3d 637, 647 (8th Cir. 1996) (PLRA "merely codifies existing law and does not change the standards for determining whether to grant an injunction").

In any event, the proposed injunction clearly complies with the PLRA.  The relief is narrowly drawn, as the "scope of the remedy" is "proportional to the scope of the violation." *Brown v. Plata,* 563 U.S. 493, 531 (2011).  It does not require broad reforms to all forms of medical care, but only applies to a specific medical condition to which Defendant has been unconstitutionally responding.  Similarly, the relief extends no further than necessary to correct the harm to the Plaintiff Class and is the least intrusive means necessary to correct the harm, as the proposed injunction essentially requires Defendant to follow the recommendations of its own expert, and continue with the process Defendant itself has implemented. Defendant's past behavior demonstrates why this injunction is necessary

Regarding the public safety and criminal justice component, the PLRA "does not require the court to certify that its order has no possible adverse impact on the public." *Id.* at 533.  But none will occur here.  No harm to public safety will result from providing constitutionally adequate medical care.

## V. Conclusion

Plaintiffs request that the Court grant their Motion for Summary Judgment and enter judgment in favor of Plaintiffs and against Defendant, with the following forms of relief:

-47-

1. Enter the terms of the preliminary injunction, as modified, as a final judgment, with the modifications requested herein.  This includes but is not limited to the treatment deadlines that have not yet passed for inmates known to have chronic HCV in December 2017 (treatment for F3 inmates by December 2018, evaluation of F3 inmates by September 2018, and treatment for inmates with HIV regardless of fibrosis score by December 2018).  One set of deadlines should be changed:  Currently, for inmates known to have chronic HCV in December 2017 who are at F2, the treatment deadline is December 2019 and the evaluation deadline is September 2019.  But going forward, F2 inmates will be treated at most within 1 year of staging (although Plaintiffs have requested 6 months) and evaluated at least 30 days before treatment.  This produces an anomalous result: An F2 inmate discovered tomorrow will be treated within 1 year (June 2019), or 6 months (December 2018), whereas someone known in December 2017 will have to wait until December 2019 for treatment.  Thus, the December 2019 treatment deadline and September 2019 evaluation deadline for F2 inmates known in December 2017 should be deleted, and all F2 inmates should be treated according to the policy going forward.  (To phase in this change, the treatment deadline can begin to run from the date judgment is entered, rather than the date they were staged).

2. Order Defendant (including its contractors and private prisons) to comply with the most current version of the HCV policy (HSB 15.03.09 supplement #3).

3. Order Defendant (including its contractors and private prisons) to modify its HCV policy (HSB 15.03.09 supplement #3) as detailed above, or otherwise order Defendant to implement such modifications.

4. Order the monitoring Plaintiffs have requested.

5. Order the FDC to ensure that its techniques for testing, staging, evaluating, and treating HCV remain current with industry standards and the standard of care.

6. Order FDC to provide all necessary and appropriate care and treatment for the symptoms and comorbidities of inmates with HCV.

7. Order such other relief that may be just and equitable.

**Certificate of Word Limit.**  Pursuant to N.D. Fla. Local Rule 7.1(F), this motion contains 11,995 words.

Respectfully submitted,

Randall C. Berg, Jr., Esq.
Fla. Bar No. 0318371
*RBerg@FloridaJusticeInstitute.org*
Dante P. Trevisani, Esq.
Fla. Bar No. 72912
*DTrevisani@FloridaJusticeInstitute.org*
Erica Selig, Esq.
Fla. Bar No. 0120581
*ESelig@FloridaJusticeInstitute.org*
Ray Taseff, Esq.
Fla. Bar No. 352500
rtaseff@floridajusticeinstitute.org
FLORIDA JUSTICE INSTITUTE, INC.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida  33131
305.358.2081
305.358.0910 – Fax

*Attorneys for Plaintiffs*

By:   *s/Dante P. Trevisani*
        Dante P. Trevisani, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed today, June 22, 2018, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notifications for this case, including all opposing counsel.

By:  *s/Dante P. Trevisani*
      Dante P. Trevisani, Esq.