# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION


CARL HOFFER,
RONALD MCPHERSON, and
ROLAND MOLINA, individually
and on behalf of a class of persons
similarly situated,

      Plaintiffs,

v.                            Case No. 4:17-cv-00214-MW-CAS

JULIE L. JONES, in her official
capacity as Secretary of the
Florida Department of Corrections,

      Defendant.
_____/


## DEFENDANT'S RESPONSE TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT


     Defendant, Julie L. Jones, as Secretary of the Florida Department of

Corrections ("Defendant"), files this response to Plaintiffs' Motion for Summary

Judgment [DE 342] and relies on the Memorandum of Law below:

## MEMORANDUM OF LAW

     Defendant made a motion for summary judgment on May 8, 2018, asking

that this court convert the preliminary injunction to a permanent injunction, and to

issue a summary judgment [DE 270].  Rather than simply concur with the Defendant's request, Plaintiffs have made their own motion, in an apparent attempt to establish additional facts, but also to request that the court add several items of relief to what Plaintiffs received in the preliminary injunction.  While Defendant responds herein to several of Plaintiffs' factual distortions, this case continues to be ripe for a summary judgment.  Defendant has conceded that relief is proper under the Eighth Amendment.  As such, extraneous facts set forth in Plaintiffs' motion would be immaterial, and, at a minimum, would be disputed, thus requiring the denial of Plaintiffs' motion.  Defendants' motion should be granted.  Although Plaintiffs are prematurely requesting additional items of relief, Defendant also comprehensively responds to these to show how they should not be a component of permanent injunctive relief.

## I.  RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

It is unsupported argument that FDC officials recognized the "importance" of direct-acting antiviral medication (DAAs) as soon as they were released.  To the contrary, Tom Reimers testified that FDC was initially trying to understand what the DAAs did, whether DAAs were tested thoroughly, etc. in 2013-2014.  It was not until 2015 that FDC realized that DAAs were being used in certain parts of the healthcare industry, so that FDC began exploring ways to reduce prices to be able to use them.  [DE 340-6, pg. 49-50, 264-265].

Based largely on a distortion of document production, Plaintiffs erroneously argue that FDC had to pay for direct-acting antiviral medication (DAAs), was aware for several years that its medical contractors were not treating chronic hepatitis C (cHCV) inmates, and instructed that inmates be put on a "wait-list" rather than treat. That is not correct. Corizon and Wexford were FDC's medical contractors from 2013 until FDC transitioned to Centurion in April-May of 2016. *Id.* at pg. 27, 54. Corizon/Wexford decided how to treat cHVC, and FDC relied on them to provide treatment. *Id.* at 32, 48-49, 51. During the Corizon/Wexford years, those companies were required to pay for DAAs, which were considered to be non-formulary drugs. When Corizon/Wexford medical staff submitted a request for DAAs, the FDC pharmacy would simply fill the order. *Id.* at 26-29, 34-35, 55. Mr. Reimers testified that he did not have any conversations with anyone at Corizon about how to treat cHCV patients, but he was aware that a relatively small number were being treated. *Id.* at 51, 254. Additionally, in 2015, when Mr. Reimers learned that Wexford was not treating anyone, he told a Wexford official, Nick Litle, that it was not acceptable. Id. at 51-52.

When Centurion became FDC's medical provider, FDC was now required to pay for the DAAs. [DE 340-10, pg. 26-27]. In April-May of 2016, Dr. Olugbenga Ogunsanwo was FDC's Assistant Secretary for Health Services. [DE 340-8, pg. 13-14]. After Centurion became a medical contractor for FDC, Dr. Ogunsanwo

met with Centurion's Dr. Jeff Keller, and indicated that treatment for cHCV inmates was in a "holding pattern" because FDC was waiting for funding. [DE 340-6, pg. 40]. Centurion then made the decision to keep a cHCV patient database for treatment prioritization. *Id.* at 39. Mr. Reimers, who succeeded Dr. Ogunsanwo in September 2016 [DE 340-8, pg. 14; 340-10, pg. 10] was not at the meeting, and did not learn of that instruction to Centurion until a short time ago. *Id.* at 40, 54. Hence, Mr. Reimers' understanding after he took over as FDC's Director of Health Services was that the patients who were most in need of treatment would be prioritized by Centurion and some treated. Consistent with that, he knew that Centurion was treating cHCV patients. *Id.* at 243-245. One year later, when Mr. Reimers' understanding changed, FDC instructed Centurion to treat all Priority 1 and some Priority 2 inmates during fiscal year 2017/2018. He also clarified that it was FDC's intention to provide cHCV treatment in accordance with its policy. [Defendant's Evidentiary Hearing Ex. 20].

Plaintiffs want the court to believe that the FDC was simply ignoring the subject of funding for cHCV treatment during recent years. That does not accurately describe the circumstances. The fiscal year '16-'17 starts on July 1, 2016. FDC made preparations for a budget request during the summer/fall of 2015. [DE 340-6, pg. 200-201]. While FDC did not submit a budget request seeking money for HCV treatment, FDC was attempting to determine the standard

of care for HCV treatment, knew that the Medicaid program was not providing DAAs, and that the Federal Bureau of Prisons, which had not provided DAAs, was re-examining that. Also, FDC was anticipating that inmates would receive HCV care though the Florida Department of Health, thus eliminating the need to use state funds. *Id.* at 203-204, 208-210. Similarly, when FDC was making preparations for the fiscal year '17-'18 budget, FDC was in the process of working with Florida's Agency for Health Care Administration to access significant rebates for DAA purchases, and it hoped to access those. *Id.* at 211-215. From last summer to the present, FDC has received $21 million dollars for DAA treatment, and will be receiving another $14 million for fiscal year 18-19. *Id.* at 229-230.

Having the benefit of hindsight, Plaintiffs criticize FDC for not adopting a policy of using DAAs from the moment they were released to the market. However, as stated above, it was not until 2015 that FDC realized that DAAs were being used in certain parts of the healthcare industry. Florida Medicaid did not authorize payment for DAAs until June 2016 [DE 340-10, pg. 30], and it was not until December 2016 that Wexford asked to have DAAs added to FDC's list of formulary drugs. [DE 340-9, pg. 32]

While Plaintiffs state that Mr. Hoffer died "after waiting for months to be taken to a transplant center," and that "he never received an evaluation," Mr. Hoffer was referred to the Mayo Clinic for a transplant evaluation. [DE 204].

Since the FDC does not control the Mayo Clinic, it could not determine whether Mr. Hoffer should have received an evaluation there. In fact, as explained in Section III. B. 11, below, Mr. Hoffer's MELD score never exceeded 17, and transplant centers routinely do not provide liver transplants unless MELD scores are well above 20.

Defendant admits that the present "standard of care" results in treatment with DAAs for patients at fibrosis stages F2-F4 as long as the inmate meets the evaluation criteria referenced in paragraph J of the HCV policy [DE 340-23], but not for F0 and F1 inmates. See Section III. B. 7, below.

## II. RESPONSE TO PLAINTIFFS' ARGUMENT

Plaintiffs have not cited to any case law or regulations for the proposition that all those with cHCV should be considered as substantially limited in a major life activity. In fact, such an assertion would be illogical since, Plaintiffs' expert, Dr. Margaret Koziel, testified that most individuals who have cHCV have no symptoms at all. [DE 369-1, pg. 46]. Also, the majority of courts appear to have held that whether HCV constitutes a disability depends upon whether the plaintiff is symptomatic and whether those symptoms affect a major life activity. See *Mitchell v. Williams*, 2016 WL 723038 at *3 (S.D. Georgia, February 22, 2016); *Horstkotte v. Comm'r. N.H. Dep't of Corr.*, No. 08-CV-61-JL, 2009 WL 4907025, at *5 (D.N.H., Dec. 11, 2009). Hence, without symptoms, most individuals with

cHCV would not be expected to have necessary substantial limitations, and thus it is impossible to make sweeping generalizations for an entire class. While Plaintiffs are correct in stating that those with cHCV are enrolled in the Gastrointestinal (GI) Clinic, any records in the GI Clinic that reflect they have been diagnosed with a virus would not automatically mean that FDC believes they all have an "impairment."

Defendant has otherwise briefed the issue of whether Plaintiffs stated a claim under the Americans with Disabilities Act and the Rehabilitation Act in her motion for summary judgment, and she incorporates that herein. [DE 270, pg. 28-32].

## III. RESPONSE TO PLAINTIFFS' REQUESTED SCOPE OF THE INJUNCTION

### A. The Court's Authority

When granting injunctive relief, the court must tailor the remedy to address the specific harm alleged. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). An injunction against state actors must directly address and relate to the constitutional violation itself. *Milliken v. Bradley*, 433 U.S. 267, 282 (1977).

The court's injunctive power is further constrained by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. See *Thomas v. Bryant*, 614 F.3d 1288,

1317-18 (11th Cir. 2018). Section 3626(a)(1) establishes three requirements necessary for an order granting injunctive relief: "[1] such relief is narrowly drawn, [2] extends no further than necessary to correct the violation of the Federal right, and [3] is the least intrusive means necessary to correct the violation of the Federal right." This means that courts cannot reach "out to control the treatment of persons or institutions beyond the scope of the violation." *Brown v. Plata*, 563 U.S. 493, 531 (2011). The Supreme Court "has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the constitution." *Id.* "Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Ball v. LeBlanc, 792 F.3d 584,* 599 (5th Cir. 2015). See *Cruz v. Beto*, 405 U.S. 319, 321 (1972) ("Federal courts sit not to supervise prisons but to . . . enforce constitutional rights.").

In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015). The Eighth Amendment does not require that medical care provided to prisoners be perfect or the best, but that the care be adequate. See *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991). Courts have held that other prisons could not be required to perform diagnostic testing, even in the extreme situation where the

failure might be considered malpractice.  See *Gardner v. United States*, 184 F. Supp. 3d 175, 186 (D. Md. 2016).  Also, the issue of what particular diagnostic technique to use is a "classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

## B.  The Relief Requested

By submitting 14 different items of relief along with their request for summary judgment, Plaintiffs are acting prematurely.  If this Court grants Plaintiffs a summary judgment, it must, prior to issuing any injunction order, give adequate consideration to FDC's views regarding remedy.  To do otherwise would be contrary to the considerations of comity, and would improperly thrust this Court into prison administration.  See *Lewis v. Casey*, 518 U.S. 343, 363 (1996)(failure to give adequate consideration to state prison authorities when developing an order to remedy a constitutional violation is grounds alone for setting aside the court's order). Such a procedure is also a recognition that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of the government." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).

Notwithstanding that, Defendant has chosen to respond in detail to Plaintiffs' proposed relief to foreclose any idea that Plaintiffs' proposals should be

part of any future court-ordered relief.  Uniformly, Plaintiffs' proposals are a wish list designed to solve problems that Plaintiffs have not shown to exist, and that are not supported with evidence.  Individually and collectively, Plaintiffs' suggested relief violates the PLRA since these items would not result in narrowly-drawn relief - they would impose requirements would extend much further than necessary to correct a failure to treat with antiviral medication those cHCV inmates at substantial risk of serious harm.  Moreover, Plaintiffs' suggested relief, which shockingly seeks to remove medical judgment and discretion, would also allow both Plaintiffs and this court to intrude into the operation of prison life, and take on the role of "supervising the minutiae of prison life," which is prohibited.  See *McKune v. Lile*, 536 U.S. 24, 37 (2002).

Finally, in making their proposed changes in medical testing, treatment, and information submission for cHCV inmates through "monitoring," Plaintiffs ignore that FDC must provide both routine and intensive medical care to nearly 100,000 patients on a daily basis, and that some of these patients have severe illnesses that also requires testing, treatment, and data reporting, along with the attention of existing medical staff.  Hence, Plaintiffs' requests should also be rejected if the court gives the necessary "substantial weight" to the "adverse impact" they would have on the operation of medical services in each of FDC's facilities.  See 18 U.S.C. § 3626(a)(1).

As to each of the Plaintiffs' requests, the Defendant submits the following additional responses:

**1. Opt-Out Testing, A Notice Campaign, and Not Charging a Co-Pay for a Visit To Sick Call**

Plaintiffs ask that FDC switch to opt-out HCV testing at reception for all newly incarcerated inmates, undertake an aggressive notice campaign regarding HCV, and waive co-payments that are charged to any inmate who reports to sick call for HCV testing.

Plaintiffs have not cited to any legal authority for the proposition that the decision to use "opt-in" as opposed to "opt-out" testing for HCV amounts to deliberate indifference to a serious medical need. Such an argument would be illogical because the Eighth Amendment only applies where there is an awareness of an inmate's serious medical need, *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000), and prior to testing, FDC could not be aware of a medical need. Moreover, members of the Plaintiff class have not described great difficulty securing HCV testing, and such allegations are not in the Complaint.

In her summary judgment motion [DE 270, pg. 25-26], Defendant referenced several cases where courts have found no Eighth Amendment violation for failing to test for a contagious disease when there was merely a risk that inmate might have HCV or hepatitis. That argument is incorporated.

There is no necessity for this court to order a conversion from the current opt-in system. When an inmate enters the prison system at a reception facility, blood is drawn to test for a variety of illnesses and conditions. The purpose is explained to the inmate, and the inmate is asked if he wants the blood sample screened for HCV. The inmate can refuse some or all of those tests. [DE 340-6, pg. 22-25]. FDC's policy, and its practice, is to provide these inmates with HCV educational information regarding HCV prevention, transmission, risk factors, and screening [DE 340-23, pg. 5]; Loomis Dec. [DE 369-2]. Inmates also get encouragement to undertake HCV testing. [DE 340-6, pg. 77]. Significantly, it has been the experience of nursing staff at the Central Florida Reception Center in Orlando that almost all inmates at reception are now choosing to be tested for HCV, and the rate of refusal for HCV is not any greater than the rate of refusal for any other test. Loomis Dec. [DE 369-2].

Plaintiffs provide citations to testimony from individuals who have estimated the prevalence of HCV among inmates. But, no evidence has been submitted regarding the prevalence among the Florida inmate population. The most recently available data shows that 6,314 inmates are known to have HVC [DE 364, pg. 2]. Since almost all inmates are opting to be tested for HCV at reception, this number will undoubtedly increase. For comparison, 5,119 inmates were known to have HCV as of March 20 [DE 241, pg. 2]. Hence, there has been

an increase of 1,000 inmates known to have HCV in only four months. Any increase will always be tempered by the fact that HCV inmates are being released at the same time new HCV inmates are being admitted.

To support their opt-out argument, Plaintiffs cite policies of other states, and an article published in the journal *Health Affairs* written by Beckman, et al. [DE 340-1]. Although the article is inadmissible hearsay and should not be considered by this court, it should be noted that out of the 49 state departments of correction that responded to the authors' survey, 32 states used an opt-in system.

Since almost all inmates are currently choosing to be tested for HCV at reception, and since FDC's policy provides for additional HCV screening to be offered "to all patients, regardless of risk factors, at multiple opportunities throughout incarceration," [DE 340-23, pg. 6] it is unnecessary for this court to order either an aggressive notice campaign regarding HCV, or a special waiver of any applicable co-payments if an inmate seeks medical services on a non-emergency, "sick" basis to obtain a screening test.

## 2. The Use of Elastography

Plaintiffs want FDC to use elastography on all inmates within a reasonable period of time, preferably 4-6 months, and to do so as a priority for those who are staged as F0, F1, and F2, unless use of elastography will delay the existing staging deadlines. In that event, the elastography would be started when FDC develops the

capacity for use without delaying staging. Alternatively, Plaintiffs ask for elastography for those inmates who don't present with "perfect concordance" on other tests. However, Plaintiffs have a significant misunderstanding regarding the effectiveness of elastography and the proprietary indices, elastography's practical use, as well as FDC's intended future use of elastography.

To initially assess whether, and to what extent, a patient has liver fibrosis, FDC takes a blood sample and then uses FibroSure, a proprietary predictive index, that utilizes a combination of age, sex, and a battery of laboratory parameters to provide a fibrosis stage estimate. Dewsnup Dec. [DE XX-3]. Proprietary indices are widely utilized in the U.S. correctional system. They have a high degree of accuracy if used appropriately. Also, correctional institutions are often located in rural or semi-rural areas, and, as exemplified in Florida, correctional patients are sometimes spread out over many different locations. Hence, these patients can be readily cared for with laboratory analysis. *Id.*

Although Dr. Dewnup is aware of Dr. Koziel's statement [DE 340-34] that FibroSure is only about 70% accurate, he believes there is a lack of data to support that. *Id.* While he acknowledges predictive indices are less effective for distinguishing between those who are at Stage 2 or 3, he believes it is strongly predictive at identifying individuals who have cirrhosis, and those who are at F0 and F1. *Id.*

Once a FDC patient has had an initial assessment of liver fibrosis, he is enrolled in the GI Clinic for further evaluation and monitoring if he is not being treated with DAAs. In the GI Clinic, every patient receives a history and physical examination, additional laboratory testing to predict the state of fibrosis, and an abdominal ultrasound or CT scan to detect the presence of cirrhosis, portal hypertension, or hepatocellular carcinoma. The abdominal ultrasound can be used to ensure that the patient is not worse than the proprietary score indicates, and is available in every prison. This is available for those inmates who are at F0-F2. *Id.*

No test will give a perfect staging estimate. Instead, practitioners look for a concordance with the history, physical exam and symptoms, labs, and test results. There is usually concordance, and in the limited circumstances when that does not occur, the FDC has retained the option of using ultrasound elastography. But, elastography also has diagnostic limitations. It can only image approximately 1/20th of a liver. Although MRI elastography can image the whole liver, it is not widely available. Also, the degree of diagnostic accuracy for elastography has not yet been proven. *Id.*

Regular and detailed review of physical examination, laboratory and test results for cHCV patients has continued since the October 2017 evidentiary hearing. FDC is unaware of any patients since December 2017 who were

predicted to be at F0-F3 as a result of the analysis of the FibroSure, physical examination, symptoms, and ultrasound, but who have quickly advanced and developed end-stage liver disease. This is evidence that the current diagnostic system used by FDC is safe and effective. *Id.*

Dr. Dewsnup provides medical services to inmates in the custody of the Oregon Department of Corrections. Based on that, he believes there is equivalent success in using either FibroSure and abdominal ultrasounds, or in using elastography and abdominal ultrasounds. He has not observed any breakthroughs in staging predictability using either of those two approaches during the last three years. Accordingly, it is his opinion that either approach is acceptable. *Id.*

Elastography does serve a limited, useful purpose. As stated by FDC, the optional use of elastography for patients in the F0-F2 stages would be proper. However, it is not necessary for all inmates with cHCV, nor is it necessary for all inmates staged at F0-F2. Instead, it should be used at the discretion of a physician for those inmates at F0 or F where indications are that the stage may actually be higher. FDC's current policy provides for the exercise of that discretion. *Id.*

Centurion has had a contract for medical services with the Massachusetts Department of Corrections, and Dr. Dewsnup provides consulting services to Centurion for those inmate patients. It has not been the practice in Massachusetts to administer elastography to all cHCV patients. *Id.*

Lastly, Dewsnup testified in October 2017 that he anticipated FDC would be making some use of elastography within 6-12 months. *See* DE 340-19 at pg. 98. That remains his understanding. *Id.*

FDC's stated use of elastography does not present a valid claim for deliberate indifference, and it is a further attempt by Plaintiffs to prematurely seek an inappropriate remedy in this action.

### 3. Treatment for Inmates at F0 and F1

Plaintiffs want FDC to treat within 1-2 years all inmates who are evaluated to be F0 and F1. Alternatively (and "initially"), Plaintiffs want all F0s and F1s monitored with elastography every 6 months.

Prior to the October 2017 evidentiary hearing, Plaintiffs similarly requested treatment for inmates at F0 and F1, arguing that the prevailing standard of care was to provide them with anti-viral medication. However, the court rejected that, relying on the opinions of Dr. Dewsnup. [DE 340-19, pg. 6-15, 17-19]. Without any new evidence, Plaintiffs are now re-arguing their previous position.

Dr. Dewsnup testified that patients at F0 and F1 have a chronic infection but are stable. As he explained, individuals in those stages do not die of liver disease; instead, they die of substance abuse and related complications [DE 340-19, pg. 55-57]. Hence, they can be monitored for disease progression and treated if they

reach the F2-F4 stages, as provided under FDC's current HCV policy and practices.

The Eighth Amendment is implicated only when there is "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Plaintiffs fail to show that not providing F0 and F1 patients with DAAs constitutes a "substantial risk." Also, by admitting in their motion that failing to provide the medication to these patients presents a risk that is not "measurable at this time," Plaintiffs show that the level of risk falls far short of the constitutional standard required to establish a violation of a federal right.

FDC addressed the use of elastography in the previous section, and described the need for there to be physician discretion for F0 or F1 inmates only in situations where the inmates have other laboratory or clinical indications that their stage may actually be higher.

### 4. Requiring FDC to Provide Certain Information To Any Inmate Who Refuses Staging or Treatment

Plaintiffs ask that FDC amend its policy to require an explanation regarding HCV consequences, treatment availability, "lack" of side effects, efficacy of the new medications, the staging process, and whether and when they will receive treatment. They argue that FDC is either not providing inmates with this information, or not providing it in an acceptable manner. They cite to declarations

of three inmates who they claim to have cHVC, but who refused a blood draw to determine their fibrosis stage because they did not receive any information regarding the purpose of the blood draw [DE 342, pg. 31-32]

This is unnecessary. As stated earlier, FDC has been providing HCV information to all newly-admitted inmates. See also, declarations of Centurion medical services employees Roberts Dec. [DE 369-4] and Shepard Dec. [DE 369-5]. Both work at reception facilities, and both state they provide an array of information about cHCV. At FWRC, this education includes information from other inmates. *Id.*

As to those inmates who were known to have cHCV as of December 2017, and for whom FDC made efforts to obtain new or updated information regarding their fibrosis stage, information about HCV has been provided in a few different ways.

Inmates known to have cHCV are enrolled in the GI Clinic, where they have received a variety of information about cHCV, including counseling on cHCV infection. [DE 430-23, pg. 6-7], and services to follow their disease progression. Roberts Dec. [DE 369-4]. This counseling also occurs when an inmate reports for sick call. Varona Dec. [DE 369-6].

Before requesting a staging blood draw of a known HCV inmate, Centurion staff have generally informed the inmates of the purpose. Ralls Dec. [DE 369-7], and Varona Dec. [DE 369-6].

For those inmates who have refused a blood draw to assess their fibrosis stage, or who have refused the anti-viral medication regimen despite qualifying it, Centurion medical staff have begun to double their efforts at education by sending specialized infectious disease nurses to meet with inmates and provide cHCV counseling. Some inmates do not consent despite these efforts, stating they do not want help from medical services, do not want to take single-dose medication, are going to be released soon, or they do not want any help from prison health services staff. Cooper Dec. [DE 369-8] and Stewart Dec. [369-9].

With their motion, Plaintiffs attached a declaration from inmate █████ ████, stating he was never given an explanation for the requested blood draws, and never received any information about HVC. That is directly contradicted by Dr. Alvia Varona, who personally counseled inmate █████ about cHCV when she learned that he refused a blood draw for cHCV testing. [DE 369-6]. Despite the information she provided, inmate █████ continued to refuse to have his blood drawn, told Dr. Varona he wanted to be left alone, and stated that since he has a life sentence, he will die in prison. *Id.*

FDC also opposes Plaintiffs' request that this court usurp Centurion's medical judgment to order specific information provided to inmates. For example, while Plaintiffs are asking that the court require inmates be informed that anti-viral medication has a "lack of side effects," that is not a correct factual assertion. Although they have fewer side effects than the older forms of treatment, some inmates suffer side effects that are believed to be attributable to the DAAs. Keller Dec. [DE 369-10]. Inmates retain their ability to refuse medical care. Further this is another example of Plaintiffs effort to inappropriately and prematurely seek to fashion a remedy in this action, which should not be a basis to prevent Defendant's requested summary judgment.

### 5. Shortening the Staging Deadline and Requiring Reliance on the Most Serious Test Results

Plaintiffs are asking for staging of all inmates within 30 days. Additionally, if an ultrasound is recommended as an additional part of the staging process, Plaintiffs are asking it be performed within 60 days of the initial FibroSure test results, with any resulting amendment of the patient's fibrosis score to be accomplished within 75 days.

The deadline for staging is 90 days. Plaintiffs have not shown the court any evidence that FDC is delaying the staging of inmates and subsequently delaying treatment with anti-viral medication. Plaintiffs have not shown the amount of time

FDC is taking to stage patients, and have not submitted any evidence that patients have sustained harm by virtue of the amount of time it took for their staging. They are requesting a cure without first demonstrating a problem.

The first step in the determination of an individual's fibrosis stage is the FibroSure test. While there was deposition testimony that it can take five days from the initial blood draw to receive the FibroSure results for an individual patient, Plaintiffs are vastly over-simplifying the process and significantly underestimating the time frames by suggesting that staging for everyone, which is an on-going process, can be done within five days. There is a range of time for the FibroSure results to be received – all results are not received within five days, and five days is at the bottom of the range. Also, when blood samples are provided for more than one patient at a time, FibroSure results can take much longer than 5 days to be received. After receipt of the results, medical staff must enter and review the results, often for more than one person. Love Dec. [DE 369-11]

After a patient is found to have cHCV, he is registered in the GI Clinic, and scheduled to be seen in the GI Clinic within 30 days. *Id.* As indicated above, when the patient is in the GI Clinic he receives an abdominal ultrasound, which is used to assess the fibrosis stage. Ultrasound results can be received within 30 days from the date the test is administered, but that is the soonest the results can be expected.

In total, the results can be obtained 60-90 days from the date the patient is found to be positive for cHCV. Love Dec. [DE 369-11].

Plaintiffs misstate Dr. Cherry and Dr. Dewsnup's testimony regarding the ultrasound when they characterize it as having nothing to do with staging. To the contrary, Dr. Cherry testified that the ultrasound furnishes more indirect clinical indicators related to cirrhosis [DE 340-4, pg. 48]. And Dr. Dewsnup pointed out that ultrasound is used to rule out "cirrhosis." [DE 340-19, pg. 75]. Whether one has cirrhosis is part of staging, i.e. determining the degree of the patients' fibrosis.

FDC needs the flexibility to stage inmates within 90 days to meet the needs at that time, without being ordered to comply with a potentially unrealistic, and unnecessary deadline of 30 days.

Plaintiffs also ask this court to require FDC to rely on the test, exam, or study indicating the highest fibrosis level, but do not supply any testimony or documents to suggest this is not already being done. Hence, this request should be rejected as well.

### 6. Shortening the Treatment Deadlines and Making Them Mandatory

Plaintiffs are asking for the elimination of the word "should" in the FDC's HCV policy as it pertains to the treatment of Priority 1 inmates in 0-6 months, and Priority 2 inmates within 6 months, arguing that eliminating "should" would result in the time periods for treating all Priority 1 and 2 inmates being mandatory rather

than aspirational. They want to shorten the treatment time period for all Priority 1 inmates to 3 months and for all Priority 2 inmates to 6 months.

Plaintiffs have shown no evidence that FDC has been treating many inmates outside the time periods currently set out in the HCV policy. They have not provided evidence that FDC is delaying treatment for Priority 1 and Priority 2 inmates to an unreasonable, or harmful, amount of time that is outside the present allowable time periods. Hence, elimination of the word "should" is unnecessary, and yet another example of the Plaintiffs seeking a judicial cure without first demonstrating a problem.

Creating mandatory deadlines would completely remove medical judgment from the treatment of the inmates, and would not account for the individual circumstances of different inmates. The provision of medical care is not always conducive to compulsory deadlines. Moreover, treatment of inmates with cHCV is not simply a matter of determining the inmate's fibrosis stage and then providing anti-viral medication. For example, FDC's HCV policy provides for an evaluation of the appropriateness and readiness of an inmate for medication. See DE 340-23, pg. 10, where the policy states that an inmate must "demonstrate willingness and an ability to adhere to a rigorous treatment regimen and to abstain from high risk behaviors while incarcerated," and if the patient does not demonstrate such a willingness and ability, a patient should "participate in any available counseling or

treatment in order to achieve the sobriety/behavior change before treatment with DAAs initiated."  Dr. Dewnup testified that sometimes newly admitted inmates are in the process of "sobering up, but their mind is not clear," and that he asks them "[i]s there something that we need to work on before we talk to you about treatment?" [DE 340-19, pg. 110-111].  If treatment periods were imperative, medical flexibility to treat the patient would be removed.

Some of the factors necessary to achieve the goal of treatment within FDC's stated deadlines are outside the control of FDC.  For example, some patients are not cooperative with the process of being diagnosed, staged, and evaluated.  Keller Dec. [DE 369-10].

FDC does not stage and evaluate patients then delay treatment if there exists additional weeks or months in the allowable treatment time periods.  Instead, all patients are closely monitored and those who require more urgent consideration are treated earlier based on their condition. *Id.*

Regarding the request that this court shorten the treatment time period for all Priority 1 inmates to 3 months and for all Priority 2 inmates to 6 months, these time periods are stringent, would not permit the exercise of medical judgment and the evaluation of individual circumstances, and have no basis in any medical literature that shows these proposed times would result in any medical benefit. Moreover, Centurion has the responsibility for treating close to 100,000 inmates

for a variety of illnesses and diseases.  If Centurion were required to cling to the suggested deadlines, this would divert medical services resources from other inmates with serious medical needs.  *Id.*

### 7.  Restaging F0-F2 Inmates Every 6 Months With FibroSure

Plaintiffs are requesting a revision of the HCV policy to require all those who are at fibrosis stages F0, F1, and F2 to be re-staged with a FibroSure every 6 months.

FDC's current HCV policy requires patients at fibrosis stages F0-F2 be seen in the GI Clinic every 6 months, receive lab testing every 6 months, and a FibroSure or elastography every 12 months. [DE 340-23].  Plaintiffs' request for re-staging every 6 months is unnecessary.  As discussed earlier, Plaintiffs have not shown any evidence that the failure to re-stage inmates at fibrosis stages F0-F2 at six-month intervals has caused harm to any inmates.

Furthermore, this change would incur significant additional cost without any significant medical benefit. There is simply no supportive medical literature for this suggestion.  Keller Dec. [DE 369-10].

Less than 1% of patients in stages F0-F2 progress to the next stage in one year, yet Plaintiffs are asking for monitoring every six months.  FDC is tracking the inmates who are in these stages every six months with a physical examination

and, blood test that evaluates their liver enzymes. Much information can be provided with this procedure. In the rare instance when an inmate in stages F0-F2 shows signs of rapid progression, medical staff has the discretion to re-order a FibroSure for updated staging. At the same time, if an inmate demonstrates unusual signs of progression sooner than his one-year re-staging with FibroSure, the provider would more likely order a liver ultrasound and/or elastography, since another FibroSure could be considered insufficient. *Id.*

### 8. The Exclusion for Time Remaining on Sentence

Plaintiffs are requesting several modifications of the HCV policy that relates to an inmate's need to have enough time remaining on his sentence to complete a pre-treatment evaluation, a course of treatment with anti-viral medication, and then post-treatment testing to determine whether the virus has been cleared. See DE 340-23, Par. J.1.

Plaintiffs claim that deposition testimony by Dr. Keller shows that FDC has been requiring only enough time remaining on the sentence to complete a course of treatment and the post-testing. Thus, they argue for the deletion from the HCV policy of the requirement that there be enough time remaining on the sentence for a pre-treatment evaluation. Plaintiffs misunderstand and take out of context Dr. Keller's testimony. A review of Dr. Keller's testimony shows he explained that a committee (acting on the results of the pre-treatment evaluation) made a

recommendation of whether there was enough time remaining in the sentence to complete the course of treatment and post-testing. [DE 340-6, pg. 37). Dr. Keller never stated the inmate did not need enough time left on his sentence for FDC to do a pre-treatment evaluation of such things as his readiness and willingness to adhere to the treatment, which are provided for in the FDC's HCV policy. Furthermore, it is illogical to think that after staging is completed, FDC would not want the inmate to have enough time remaining in prison to conduct an evaluation of his willingness and ability to accept the anti-viral medication as well as enough time to complete the treatment and to be post-tested.

Based on their misreading of Dr. Keller's testimony, and the HCV policy, Plaintiffs are asking for the deletion of what they characterize as "ambiguous" language that requires an inmate to have 12-18 months left on his sentence to take part in the pre-treatment evaluation, course of treatment, and post-treatment testing. The policy does not require an inmate to have 12-18 months left in his sentence. Instead, it requires the inmate have sufficient time remaining for those three things to be accomplished, and the policy simply states that "generally, this requires approximately 12-18 months." See DE 340-6, Par. J.1. Plaintiffs have also not produced any evidence to show that FDC is requiring all inmates to have 12-18 months remaining on their sentence, or that any inmate has been excluded from treatment because he did not have 12-18 months remaining on this sentence.

Since it is logical that circumstances can vary from inmate to inmate depending on such things as their medical condition and history, and the amount of time necessary for a pre-treatment evaluation and for treatment, FDC could never set an exact time period remaining for all inmates to accomplish the three necessary tasks. FDC needs to have a policy that refers to having "sufficient" time remaining on the sentence.

Without any supporting medical testimony, Plaintiffs claim a clinical reason does not exist for an inmate to be required to have enough time remaining on his sentence to undergo post-treatment testing, and they assert that it is sufficient "[i]f a patient can complete the course of treatment **or close to it**," (emphasis added), and want to require that an inmate only have enough time remaining on his sentence to complete a course of treatment. Without any understanding of what normally occurs after an inmate is released from prison, they ask that Centurion's Infectious Disease Committee have the discretion to approve an inmate to receive anti-viral medication if "arrangements can be made for the inmate to obtain the remaining medications outside of prison."

According to Dr. Dewsnup, for a patient to have the best chance to eliminate the cHVC virus from his blood, and for a course of anti-viral medication to be successful, an inmate needs to complete the course of treatment. Present data indicate that the best chance for SVR (sustained viral response) follows 100%

adherence to the planned therapy. Correspondingly, the chance of SVR decreases with less than 100% adherence. Since Dr. Dewsnup has not seen graphs of response vs. adherence, he believes that it is not possible to predict the success of therapy with a given adherence rate less than 100%. It isn't presently possible for a provider to predict whether the patient "came close enough." Present practice is to wait for 3 months and assess the SVR, and then proceed from there if retreatment is necessary. It is critical for patients to know and understand this prior to release, especially if their chances for medical follow-up outside of prison are poor. Dewsnup Dec. [DE 369-3].

While an individual is in prison, medical staff have some measure of control to monitor the administration of the medication so that the course of treatment is completed. That control is lost when an inmate is released. If a patient was released on treatment, a community provider would need to assume immediate management responsibilities, and this is not the usual situation. Even if the patient received full treatment during incarceration, after release the inmate may not have access to health insurance. This reduces the likelihood that he could find a location that would either continue to administer the medication or follow up with him to ensure SVR was reached. Even if a location were available, FDC would not know whether he would report to receive the medication, or whether exceedingly common lifestyle challenges would divert him from completion of his course of

treatment, such as the necessity of obtaining housing and food, the inability to complete a non-supervised course of therapy, transportation problems to a clinic for necessary follow-up medical care, or a relapse into criminal behavior or drug and alcohol use. Present literature, confirmed by Dr. Dewsnup's experience, indicates that over 50% of patients have these post-incarceration challenges and do not return for medical follow-up. *Id.*

If a released individual does not complete his course of treatment, and therefore does not achieve SVR, there would be a loss of the public health benefit that would be achieved by removing an cHCV infected individual from society, and a waste of the funds that FDC expended to purchase the anti-viral medication. *Id.*

Dr. Dewsnup believes that an important clinical rationale exists for post-treatment testing: it allows the FDC to determine whether SVR occurred in each patient and then be able to make any necessary adjustments in a number of considerations such as the selection of salvage medications, determination of length of treatment, and assessment of the pools of antiviral resistance in the FDC population. Moreover, it allows the management of co-morbidities affected by treatment such as insulin requirements or reducing the risk of teratogenicity after treatment with Ribavirin. If patients who took the anti-viral medication were not available for post-treatment testing, FDC would not be able to make these

adjustments or learn how to avoid complications in future patients to achieve the highest SVR rates possible. *Id.*

Plaintiffs' request to delete the 12-18 months remaining on an inmate's sentence requirement should be rejected since it is not determinative of whether FDC to providing constitutionally adequate care, and is another inappropriate attempt to prematurely fashion a remedy.

### 9. Referrals to Health Clinics for Those Being Released

Plaintiffs are asking that FDC provide referrals to community health centers for any cHCV infected inmates not treated with anti-viral medication due to having insufficient time remaining on their sentence. They want the referral to be a community health center where the released individual would "obtain treatment and testing."

The instant lawsuit only concerns the provision of medical treatment for individuals who are incarcerated, but Plaintiffs are improperly asking this court to impose obligations to assure cHCV-infected inmates will receive anti-viral treatment after release.

Additionally, FDC already provides pre-release planning for inmates who need continuity of health care when they are released. This is done for all inmates pursuant to an existing FDC policy. Prior to the release of an inmate who will need continued health care, the healthcare staff at each institution identifies that

inmate and works with the classification staff to provide that inmate with information and assistance. [DE 340-24] Love Dec. [DE 369-11].

FDC's pre-release planning would apply to inmates infected with cHCV. The information and assistance services given to that inmate prior to release would include providing information concerning available health clinics in their residential area and the remainder of the State; however, since it would be unknown whether the released individual would have health insurance or some means to acquire anti-viral medication at no cost or low cost, and would comply with all requirements, the pre-release information services could never include a referral to community health centers where that individual would be assured of receiving treatment and testing. *Id.*

### 10. The Exclusion Based on High-Risk Behavior

Plaintiffs ask for the deletion of what they characterize as the "exclusion" for treatment of cHCV inmates based on their participation in high-risk behaviors.

Among other criteria, FDC's HVC policy requires that inmates "demonstrate willingness and an ability to adhere to a rigorous treatment regimen and to abstain from high risk behaviors while incarcerated." HSB 15.03.09, p. 10 ¶ J.1. (DE 340-23). The policy explains the rationale:

> A cHCV patient's attitude, functional ability to thrive within
> the system, and optimal treatment of mental health issues are

critical for good outcomes.  Patients who have chronic disciplinary issues within the system have very high substance abuse relapse rates upon release, with newer evidence indicating higher re-infection rates. Patients should be counseled and observed on a case-by-case basis, and involvement of mental health professionals is critical.  It is also critical to remember that patients who have chronic behavioral issues, common in jails/prisons, are rarely able to establish and maintain a therapeutic provider-patient relationship which results in completion of treatment and an SVR.

[DE 340-23, pg. 10, Par. J.3.].

That reasoning rebuts Plaintiffs' assertions in their motion – unsupported by any medical evidence – that FDC's only concern should be whether the inmate has demonstrated that he "will show up to the pill line every day." [DE 342, pg. 39-40].

Plaintiffs say the policy is vague, but that fails to appreciate the nature of the FDC policy and the roles of medical staff.   The request seeks a rigid set of written rules for treating physicians to apply.  Instead, the HCV policy is a set of "recommendations," See DE 340-23, pg. 1, and not a set of rigid rules to be followed by medical practitioners who need to exercise professional judgment based on individual circumstances.

While their motion arguments are internally inconsistent, Plaintiffs initially take the position that the high-risk behavior results in "exclusions" that are "automatic," and they cite to, but mischaracterize, the testimony of Dr. Keller.  Dr.

Keller actually testified that high-risk behavior is not an exclusion for treatment, but, instead, is only a temporary ineligibility. [DE 340-6, pg. 123.] Moreover, the policy itself says as much in paragraph J.3. when it states that inmates who demonstrate an unwillingness and inability to adhere to a rigorous treatment regimen, who do not abstain from high-risk behaviors, have chronic disciplinary issues, or who have behavioral-management issues "*may not* be eligible for treatment *until those issues are considered to be resolved*." (emphasis added) [DE 340-23, pg. 10, Par. J.3.]

Temporary ineligibility is a clinical judgment that must be made by physicians who take into consideration many factors on a case-by-case basis. Dewsnup Dec. [DE 369-3].

Later in their motion, Plaintiffs concede that high-risk behavior would only result in a temporary ineligibility. However, without any evidence, Plaintiffs tell the court that their ineligibility should be for no more than three months. They again misrepresent Dr. Keller's prior testimony, indicating that ineligibility is generally for six months. Actually, Dr. Keller testified there is no "hard and fast" rule on the length of ineligibility, and each inmate's ineligibility is scrutinized on a "case by case" basis. [DE 340-6, pg. 124]. Six months is still a reasonable period of time. Dr. Dewsnup opined that a patient needs at least six months without evidence of continuing HCV risk behaviors, or uncontrolled mental health

problems which would affect adherence with a DAA treatment regimen. [DE 119, pg. 5]. He also testified that with substance abuse, six months is generally considered to be reasonable for a person to achieve sobriety. [DE 340-19, pg. 133].

The policy does not apply to single incidents of misbehavior, such as getting into a fight, as Plaintiffs suggest. An inmate can be considered temporarily ineligible based on disciplinary or behavioral management issues that are chronic. See DE 340-23, pg. 10, Par. J.3, which states "[p]atients who have chronic behavioral management issues, common in jails/prisons, are rarely able to establish and maintain a therapeutic provider-patient relationship which results in completion of treatment and an SVR."

Dr. Dewsnup drafted the policy portion that considered a temporary ineligibility for high risk behavior. As he explains, a temporary ineligibility was based on his many years of treating and advising inmates with HCV. Dewsnup Dec. [DE 369-3]. Comprehensive cHCV treatment includes sobriety and positive lifestyles, not just viral eradication. See DE 119, pg. 2. The positive outcomes of increased survival and improved quality of life associated with successful viral eradication and SVR are also dependent upon sobriety and positive lifestyle change. *Id*.

Other prison systems also recognize the importance of patient conduct and

sobriety for achieving SVR.  The Federal Bureau of Prisons considers the inmate's

willingness and ability to adhere to the treatment and to abstain from high-risk

activities. [DE 341-1, pg. 9].  See the policies of Tennessee [DE 369-12, pg. 11],

New Hampshire [DE 369-13, pg. 2] and Minnesota [DE 340-29, pg. 5], that

consider a variety of conduct and high-risk activities as a prerequisite to treatment.

Based on the foregoing, this Court should reject Plaintiffs' request to modify

FDC's policy regarding temporary ineligibility based on an inmate's high risk

behavior.

## 11.  Clarifying MELD Score Calculation and Liver Transplant Policy

Plaintiffs want this court to order FDC to amend in several respects the

portion of its HCV policy relating to referrals for liver transplants.  Currently, the

policy states the following:

P.      REFERRAL FOR LIVER TRANSPLANTS FOR PATIENTS WITH
        DECOMPENSATED CIRRHOSIS

1.      All patients with decompensated cirrhosis who have the
        following will be referred to a Florida liver transplant center for
        evaluation in accordance with that center's criteria and
        procedures.

        a.      a MELD score of 15 or higher
        b.      Any significant complication or co-morbidity of cirrhosis
        c.      A diagnosis of hepatocellular carcinoma (HCC)

2.    Thereafter, co-management as directed by the transplant center will be instituted if the patient is listed for transplant.

[DE 340-23, pg. 13, Par. P]

Plaintiffs request that "decompensated cirrhosis" be defined as the presence of encephalopathy, ascites, bleeding varices, or jaundice.  Defendants do not object to stating that patients who have decompensated cirrhosis are those who have cirrhosis of the liver, and who experienced encephalopathy, ascites, bleeding varices, or jaundice.  The symptoms encephalopathy, ascites, bleeding varices, or jaundice do not, alone, indicate decompensated cirrhosis because they could have other causes, but if they are experienced by someone who has cirrhosis, the FDC would be comfortable considering that person to have decompensated cirrhosis. Keller Dec. [369-10].

Plaintiffs believe FDC should clarify the policy to state that FDC will refer patients to transplant centers if the patient has one of the listed conditions in P1a, P1b, or P1c.  Instead, FDC believes that a revision of the conditions is necessary based on the experience of the Centurion medical staff during the last several months.  A few transplant centers in Florida have informed Centurion that they use a MELD score of 15 or higher for their referrals, and the use of a MELD score of

15 or higher for a referral is consistent with AASLD recommendations. Love Dec. [DE 369-11]; [DE 340-6, pg. 18]; [DE 340-5, pg. 148].

Another advantage of the MELD score is that it is a calculation that it not dependent upon subjective opinion. Dr. Keller believes it would be appropriate to continue using the MELD score as a condition for referral. However, the use of anti-viral medication can potentially lower one's degree of fibrosis and the MELD score. Hence, for individuals who have been scheduled to receive DAA medication, are undergoing DAA treatment, or who have finished DAA treatment, a referral should be made only if the post-treatment MELD score is over 15. Moreover, transplant centers will normally not consider an individual to be appropriate for a liver transplant unless the MELD score is well over 20. Keller Dec. [DE 369-10]. Dr. Dewsnup similarly testified at the evidentiary hearing that transplants usually do not occur until the patient is more than 24 or 25. [DE 340-19, pg. 157].

Since the diagnosis of hepatocellular carcinoma is an objective determination based on tests, and it should be generally accepted as a referral condition by transplant centers, the FDC can keep this as a condition for referral as well. Keller Dec. [DE 369-10]. But, the second listed condition in the current policy, which states "any significant complication or co-morbidity of cirrhosis," needs to be removed from the policy. The words "significant complication of

cirrhosis" would be difficult for providers to interpret and apply consistently.

Additionally, the complication could be temporary, Keller Dec. [DE 369-10], and

these words also do not appear to be referral criteria that is used by any Florida

transplant centers. Love Dec. [DE 369-11]. Keeping that as a condition would

likely result in referrals that are considered inappropriate. Keller Dec. [369-10].

Similarly, the mere existence of a co-morbidity should not result in a referral if the

co-morbid condition is well-controlled. *Id.*

Plaintiffs request that the policy state that FDC must make a referral to a

liver transplant center within 30 days for a patient having any one of the triggering

events. Despite the fact that this is an attempt by Plaintiffs to prematurely seek a

remedy, Defendants do not oppose the incorporation of a 30-day period-of-time for

a referral; however, while a referral can be initiated within 30 days, completion of

the referral is dependent upon the transplant centers' requests for information, and

speed of processing, all of which is outside of FDC's control. Love Dec. [DE 369-

11]. As a result, FDC will amend the policy to reflect that a referral will be

initiated within 30 days of the determination that there is either a qualifying MELD

score, or the diagnosis of HCC. However, FDC's agreement and amendment of its

policy is not a concession that would be a necessary remedy for the instant case,

and Plaintiffs' motion should be denied.

Plaintiffs request that the MELD score be calculated every 30 days (and then as often as directed by the transplant center) instead of every three months. Plaintiffs have not provided any medical support for this, while Dr. Dewsnup testified at the evidentiary hearing that MELD is a tool to evaluate the 3-month prognosis in patients [DE 340-19, pg. 156-157]. Thus, the medical evidence previously submitted in this case supports three-month evaluations, not monthly evaluations. There are other medically-based reasons that a 30-day recalculation of MELD for patients with decompensated cirrhosis is a bad idea. For example, those inmates with anemia can ill afford a regular 30-day blood loss, drawing blood every 30 days could cause an inmates' veins to collapse, and these inmates with decompensated cirrhosis, who are often not feeling well, could be expected to refuse such a regular blood draw for that purpose. Keller Dec. [DE 369-10].

Plaintiffs mention Mr. Hoffer's MELD scores in December and January to support their claim that MELD should be calculated every 30 days. But, Mr. Hoffer's MELD score of 17 in January 2018 was only slightly above the referral criteria of 15, and nowhere near the MELD score typically required by transplant centers to consider an individual to be a transplant candidate. Notably, Plaintiffs do not introduce any evidence that a Florida transplant center would have considered Mr. Hoffer to be a candidate for a transplant, or would have provided him with a liver, with a MELD score at 17. Moreover, it has been Dr. Keller's

experience that even after a referral is made, transplant centers do not ask for updated MELD scores on a 30-day basis. *Id.*

Plaintiffs believe the policy should require FDC to "promptly comply" with the transplant center's request for records, and "promptly transport" the inmate to and from the transplant center. Importantly, there is no evidence of a pattern of FDC's failure to timely provide requests from transplant centers for either records, or the transportation of inmates to the transplant centers. Using Mr. Hoffer experiences, Plaintiffs claim that his referral process did not go "smoothly," and FDC does not know the reason. Even if the referral was not "smooth," that does not show FDC failed to timely provide documents to the transplant center, or that such practice is common, and that instance also does not relate to inmate transportation to transplant centers.

Finally, Plaintiffs request the execution of referral agreements with transplant centers on the pure speculation that without them a likelihood of a smooth process for liver transplant referrals will be less likely. Referral agreements are not necessary for FDC to make referrals, and prior referrals have been effectuated with what is referred to as a "single case agreement" between Centurion and the transplant center which indicates a commitment to pay the center's listed fees. Love Dec. [DE 369-11].

## 12. Clarifying the Exclusion for Life Expectancy

FDC's current HCV policy provides that inmates are eligible for treatment with anti-viral medication if they have a life expectancy sufficient to achieve benefit from HCV viral eradication. Plaintiffs ask that FDC change the policy to state a patient is ineligible if he has a life expectancy of less than 18 months.

Plaintiffs have not shown the court that FDC has been denying DAA treatment to a large number of inmates based on life expectancy. Since January 2018, FDC has been filing monthly reports with the court regarding the treatment of cHCV inmates. Those reports include the number of inmates determined to be permanently ineligible for treatment. According to the August 2018 report, almost 2,355 inmates have begun or completed treatment with DAAs. [DE 364, pg. 3]. During the last eight months or so, only one inmate has been considered ineligible for treatment due to his life expectancy, and that inmate was in palliative care. [DE 364-1]

In accordance with FDC's policy, after an inmate is staged, but before DAA medication is provided, the inmate is evaluated for treatment. One of the factors considered is whether the inmate has "a life expectancy sufficient to achieve benefits from viral eradication." [DE 340-23, pg. 10, Par. J.1.]

When evaluating a patient's treatment for a number of diseases or conditions, physicians commonly consider whether the patient will benefit from

the treatment. Dewsnup Dec. [DE 369-3]. Physicians generally do not want to recommend or administer treatments to individuals who will not benefit from the them. *Id.*

Subjectivity is an inescapable part of the diagnostic and decision-making process in medical practice. To a large extent, the application of medical judgment is the application of medical subjectivity. *Id.* Plaintiffs' suggestion that an inmate only be considered ineligible to receive DAAs if his life expectancy is estimated to be less than 18 months does not allow for a consideration of whether the inmate's priorities ought to be pain relief or treatment for another condition, and whether an inmate will not benefit from the cHCV treatment because he is expected to die from another condition sooner than from the advancement of cHCV. *Id.*

Dr. Dewsnup gave an example of a patient with congestive heart failure, who would be in the five-year survival category and ended up having a miserable life. [DE 340-19, pg. 134]. There are certainly other situations in which treatment for that patient's cHCV is not likely to improve his quality of life or help him live longer. Dewsnup Dec. [DE 369-3].

To some extent, Plaintiffs are suggesting a swap of one factor that they criticize as being subjective, i.e. "a life expectancy sufficient to achieve benefits," for another that has subjectivity as well, i.e. "less than 18 months." Life expectancy is, as the name suggests, an "expectancy." It cannot be measured or

foretold with certainty. Instead, it is similarly the result of medical opinion. Dewsnup Dec. [369-3]. Physicians seek to provide treatment. The current policy language is typically not difficult to apply since it is usually obvious whether an inmate will die of heart disease, lung disease, or some other condition before that inmate could realize a benefit from cHCV treatment. *Id.*

The policy wording used for life expectancy is the identical language used by the Oregon Department of Corrections (ODC) in its policy. Dr. Dewsnup, an infectious disease consultant for ODC, has not found that ODC's policy has presented any difficulty for him in application to inmates at ODC. *Id.*

In all areas of medicine, physicians make decisions that are individualized to the patient. If there were implementation of Plaintiffs' suggestion that ineligibility be based on a life expectancy estimated to be less than 18 months, FDC physicians would be less able to make decisions that are individualized to the patients' unique circumstances. *Id.* Based on the foregoing, FDC requests that this Court reject Plaintiffs' request to modify the policy regarding ineligibility based on life expectancy sufficient to achieve benefits from viral eradication.

### 13. Correcting the Risk Factors

Plaintiffs want FDC to add language to its policy that HCV risk factors include being born between 1945 and 1965, having been previously incarcerated, and having HIV. [DE 342, pg. 43]. Their explanation is that without the addition,

there will be fewer inmates who will be offered treatment, and fewer who will request testing. *Id.* at pg. 44.

Plaintiffs have not provided any evidence that fewer inmates have requested to be tested because of the absence of their requested language in a policy that is obviously drafted by FDC to guide its staff and medical contractor's staff in administering medical services to those with HCV. They have also not shown how the inclusion of that language in the HCV policy would relate to, and be covered under, their Complaint, which alleges deliberate indifference in the failure to provide life-saving "treatment" to prisoners known to have HCV. See DE 1, Par. 1.

Plaintiffs have not shown that Centurion is only using the information contained in the FDC's HCV policy when it educates all newly incarcerated inmates about HCV, or offers HCV screening at multiple opportunities throughout incarceration. See DE 340-23, pg. 5, Par. D, and pg. 6, Par. F. Plaintiffs have also not shown that Centurion does not offer screening to inmates who were born between 1945 and 1965, were previously incarcerated, or have HIV as a direct result of the failure of those risk factors to be listed on page one of FDC's HCV policy. To the contrary, FDC's HCV policy explicitly states that screening for cHCV will be offered to all patients "regardless of risk factors." [DE 340-23, pg.

6, Par. F].  As such, FDC requests that this Court reject Plaintiffs' request to add additional risk factors to FDC's policy.

### 14. Monitoring

Plaintiffs request monthly reports that expand on the information that has been provided to the court for almost eight months, but do not provide any explanation for the expanded scope of information, and do not explain how the additional information will better enable the court to determine whether cHCV inmates in the F2-F4 stages are receiving anti-viral medication.  Interestingly, Plaintiffs want a reporting on the number of inmates who have succeeded or failed in achieving SVR after completing treatment, yet, earlier in their motion Plaintiffs ask that inmates be released from prison while they are in the process of taking their medication, and without the need for any post-treatment testing to determine whether the inmate achieved SVR - proposals that would destroy the accuracy of the SVR information they now request.

Plaintiffs unrealistically ask for the information in the report to be certified. It is inappropriate to ask a FDC official to personally vouch for the accuracy of the information when it is largely being supplied by a FDC contractor on the basis of data inputted from numerous contractor employees who are providing care to thousands of inmates at over 70 different locations.

Plaintiffs also want spreadsheets containing over a dozen pieces of information provided only to them. They do not state how often they want the information, or how it would be useful. Assuming it was provided on a quarterly basis, Plaintiffs' counsel will presumably use that information to submit numerous unwarranted requests for "investigation" and response, which can have the cumulative effect of improperly thrusting them into the role of supervising the minutiae of prison life, while adversely impacting the operation of medical services contrary to 18 U.S.C. § 3626(a)(1).

Rather than only asking for this information from FDC, which would produce information from its medical contractor, Plaintiffs erroneously ask for information from any "private prison contractor," although the private prison corporations are not parties to this case, and even though Plaintiffs have not shown that FDC has the necessary amount of control over them to require the production of the requested information.

Although Plaintiffs seek the ability to submit complaints to FDC for investigation and response, they do not constrain themselves to the submission of such complaints on a periodic basis, such as a quarterly submission, and do not provide the necessary specificity for their request of "documentation" related to inmates who are deemed ineligible for treatment, or who refuse staging or

treatment. Such a potentially overly burdensome number of requests could significantly impact the administration of health services.

Finally, Plaintiffs request that any future changes to the HCV policy be submitted to them for comment and for court approval would further incorrectly permit them to exercise control over prison administration.

Plaintiffs' premature, attempt to insert themselves as monitors over FDC's compliance with any injunction which may be entered in this action, and their request for much more information that is necessary or that FDC is able to provide, should be rejected.

WHEREFORE, for the foregoing reasons, Defendant requests this court to deny the Plaintiffs' motion for summary judgment.


## CERTIFICATION OF MEMORANDUM WORD COUNT

Undersigned counsel, pursuant to local rule 7.1(F), certifies the preceding memorandum contains 11,013 words.


Respectfully submitted,

**PAMELA JO BONDI**
**ATTORNEY GENERAL**

*/s/ Albert J. Bowden*

Albert J. Bowden
Special Counsel
Florida Bar No.: 802190
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida  32399-1050
(850) 414-3300, Ext. 4716
(850) 488-4872 (Fax)
al.bowden@myfloridalegal.com


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been electronically served by the Court's CM/ECF systems on counsel for this 17th day of August 2018.


*/s/ Albert J. Bowden*
Albert J. Bowden