# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

CARL HOFFER, et al.,

       *Plaintiffs*,

v.                             Case No. 4:17cv214-MW/CAS

MARK S. INCH, in his official
capacity as Secretary of the
Florida Department of
Corrections,

       *Defendant*.

_____/

## ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

This Court previously issued a preliminary injunction requiring the Florida Department of Corrections ("FDC") to treat inmates infected with the Hepatitis C virus ("HCV"). ECF No. 153; ECF No. 185. Defendant admits most of this Court's prior findings and, by way of a motion for summary judgment, asks this Court to make the preliminary injunction permanent and award no further relief. ECF No. 270. Plaintiffs also move for summary judgment but ask this Court to enter a permanent injunction broader in scope than the preliminary injunction. ECF No. 342. For the

reasons that follow, the parties' cross-motions for summary judgment are **GRANTED in part** and **DENIED in part**.

## I. Background

### A. *Forging the Path*

Plaintiffs Carl Hoffer, Ronald McPherson, and Roland Molina filed this case on May 11, 2017. ECF No. 1. All three were inmates in FDC's custody, were infected with HCV, and had been denied proper medical treatment. *See id.* They moved to certify a class of similarly situated plaintiffs and also moved for a preliminary injunction requiring FDC to properly treat HCV-infected inmates. ECF No. 10; ECF No. 11.

To resolve Plaintiffs' motions, this Court held a five-day evidentiary hearing beginning on October 19, 2017. *See* ECF No. 142. This Court heard from medical experts, FDC officials, and the named Plaintiffs themselves. *See id.* The parties also introduced several exhibits, the most notable of which was "HSB 15.03.09 Supplement #3," FDC's official written policy for managing HCV ("FDC's policy").

Although a number of facts remained unclear, the truth uncovered at the hearing was crystal: FDC was shirking its duty to properly treat HCV-infected inmates because the treatment—

specifically, the use of direct-acting antivirals ("DAAs")—was too costly. By order dated November 17, 2017, this Court detailed FDC's "long and sordid history of failing to treat HCV-infected inmates," held that Plaintiffs were likely to succeed on their Eighth Amendment deliberate-indifference claim, and granted Plaintiffs' motion for preliminary injunction. ECF No. 153. Moreover, having found that the necessary requirements were met, this Court granted Plaintiffs' motion for class certification as well. ECF No. 152.

Before issuing a preliminary injunction, this Court first ordered Defendant to file a proposed treatment plan consistent with this Court's "broad" directions. *See* ECF No. 153, at 28–32. After receiving Defendant's plan, noting deficiencies with the plan, and receiving further comments from the parties, this Court ultimately issued a preliminary injunction on December 13, 2017. ECF No. 185. Simply put, the injunction requires Defendant to (1) ensure that FDC and its agents comply with the treatment plan (with modifications), (2) ensure that FDC and its agents comply with FDC's policy (with modifications), and (3) file monthly status reports outlining FDC's progress in complying with the injunction. *Id.* at 3–6.

## B. *Fifteen Months Down the Road*

Over fifteen months have passed since this Court issued the preliminary injunction. Within that time, FDC has screened 55,348 inmates for HCV, identified 7,185 inmates as having chronic HCV ("cHCV"),[1] and begun or completed treating 4,901 inmates with DAAs.[2] ECF No. 453. In addition to making amends, FDC has also recognized some of its past wrongs. For instance, FDC now admits that it "was not adequately monitoring all inmates with cHCV prior to the preliminary injunction." ECF No. 270, at 28. FDC further admits that "cHCV constitutes a serious medical need" and that FDC's "failure to treat inmates with cHCV was due to lack of funding." *Id.* at 17–18. In short, FDC admits this Court's finding of deliberate indifference. *See id.* at 18.

---

[1] As explained in a previous order, "about 20–50% of people infected with HCV spontaneously clear the virus within six months of infection." ECF No. 153, at 4. "The remaining 50–80% who don't clear the virus are referred to as having chronic HCV." *Id.*

[2] Time has also brought much change for the named Plaintiffs. Carl Hoffer completed DAA treatment but died while still in custody and waiting for a liver transplant. ECF No. 269-1, at 2; ECF No. 342, at 19. Ronald McPherson completed DAA treatment and was later released from prison. ECF No. 269-1, at 2. Roland Molina remains in FDC custody but has completed DAA treatment, and "his post-testing indicates that he has achieved a sustained virologic response (SVR), which means that [HCV] is no longer detected in his blood." *Id.* Of course, these developments do not moot this case. *See, e.g., J W ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1265 n.4 (11th Cir. 2018).

C. *A Course for the Future*

Cases tend to be resolved rather quickly after a preliminary injunction is issued. That is, preliminary injunctions often get appealed, and the appellate courts' opinions tend to be so decisive that the parties either settle or one side accepts defeat. Here, neither side appealed, and Defendant only accepted partial defeat. Indeed, although Defendant "no longer wishes to contest" the issues this Court "already resolved" and asks this Court to convert the preliminary injunction to a permanent injunction, Defendant still seeks summary judgment in his favor as to any unresolved issues. ECF No. 270, at 2. And while Plaintiffs "agree that a permanent injunction should be entered against Defendant," they submit that "there are a number of issues that are still in dispute, and several forms of relief that Plaintiffs are requesting that are not currently required by the preliminary injunction," ECF No. 342, at 2.

Consequently, this Court is left to finish what it started when it issued the preliminary injunction almost a year and a half ago. This Court agrees with the parties that summary judgment is the right tool for that job. No triable issues of fact remain, so an evidentiary hearing is unnecessary to "convert" the preliminary

injunction to a permanent injunction. *United States v. Prater*, No. 8:02-CV-2052-T-23MSS, 2005 WL 2715401, at *5 (M.D. Fla. Sep. 23, 2005). Instead, this Court may simply incorporate its prior findings and "recast" them in terms of the permanent-injunction standard. *See id.* Accordingly, this Court hereby expressly incorporates all findings from its prior order granting Plaintiffs' motion for preliminary injunction, ECF No. 153.

## II. Analysis

This Court begins its analysis by addressing the merits of Plaintiffs' three claims: deliberate indifference under the Eighth Amendment; discrimination under Title II of the Americans with Disabilities Act ("ADA"), and discrimination under the Rehabilitation Act ("RA"). *See* ECF No. 1. This Court then turns to the propriety of Plaintiffs' additional requests for relief. Finally, this Court considers the requirements for a permanent injunction.

### A. *The Merits of Plaintiffs' Claims*

#### 1. Deliberate Indifference Under the Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on inmates. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). The Supreme Court has interpreted this prohibition to

encompass "deprivations . . . not specifically part of [a] sentence but . . . suffered during imprisonment." *Id.* at 297. Consequently, an inmate who suffers "deliberate indifference" to his "serious medical needs" may state a claim for a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on their claim of deliberate indifference, Plaintiffs must show (1) a serious medical need, (2) Defendant's deliberate indifference to that need, and (3) causation between Defendant's indifference and Plaintiffs' injuries. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

This Court previously found that chronic HCV is a serious medical need. ECF No. 153, at 14–15. Defendant does not dispute that finding. ECF No. 270, at 17. Moreover, several other courts have since held that chronic HCV is a serious medical need. *See, e.g.*, *Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 WL 4361639, at *12 (S.D. Ind. Sep. 13, 2018); *Pevia v. Wexford Health Source, Inc.*, No. ELH-16-1950, 2018 WL 999964, at *16 (D. Md. Feb. 20, 2018). Once again, this Court concludes that chronic HCV is a serious medical need.

This Court also previously found that Defendant was deliberately indifferent to Plaintiffs' serious medical needs. ECF

No. 153, at 16–24. Defendant does not dispute that either. *See supra* p. 4 (citing ECF No. 270). Of course, Defendant's compliance with the preliminary injunction since its issuance does not absolve Defendant of liability. This Court may still take Defendant's past actions into account. *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."). Moreover, Defendant continues to oppose relief that this Court finds to be constitutionally required. *See infra pp.* 14–53. Given Defendant's past actions as well as Defendant's continued opposition to implementing constitutionally required relief, this Court finds that Defendant is being deliberately indifferent to Plaintiffs' serious medical needs and that there is a real and immediate threat of repeated injury in the future.

Finally, as it did before, this Court finds that Plaintiffs have established causation. As Secretary of FDC, Defendant is ultimately responsible for FDC's policies and practices. *See* § 20.315(3), Fla. Stat. As such, because Plaintiffs' claim is based on inadequacies in FDC's policy and the implementation of that policy, the causation element is satisfied. *Cf. Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[T]he causal connection may be

established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights . . . ." (alteration in original) (internal quotation marks omitted)); *Zatler v. Wainright*, 802 F.2d 397, 401 (11th Cir. 1986) (same).

Thus, Plaintiffs have succeeded on the merits of their Eighth Amendment deliberate-indifference claim.

2. Discrimination Under Title II of the ADA[3]

Title II of the ADA provides in relevant part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

"[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates . . . ." *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998). That is, "a disabled prisoner can state a Title II-ADA claim if he is denied participation in an activity provided in state prison by reason of his disability." *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1081 (11th Cir. 2007).

---

[3] This Court did not address Plaintiffs' ADA claim in its order granting Plaintiffs' motion for preliminary injunction. *See* ECF No. 153, at 13 n.12.

Although "the ADA . . . was never intended to apply to decisions involving . . . medical treatment," *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005), the Supreme Court has made clear that "medical 'services'" fall within the ambit of Title II, *see Yeskey*, 524 U.S. at 210. Therefore, a qualified inmate who is denied the benefit of medical services by reason of his disability can state a Title II ADA claim.[4]

Defendant does not dispute that a prison inmate can state a Title II ADA claim for medical services. *See* ECF No. 270, at 28. Rather, the only dispute regarding Plaintiffs' ADA claim is whether inmates can assert a disability *en masse*. *See id.* at 28–32; ECF No. 342, at 21. This Court finds they cannot.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;

---

[4] *See, e.g.*, *Lonergan v. Fla. Dep't of Corrs.*, 623 F. App'x 990, 994 (11th Cir. 2015) (unpublished) (holding that prison's failure to give an inmate treatment prescribed by his dermatologist was "sufficient for the [inmate] to plead a prima facie ADA claim"); *Stafford v. Wexford of Ind., LLC*, No. 1:17-cv-00289-JMS-MJD, 2017 WL 4517506, at *3 (S.D. Ind. Oct. 10, 2017) ("Plaintiffs do not complain[] about the quality of care administered by Wexford; rather, they assert that Wexford has refused to treat Plaintiffs' disabilities, which is actionable under the ADA."); *Johnson v. Bryson*, No. 5:16-cv-453-CAR-MSH, 2017 WL 3951602, at *1 (M.D. Ga. Sep. 8, 2017) ("[T]he ADA is not wholly inapplicable to claims based on deliberate indifference to an inmate's medical condition.").

or (C) being regarded as having such an impairment." 42 U.S.C. § 12102. A claimant only needs to satisfy one of those definitions. *Gordon v. E.L. Hamm & Assocs.*, 100 F.3d 907, 911 (11th Cir. 1996). Here, Plaintiffs claim that they satisfy the first two. ECF No. 342, at 21. But Plaintiffs gloss over the mandatory individualized inquiry that accompanies both definitions.

Although Plaintiffs argue that "the case Defendant cites for the proposition that a disability determination is a highly individualized inquiry . . . was abrogated by the ADA Amendments Act of 2008 . . . and the Act's implementing regulations," ECF No. 362, at 13–14, the very regulations Plaintiffs rely on still require an "individualized" inquiry. Indeed, beginning with the first definition, the applicable regulation explicitly provides that "[t]he determination of whether an impairment substantially limits a major life activity **requires an individualized assessment**." 28 C.F.R. § 35.108(d)(1)(vi) (emphasis added). This Court cannot ignore the plain meaning of the word "requires."[5] This is especially true given that another subsection of the same regulation also

---

[5] "[A] regulation should be construed to give effect to the natural and plain meaning of its words." *Ala. Air. Pollution Control Comm'n v. Republic Steel Corp.*, 646 F.2d 210, 213 (5th Cir. Unit B May 1981).

refs to the individualized inquiry using mandatory language. Specifically, although a later subsection notes that "the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage," it still refers to the individualized assessment as being "necessary."[6] *Id.* § 35.108(d)(2)(ii).

These same requirements apply to the ADA's second definition of disability (i.e., the "record of" definition). *Id.* § 35.108(e)(2) (noting that "the principles articulated in paragraph (d)(1) of this section apply"); § 35.108(d)(2)(ii) (referring to the "'record of' prong). And, as Plaintiffs point out, "[b]ecause Congress explicitly authorized the Attorney General to promulgate regulations under the ADA . . . the regulations must [be given] legislative and hence controlling weight." ECF No. 362, at 15 n.8 (quoting *Shotz v. Cates*, 256 F.3d 1077, 1079–80 (11th Cir. 2001)).

---

[6] It is no answer to harp on the fact that the assessment "should be particularly simple and straightforward." 28 C.F.R. § 35.108(d)(2)(ii). No matter how easy or straightforward the "individualized assessment" is, it is still plainly "necessary." *Id.*; *see also Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 172 (3d Cir. 2017) (unpublished) ("We agree that cancer can—and generally will—be a qualifying disability under the ADA. Nevertheless, '[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment.' Although the ADAAA makes the individualized assessment 'particularly simple and straightforward' for diseases like cancer, an individualized assessment must still take place." (citations omitted)).

Because Plaintiffs assert their ADA claim as a class, and because an ADA claim requires an individualized inquiry, this Court must decertify the class as to Plaintiffs' ADA claim. *See, e.g.*, *Stafford*, 2018 WL 4361639, at *21 (decertifying class of HCV-infected inmates with respect to ADA claim because the claim requires an individualized assessment). However, given that Carl Hoffer is deceased, Ronald McPherson has been released from prison, and Roland Molina has been successfully treated, *see* ECF No. 269-1, at 2, the named Plaintiffs can no longer state individual ADA claims. As such, their ADA claims are denied as moot.

3. Discrimination under the RA[7]

"Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases . . . ." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). The only relevant difference is that the RA has a federal funding requirement. *See, e.g.*, *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005) (unpublished). It is undisputed that FDC receives federal funds. ECF No. 1, at 42; ECF No. 187, at 29. Accordingly, for the same reason this Court decertified the class with respect to the ADA

---

[7] This Court did not address Plaintiffs' RA claim in its order granting Plaintiffs' motion for preliminary injunction. *See* ECF No. 153, at 13 n.12.

claim, this Court also decertifies the class with respect to the RA claim. *See supra* pp. 9–13. Again, the named Plaintiffs' individual RA claims are denied as moot.

## B. *Plaintiffs' Additional Requests for Relief*

This Court did not address all of Plaintiffs' requests for relief when it granted their motion for preliminary injunction. *See* ECF No. 185, at 2. Instead, this Court focused on what seemed to be the most pressing issues and noted that Plaintiffs were not precluded from seeking further relief later on. *See id.* Plaintiffs have taken advantage of this Court's promise and now seek fifteen categories of additional relief. *See* ECF No. 342. This Court addresses each category in turn.

1. Routine Opt-Out Testing and an Aggressive Notice Campaign

FDC uses an "opt-in" method of testing/screening inmates for HCV; i.e., inmates are asked if they want their blood tested for HCV and only receive the test if they respond affirmatively. *See* ECF No. 270, at 27; *see also* ECF No. 340-6, at 23–26. This is in contrast to an "opt-out" method, where patients are told they are going to be tested for HCV (among other things) and must explicitly ask to be excluded.

Plaintiffs have asked for routine opt-out testing since the inception of this case. *See* ECF No. 1, at 44. They claim that FDC is knowingly undercounting the number of HCV-infected inmates and that opt-out testing would capture a larger amount. *See* ECF No. 342, at 24–27. They argue that FDC's knowledge of the problem and failure to remedy it constitutes deliberate indifference:

> Defendant knows that there are thousands more prisoners in its care who are infected with HCV and are at serious risk of damage to their health, but has deliberately remained ignorant of their identities, thereby ensuring they will never receive treatment. This "head-in-the-sand" approach amounts to clear deliberate indifference. *See, e.g., Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

*Id.* at 25.

At the evidentiary hearing in late 2017, Defendant's medical expert, Dr. Dewsnup, approved of opt-out testing but stated that opt-in testing was also appropriate as long as it was combined with "peer education."[8] ECF No. 340-19, at 46. However, FDC is only employing peer education at two of its institutions and has no

---

[8] Peer education consists of experienced inmates educating other inmates about HCV and its treatment. Dr. Dewsnup explained that the benefits of peer education are that inmate educators act as role models, speak the right "language," and can be asked questions without fear of reprisal. *See* ECF No. 340-19, at 47.

specified timeline for expanding the program statewide. ECF No. 340-6, at 71–77. Moreover, FDC is unaware of whether materials are given out as part of the program, how many inmate educators have been trained, or how many inmates have participated. *Id.* at 198.

FDC's failure to implement peer education is also evident from the numbers. National estimates suggest that between 16% and 41% of the United States jail and prison population has HCV, translating to between 14,700 and 40,184 FDC prisoners. ECF No. 10-1, at 5, 12. Dr. Dewsnup believes the best estimate for FDC prisoners is approximately 20%. ECF No. 340-5, at 41–42. However, FDC has only identified 7,185 inmates as having chronic HCV; i.e., roughly 7%. ECF No. 453. Clearly FDC is undercounting the number of inmates with chronic HCV, and it unquestionably knows it is doing so. ECF No. 340-6, at 232–35. This struthious approach to treatment amounts to deliberate indifference as it allows FDC to avoid any further obligations simply by pretending sick inmates don't exist.[9]

---

[9] It is of no legal significance that FDC is being deliberately indifferent to inmates who are ignorant of their serious medical needs. The focus is on FDC's knowledge, not the inmates'. *See, e.g., Melton v. Abston*, 841 F.3d 1207, 1224 (11th Cir. 2016) ("[A] finding of deliberate indifference requires a finding of the defendant's subjective knowledge of the relevant risk . . . ."). To hold

Consequently, something has to change. This Court is mindful of its role "not to supervise prisons but to enforce the constitutional rights of . . . prisoners." *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *see also Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (cautioning federal courts not to become "enmeshed in the minutiae of prison operations"). However, time has also shown that FDC cannot be given free reign. Accordingly, this Court will offer Defendant two options. FDC can accept Plaintiffs' proposal, which is to implement a system of opt-out testing along with an aggressive notice campaign. *See* ECF No. 342, at 24–27. Alternatively, FDC can accept the proposal of its own expert, Dr. Dewsnup, which is to undertake opt-in testing paired with peer education.[10] *See* ECF No. 340-19, at 46.

Whichever option Defendant takes, the undertaking needs to be legitimate. FDC may not continue to use opt-in testing and only put forth a half-baked attempt at peer education. This Court is not choosing the best policy, but simply seeks to enforce the

---

otherwise would mean that FDC could avoid treating an insane inmate simply because he is unaware of his condition.

[10] It is worth noting that Dr. Dewsnup also advised: "if it was going to cause a big kerfuffle, [he didn't] think it's worth the kerfuffle" to stick with opt-in testing. *See* ECF No. 340-19, at 46. Unless FDC operates under a policy of judicio-masochism, it would be wise to take the advice of its own experts.

rights of prisoners. In sum, this Court finds that FDC is being deliberately indifferent by not following the advice of its own medical expert regarding a proper screening method.

2. Elastography

"The principal consequence of [HCV] infection is infection of the liver, which causes inflammation that in turn may result in scarring of the liver (fibrosis)." ECF No. 153, at 2. "The amount of liver scarring a patient has is usually measured on the METAVIR scale." *Id.* at 3. "On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis)." *Id.*

Both this Court and the parties have used the METAVIR scale to set appropriate medical deadlines. For instance, the preliminary injunction explicitly provides that "FDC must initiate treatment for all known chronic HCV inmates, who are eligible for treatment, and who have fibrosis stage 3, by December 31, 2018." ECF No. 185, at 4. These deadlines are premised on the understanding that liver scarring presents serious medical consequences and that survival rates differ depending on the extent of scarring. *Cf.* ECF No. 153, at 3–6. As such, it is extremely important that inmates' fibrosis levels are correctly identified.

18

Currently, FDC is using FibroSure[11] tests combined with ultrasounds to estimate fibrosis levels. *See* ECF No. 370, at 14–15. However, Plaintiffs' medical expert, Dr. Koziel, claims that FibroSure is "only accurate about 70% of the time." ECF No. 340-34, at 1. She further notes that while FibroSure has "relatively good sensitivity and specificity for advanced fibrosis or complete lack of fibrosis, [it] is not as good for measuring patients in the middle of the spectrum." *Id.* Thus, she claims "there is a significant likelihood that a patient with a FibroSure score of F1 may in fact have fibrosis in the range of F2 to F3" and that "a FibroSure test may miss fibrosis in a significant number of patients." *Id.* at 1–2. Moreover, she believes that "[u]tilizing follow-up abdominal ultrasounds, while helpful, is not sufficient to identify these patients." *Id.* at 2.

Instead of using the FibroSure-plus-ultrasound method, Plaintiffs want FDC to begin using elastography.[12] ECF No. 342,

---

[11] FibroSure is a "proprietary predictive index [that] utilizes a combination of age, sex, and a battery of laboratory parameters [from a blood test] to provide an estimate of the fibrosis stage." ECF No. 369-3, at 2.

[12] The parties haven't explained what elastography is in great detail. To place things in context, this Court has taken judicial notice of certain facts that are not subject to reasonable dispute from sources whose accuracy cannot reasonably be questioned (at least not with respect to the facts at issue). Fed. R. Evid. 201(b)(2). From what this Court has gathered, elastography is a way

at 27–29. Dr. Koziel states that "transient elastography is extremely accurate in detecting hepatic fibrosis, particularly for patients with moderate fibrosis (F1 to F2)." ECF No. 340-34, at 2. Although the gold standard for evaluating liver disease is (or, at least, *was*) the liver biopsy, Dr. Koziel believes that transient elastography is the "next most accurate" thing (and far less invasive). *See* ECF No. 361-3, at 34–35; ECF No. 10-1, at 7.

Dr. Dewsnup, on the other hand, sees things differently. Dr. Dewsnup believes "there is a lack of data to support" Dr. Koziel's statement that FibroSure is only accurate about 70% of the time. ECF No. 369-3, at 2. While Dr. Dewsnup "would acknowledge that . . . predictive indices [(like FibroSure)] are less effective for distinguishing between those who are at Stage 2 or 3," he believes they are "strongly predictive at identifying the individuals who have cirrhosis, and those who are at F0 and F1." *Id.* Moreover, Dr.

---

of mapping the elastic properties of soft tissue (e.g., a liver) using various medical imaging techniques. *See, e.g.*, *Elastography*, Wikipedia, https://en.wikipedia.org/wiki/Elastography [https://perma.cc/6A5K-FDUP] (hereinafter "*Wiki*"). One form of elastography using ultrasound imaging is referred to as "transient elastography," which is used by the commercial system FibroScan. *See id.* A newer form of elastography using ultrasound imaging is referred to as point shear-wave elastography. *See, e.g.*, Rosa M.S. Sigrist et al., *Ultrasound Elastography: Review of Techniques and Clinical Applications*, 7(5) Theranostics 1303, 1307–08 (2017). Finally, another form of elastography uses magnetic resonance imaging ("MRI"). *See Wiki.*

Dewsnup states that "[t]he abdominal ultrasound can be used as a check to make sure that the patient is not worse than the proprietary score indicates." *Id.* at 3.

From his experience, Dr. Dewsnup finds that "no one test will give you a perfect estimate of staging" and that, instead, "practitioners look for a concordance with the history, physical exam and symptoms, labs, and test results." *Id.* He states that usually "there is concordance," but "[i]n the limited circumstances in which that does not occur, . . . FDC has retained the option of using ultrasound elastography." *Id.* Dr. Dewsnup "do[es] not believe [elastography] is necessary for all inmates who have cHCV, nor do[es] [he] believe that it is necessary for all inmates who are staged at F0-F2." *Id.* at 4. Rather, he "believe[s] there should be physician discretion to use elastography for those inmates who are at F0 or F1 by FibroSure but have other laboratory or clinical indications that the stage may actually be higher." *Id.* at 4.

After considering the statements of both sides' experts, it seems that the propriety of using routine elastography is a matter of reasonable medical disagreement. Such disagreement does not amount to deliberate indifference. *See, e.g., Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Mere medical malpractice,

however, does not constitute deliberate indifference. Nor does a simple difference in medical opinion." (citation omitted)). Accordingly, this Court finds that FDC is not constitutionally *required* to stage every HCV-infected inmate using elastography (despite the fact that it would probably be much better practice).

Having said that, this Court does find that FDC is constitutionally required to make the option of elastography available to its medical staff. Even Dr. Dewsnup believes that physicians should have the discretion to use elastography when necessary. ECF No. 369-3. While Dr. Dewsnup hoped that FDC would be utilizing elastography within 6–12 months of the preliminary-injunction hearing, *id.* at 5, it is this Court's understanding that FDC is still not using any kind of elastography, *see* ECF No. 340-6, at 129. Instead, FDC merely has vague plans to obtain elastography machines at some unspecified time in the future. *Id.* at 129–30. Accordingly, this Court will require FDC to form a definite plan to make elastography available to its medical staff within a reasonably immediate timeframe and will require FDC to stick to that plan assuming this Court agrees with it.

In sum, this Court finds that it is not deliberately indifferent for FDC to use the fibrosure-plus-ultrasound method of staging instead of elastography. However, this Court finds that it *is* deliberately indifferent for FDC not to have the option of elastography available to medical staff.

3. Treatment for F0 and F1 Inmates

FDC is not prescribing DAAs to inmates with fibrosis scores of F0 or F1.[13] *See* ECF No. 340-23, at 8–10; ECF No. 340-6, at 129, 200. Instead, those inmates are only monitored. That is, they are "seen" in the clinic every six months, "receive laboratory testing" every six months, and receive "proprietary predictive indices and/or elastography" every twelve months. ECF No. 340-23, at 7.

Plaintiffs argue that F0 and F1 inmates should also be treated with DAAs. ECF No. 342, at 30–31. They claim that "[t]he only reason why FDC is electing not to provide treatment is due to the cost of treatment, which is per se deliberate indifference." *Id.* at 30 (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991)). This Court agrees.

---

[13] Unless they have another unique qualifying condition. *See* ECF No. 340-23, at 8–10.

Although Dr. Dewsnup testified that, with respect to the treatment of F0 and F1 inmates, "it's safe to wait for a bit," ECF No. 340-19, at 114, he never testified that F0 and F1 inmates should *never* be treated, *see id.* at 1–208. Indeed, his statement was simply made in the context of a preliminary-injunction hearing and faced with the need to triage thousands of inmates. *See id.* at 117–18. FDC has not put forth any medical reason (nor does the record otherwise reveal a medical reason) why F0 and F1 inmates should not be treated. Rather, as Dr. Dewsnup explicitly noted, F0 and F1 inmates must be treated eventually. *Id.* at 120 ("[W]e're going to have to treat eventually even if they are Stage 0 or Stage 1 . . . .").

Meanwhile, F0 and F1 inmates face substantial suffering and harm. Dr. Koziel explained that HCV infection can result in many symptoms, that there isn't an "absolute correlation" between symptoms and fibrosis stage, and that even F0 and F1 inmates can suffer symptoms. ECF No. 361-3, at 45–48. And both Dr. Koziel and Dr. Dewsnup agreed that—even for F0 and F1 inmates— successful treatment of HCV tends to decrease mortality rates. ECF No. 340-40, at 58.

While Defendant claims that this Court already "rejected" treatment for F0 and F1 inmates, ECF No. 370, at 17, that was only this Court's holding at the preliminary-injunction stage. This Court was focused on ensuring that the sickest inmates were treated first and understood that—as a practical matter—it was unrealistic to order FDC to treat everyone immediately. *See* ECF No. 340-19, at 130–31. But fifteen months have passed since then, and FDC has begun or completed treating almost 5000 inmates within that time. *See supra* p. 4. FDC can no longer use resource limitations and implementation difficulties as an excuse to delay treatment.

This Court is not alone in recognizing that F0 and F1 inmates must be treated. Indeed, a court in Indiana granted summary judgment in favor of a class of inmates as to their deliberate-indifference claim and found that the undisputed evidence in the case showed that all inmates with chronic HCV should be treated. *See Stafford*, 2018 WL 4361639 at *18–20. And a court in Pennsylvania denied the prison defendants' motion for summary judgment because it found that there was a genuine dispute of material fact as to whether they were being deliberately indifferent by not treating F0 and F1 inmates. *Chimenti v. Wetzel*,

No. 15-3333, 2018 WL 3388305, at *10–12 (E.D. Pa. July 12, 2018).[14] Finally, although a third court declined to order treatment of F0 and F1 inmates at the preliminary-injunction stage, it still recognized that the inmate plaintiffs "raise[d] substantial doubts" about the defendants' failure to treat F0 and F1 inmates. *Buffkin v. Hooks*, No. 1:17CV502, 2019 WL 1282785, at *9 (M.D.N.C. Mar. 20, 2019). Further, that court enjoined the enforcement of the prison's HCV policy because of the risk "that the policy might be construed to prohibit or prevent doctors from administering DAAs to any prisoner with HCV whose FibroSure score is below F2." *Id.*

As far as timing, Plaintiffs propose that F0 and F1 inmates be treated within two years of staging. *See* ECF No. 342, at 30–31. Defendant does not propose an alternative date (other than *never*). *See* ECF No. 370. Given FDC's progress in treating inmates within the past fifteen months, *see supra* p. 4, this Court finds a two-year deadline to be appropriate. Indeed, considering that FDC has been able to begin or complete treatment of almost 5000 inmates within the past fifteen months, FDC should be able to begin treating the

---

[14] The case has since settled. *See* Order, *Chimenti v. Wetzel*, No. CV 15-3333 (E.D. Pa. Feb. 7, 2019), ECF No. 139.

~4000 known F0 and F1 within the next two years. *See* ECF No. 453, at 2–3.

In sum, this Court finds that even F0 and F1 inmates have serious medical needs, FDC is aware of those needs, and FDC's decision not to treat those inmates—without *any* medical reason for that decision—constitutes deliberate indifference.

4. Informed Refusals and Proper Education

FDC's policy provides that "[o]nce patients are found to be infected with chronic HCV, they should be counseled by a clinician during the initial visit regarding the natural history of the infection, measures to assess the progress of cHCV, potential treatment options, and specific measures to prevent transmitting the HCV infection to others." ECF No. 340-23, at 6. The policy does not provide for any counseling or education after an inmate *rejects* a procedure. *See id.* at 1–14. As of March 2019, 61 inmates have refused to participate in the staging process and 171 inmates have refused DAA treatment. ECF No. 453, at 2, 4.

As Plaintiffs rightfully point out, these refusal statistics "are incredibly high numbers given the 95% cure rate, absence of side effects, and devastating consequences of the disease." ECF No. 342, at 31. Plaintiffs argue "[t]he only logical inference is that the

vast majority of these patients were not fully informed of the above information." *Id.* at 31–32. In support, Plaintiffs cite the declarations of three inmates who refused staging because they were not adequately informed of the process. *Id.* at 32. All three inmates state that they would have consented had they been properly informed. *Id.*

In response, FDC cites the declaration of Dr. Alvia Varona, who claims she personally counselled one of the three inmates Plaintiffs refer to. ECF No. 370, at 20. Dr. Varona states that during her encounter with the inmate she "explained the blood draw . . . and told him the labs were absolutely necessary in order for him to be evaluated for curative treatment for cHCV." ECF No. 374-1, at 2. However, Dr. Varona does not state whether she told the inmate about DAAs or why his blood test was different than the others he had been offered for years. *See id.* And the inmate states that Dr. Varona failed to provide him that information. ECF No. 377-1.

FDC also cites the declarations of two nurses who claim that they provide educational information about HCV to newly incarcerated inmates at two of FDC's reception centers. ECF No. 370, at 19 (citing ECF No. 369-4, ECF No. 369-5). One of the nurses

further states that when an inmate refuses to have their blood drawn for HCV testing she "provide[s] more education to the inmate about cHCV, particularly about the risks of refusing treatment, in an effort to get them to consent to being screened." ECF No. 369-4, at 1–2. But what the nurses don't say is whether they educate inmates about DAAs, the significance of the new HCV tests FDC is using, and FDC's obligations for treatment as a result of this litigation. *See* ECF No. 369-4; ECF No. 369-5. Moreover, the two nurses can only speak for the education they provide at their two institutions; they don't explain what is happening at the many other institutions FDC operates.

In short, Plaintiffs have presented evidence showing that inmates are not being properly informed after refusing HCV-related medical care. The declarations prepared by Dr. Varona and the two nurses do not create a genuine dispute of material fact as to that issue.[15] And, just as FDC cannot avoid its duty to treat by knowingly undercounting inmates, *see supra* p. 16, FDC also cannot avoid its duty to treat by knowingly keeping inmates underinformed. Accordingly, this Court agrees with Plaintiffs that

---

[15] Nor do the other cited declarations. *See* ECF No. 369-7, ECF No. 369-8, ECF No. 369-9.

"a section [must] be added to [FDC's] policy requiring an explanation to anyone who refuses staging or treatment of, at least, a) the consequences of HCV, b) the availability, lack of side effects, and efficacy of the new medications, c) the staging process, and d) whether and when they will receive treatment." ECF No. 342, at 32. This is so because it would be deliberately indifferent to avoid treating HCV-infected inmates by keeping them uninformed about the nature of their treatment.

Defendant can rest assured that this relief will not "usurp Centurion's[16] medical judgment." *See* ECF No. 370, at 21. It goes without saying that medical staff will still retain their independent medical judgment when informing inmates. For example, staff will not be required to tell inmates that DAAs have *no* side effects, but they must be informing inmates that DAAs have *far fewer* side effects than the previous regimen. *Cf.* ECF No. 153, at 6–7.

5. Shortening the Staging Deadline and Requiring Reliance on the Most Serious Test Result

FDC's policy provides that inmates must be staged within 90 days of confirming they have chronic HCV. ECF No. 340-23, at 6.

---

[16] FDC has outsourced its provision of medical care to Centurion, a private contractor. *See* ECF No. 153, at 10–12.

This Court originally set the deadline at 60 days but later extended it at Defendant's request. ECF No. 243. This Court granted the extension because it accepted Defendant's representation that FDC needed additional time for inmates to undergo "ultrasound or 'EGD' tests" with outside vendors. *See id.* Plaintiffs now claim that "further discovery has demonstrated that the deadline should actually be shortened to 30 days." ECF No. 342, at 33. This Court agrees.

As Plaintiffs point out, "[s]taging is simply determining a patient's fibrosis level." *Id.* The record now reveals that FDC is relying almost exclusively on the FibroSure to determine fibrosis levels. *See supra* p. 19; *see also* ECF No. 370, at 14–15; ECF No. 340-6, at 119–20. Although Defendant claims that FDC also uses ultrasounds to stage inmates, *see* ECF No. 370, at 22–23, the truth is that ultrasound results can only make an inmate's stage go up (by indicating the presence of cirrhosis). Dr. Dewsnup made clear that "the ultrasound is not used to estimate. It's not used to estimate staging. It's used to rule out occult portal hypertension and cirrhosis. It's just a part." ECF No. 340-5, at 76; *see also* ECF No. 340-19, at 75. Dr. Cherry, Centurion's Medical Director for the State of Florida, testified similarly:

Q. So everybody gets the initial staging from the FibroSure, right?

A. Right.

Q. And some portion of those patients the staging could be changed based on the results of the ultrasound?

A. No. We just go by the FibroSure only.

Q. Just by the FibroSure only?

A. Right.

Q. So –

A. It's not as accurate, but that's what we are doing.

Q. Okay. So the staging -- the initial staging that happens with the FibroSure is done when the FibroSure happens?

A. Right.

Q. And the follow-up ultrasounds are to screen for abnormalities?

A. Right. Well, it allows you to – you have somebody that's an F4, okay, on the FibroSure test, you do the ultrasound, it can be absolutely normal because the FibroSure is not – does not have a hundred percent specificity obviously. So we find that kind of information.

And also if they have F4, F3, you are doing an ultrasound to see, like I said before, what's going on with the spleen. If it's enlarged, its an indirect indication of significant cirrhosis or some kind of fibrosis or whatever in the liver. You also use that to calculate a platelet screen ratio.

ECF No. 340-4, at 48–49.

Since inmates can be initially staged using a FibroSure, the staging deadline must only be based on the time it takes to get those results. Indeed, it is critical that the staging deadline is only as short as necessary because treatment deadlines run from the date an inmate is staged. In other words, if the staging deadline is artificially long, then that enables FDC delay treatment for a non-medical reason.[17] "[A] deliberate delay in rendering necessary medical treatment for non-medical reasons is enough to state a deliberate indifference claim." *Melton*, 841 F.3d at 1229.

Plaintiffs claim that "[i]t only takes five days from the initial blood draw to get the [FibroSure] results," ECF No. 342, at 33, and that "[t]here is no reason why the vast majority of patients cannot simply be staged initially within 30 days," *id*. at 35. In a Rule 30(b)(6) deposition, Dr. Keller, the Chief Medical Officer for Centurion, and Victoria Love, the Vice President of Operations for Centurion of Florida, also indicated that it should only take five

---

[17] Not only does an artificially long staging deadline enable FDC to delay treating inmates, it also enables FDC to avoid treating some inmates altogether because some inmates will have insufficient time remaining on their sentences—time they would have otherwise had but for the artificially long staging period. *See infra* pp. 38–40 (discussing the exclusion for time remaining on sentence).

days to obtain FibroSure results. *See* ECF No. 340-6, at 118–19. However, Ms. Love has since stated in a declaration that "all results are not received within that amount of time." ECF No. 369-11, at 2. Rather, she claims "[t]here is a range of time for the receipt of the FibroSure results, and five days is the soonest amount of time." *Id.* Ms. Love does not state what the outer limit is for receiving results. *See id.*

To the extent Ms. Love's declaration contradicts what she stated at her deposition, the declaration may be disregarded. *See, e.g., Van T. Junkins & Assocs.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). Regardless, Ms. Love did not state—and FDC has not otherwise shown—that FibroSure results cannot be obtained within thirty days. *See* ECF No. 369-11; *see also* ECF No. 370, at 21–23. As such, this Court finds that the staging deadline must be shortened to thirty days. Having the staging deadline any longer amounts to deliberate indifference because it delays (and in

some cases excludes) an inmate's necessary treatment without a medical reason.

To be clear, the thirty-day deadline does not mean that an inmate must be given an ultrasound within thirty days. As already mentioned, an inmate can be *initially* staged using a FibroSure.[18] *See supra* pp. 29–31. To the extent an inmate needs an ultrasound and the ultrasound reveals that the inmate is in a worse condition, the inmate can be restaged to a higher level and placed on a shorter treatment timeline. Ms. Love states that ultrasound results can be obtained within 90 days of the date a patient is found to be positive for chronic HCV. ECF No. 369-11, at 2. Accordingly, any necessary ultrasounds must occur within 90 days of the date an inmate is diagnosed with chronic HCV. Any necessary restaging must occur within five days after the ultrasound results are obtained.

Finally, Plaintiffs are right that it must be explicit in FDC's policy that "FDC must rely on the test, exam, or study indicating the highest fibrosis level." ECF No. 342, at 35; *see also id.* ("That is, if one indicator shows F3 but another shows F2, FDC must stage the patient at F3."). Defendant's only counterargument is that

_____

[18] Of course, the deadline might have to be modified if FDC voluntarily switches to using elastography instead of FibroSure tests.

Plaintiffs have failed to "supply any testimony or documents to suggest this is not already being done." ECF No. 370, at 23. What Defendant fails to recognize is that it has a "long and sordid history" of failing to treat HCV-infected inmates. *See* ECF No. 153. As a result, even if FDC is already relying on the most serious test result, that requirement must be explicit in the policy to prevent any confusion or relapse in the future.

6. Shortening the Treatment Deadlines and Making them Mandatory

FDC's policy states that inmates in Priority 1 "should" receive treatment within six months and that inmates in Priority 2 "should" receive treatment within twelve months. ECF No. 340-23, at 9. Plaintiffs argue that "the policy should be edited to clarify that these are mandatory deadlines, not aspirational goals," and that "the deadlines should be shortened." ECF No. 342, at 36.

This Court finds that FDC's policy needs to have mandatory deadlines. Defendant's only counterargument is that "[c]reating mandatory deadlines would completely remove medical judgment from the treatment of the inmates, and would not account for the individual circumstances of different inmates." ECF No. 370, at 24. But Defendant fails to adequately explain why mandatory

deadlines would be unworkable. This Court set several deadlines in its preliminary injunction, and Defendant seems to understand those are mandatory. This Court sees no reason why the case should be any different when those deadlines are in FDC's policy.

Moreover, contrary to Defendant's assertion, adding mandatory deadlines to FDC's policy does not mean that all "medical flexibility to treat the patient would be removed." *Cf. id.* at 25. The policy still permits medical staff to temporarily exclude an inmate from treatment if the inmate isn't ready for it. *See* ECF No. 340-23, at 10. That exclusion necessarily includes inmates who are "not cooperative with the process of being diagnosed, staged, and evaluated." *Cf.* ECF No. 370, at 25.

However, this Court finds that the deadlines do not need to be shortened. While it might be *ideal* to have shorter treatment deadlines, Plaintiffs have failed to show that the current deadlines result in deliberate indifference. In fact, the only support Plaintiffs offer for shorter deadlines is a settlement entered into by the Massachusetts Department of Corrections. *See* ECF No. 342, at 36. The fact that one state's prison system settled for a shorter deadline does mean every state must follow suit. Besides, this Court decided on the deadlines it set at the preliminary-injunction

stage because they were supported by Dr. Dewsnup's testimony. Plaintiffs have failed to provide any medical evidence suggesting that the deadlines should be shortened. Thus, this Court cannot conclude that the current deadlines amount to deliberate indifference.

7.  Restaging F0, F1, and F2 Inmates Every 6 Months

FDC's policy provides that F0, F1, and F2 inmates shall be "seen" and "receive laboratory testing" every six months but only be restaged every twelve months. ECF No. 340-23, at 7. Plaintiffs argue that these inmates should instead be restaged every six months. ECF No. 342, at 36–37. This Court disagrees.

While it might be better to have inmates restaged every six months, that does not make it constitutionally required. Moreover, contrary to Plaintiffs' representation, "both Dr. Dewsnup and Dr. Koziel" did not recommend restaging every six months. *Cf. id.* at 37. While Dr. Koziel did make such a recommendation, ECF No. 340-34, at 2, Dr. Dewsnup simply said that "continual monitoring and serial evaluation is . . . critical." ECF No. 340-19, at 161. When asked whether "that would include *monitoring or drawing labs* every 3 to 6 months," Dr. Dewsnup replied: "That's correct. And doing imaging studies probably *every year*. I think we are

stabilizing it about a year for serial elastography."[19] *Id.* (emphasis added).

Additionally, Dr. Keller recommends against restaging every six months. ECF No. 369-10, at 3. He states that it would not bring "any significant medical benefit." *Id.* Further, he states that he is "not aware of any medical literature that would support this request." *Id.* Finally, he notes that "[i]n the rare instance in which an inmate in stages F0-F2 were to show signs of rapid progression, medical staff has the discretion to re-order a FibroSure for updated staging." *Id.* at 3–4.

Consequently, this Court finds that there is reasonable medical disagreement about whether F0, F1, and F2 inmates should be restaged every six months. As previously explained, such disagreement does not amount to deliberate indifference. *See, e.g., Waldrop*, 871 F.2d at 1033. Therefore, this Court cannot order FDC to restage F0, F1, and F2 inmates every six months.

However, even Dr. Keller recognizes that medical staff should have the *discretion* to restage inmates sooner than

---

[19] This Court understands that "imaging studies" are not the same thing as a FibroSure test. However, they are both tools for restaging. And Dr. Dewsnup has already stated that he finds them effectively equivalent. *See supra* pp. 20–21. Given that context, Dr. Dewsnup can be understood to be recommending restaging once a year.

scheduled. ECF No. 369-10, at 3–4. FDC's policy does not explicitly

allow for such discretion. *See* ECF No. 340-23, at 7. Given FDC's

past and the potential for relapse in the future, it is important that

the policy include clear directives. Accordingly, this Court finds

that FDC's policy must be amended to make clear that medical

staff have the discretion to restage inmates sooner than scheduled.

Denying such discretion amounts to deliberate indifference.

8. The Exclusion for Time Remaining on Sentence

FDC's policy excludes from treatment anyone who does not

> have sufficient time remaining on their sentence in the
> Department of Corrections to complete pre-treatment
> evaluation, a course of treatment (lasting between 8-
> 24 weeks) and post treatment SVR[20] assessment at
> 12 weeks after treatment is completed, in order for
> patient education and system efficiencies to be
> evaluated (generally, this requires approximately 12-
> 18 months).

ECF No. 340-23, at 10.

Plaintiffs argue that this exclusion should be amended in

several respects. ECF No. 342, at 37–38. This Court agrees.

First, this Court finds that the exclusion must not refer to

"pre-treatment evaluation." FDC only considers the exclusion *after*

---

[20] SVR stands for sustained viral or virologic(al) response. *See* ECF No.
340-19, at 58; ECF No. 10-1, at 9. The term is used to describe the condition of
having cleared a virus on a certain date after treatment. *See* ECF No. 340-19,
at 59; ECF No. 10-1, at 9.

an inmate has already been evaluated.[21] *See* ECF No. 340-6, at 84, 121–22. As such, leaving in the requirement that there be time for pre-treatment evaluation will only cause confusion and increase the potential for unwarranted future exclusions. Plaintiffs are correct in noting that "it's important for the policy to be precise and accurate because it will be relied upon by practitioners long after this case is over and therefore must be easily understood by someone unfamiliar with this case." ECF No. 378, at 13.

Second, this Court finds that the exclusion must not refer to "post treatment SVR assessment." The only rationale FDC offers for post-treatment testing is that it allows FDC to make sure the program is working and to make improvements to the program in the future. *See* ECF No. 370, at 29–32 (citing ECF No. 369-3). While that is certainly a worthwhile goal, that goal only helps make treatment generally better for inmates in the future, it's not

---

[21] Defendant harps on the need "to do a pre-treatment evaluation of such things as [an inmate's] readiness and willingness to adhere to the treatment." ECF No. 370, at 28. This Court is not holding that FDC cannot conduct such an evaluation. Rather, this Court is simply acknowledging the fact that—according to Defendant's Rule 30(b)(6) representative—the decision to exclude an inmate for remaining time on their sentence isn't made until *after* an evaluation has occurred. That is, the inmate has already been evaluated for readiness and willingness to adhere to treatment.

a *medical reason* to withhold treatment from a specific inmate in the present.

Finally, this Court finds that the exclusion must not include the "12-18 months" estimate. Given that pre-treatment evaluations and post-treatment SVR assessments will no longer be taken into account, an inmate shouldn't need twelve to eighteen months remaining on their sentence. Instead, the inmate—who has already been staged and evaluated—simply needs to have "sufficient" time remaining on their sentence to complete a course of treatment.

In sum, this Court finds that the exclusion for time remaining on an inmate's sentence contains language that will lead to an inmate being excluded from necessary treatment for non-medical reasons. Such exclusion amounts to deliberate indifference.

9. <u>Referrals to Health Clinics for Those Being Released</u>

Plaintiffs argue that inmates who are deemed ineligible based on insufficient time remaining on their sentence "should be referred to community health centers to obtain treatment and testing." ECF No. 342, at 39. However, "FDC already provides pre-release planning for inmates who need continuity of health care

when they are released." ECF No. 370, at 32. Plaintiffs have offered no legal basis for ordering FDC to do any more than it is already doing in that respect. Accordingly, Plaintiffs' request is denied.

10. <u>Exclusion for High-Risk Behaviors</u>

FDC's policy excludes from treatment anyone who does not "demonstrate willingness and an ability to adhere to a rigorous treatment regimen and to abstain from high risk behaviors while incarcerated." ECF No. 340-23, at 10. Plaintiffs argue that this exclusion should be amended in several respects. ECF No. 342, at 39–41. This Court agrees in part and disagrees in part.

First, this Court finds that "not all infractions should result in automatic exclusions." *Cf. id.* at 39. Treatment can only be delayed for "medical reasons." *See Melton*, 841 F.3d at 1229. As such, unless there is a medical reason to exclude an inmate from treatment based on a single infraction, the inmate must not be excluded. However, the question is not—as Plaintiffs propose— simply whether the behavior has "any bearing on whether a patient will show up to the pill line every day." ECF No. 342, at 30. Rather, as Dr. Dewsnup points out, "ineligibility is a clinical judgment that must be made by physicians who take into

consideration many factors on a case-by-case basis." ECF No. 369-3, at 8.

Of course, it is impossible for this Court to list each and every type of behavior that might render an inmate ineligible. This Court is not a medical professional, and, as Dr. Dewsnup stated, exclusions require a case-by-case analysis. However, Defendant must be aware that the acts of consuming illicit drugs or fighting other inmates, in and of themselves, are not valid reasons to exclude treatment. This is true even if an inmate is using intravenous drugs and risks re-infecting himself with HCV.[22] What matters is whether there is a "medical reason" to deny treatment. If medical staff conclude that that there is a *medical* reason to deny an inmate treatment because of the inmate's illicit drug use or fighting, then so be it. If FDC begins abusing the exclusion by excluding inmates without a valid medical reason, then Plaintiffs can move this Court to find Defendant in violation of the permanent injunction.

---

[22] *Cf. Reid v. Clarke*, No. 7:16-cv-00547, 2018 WL 3626122, at *4, n.2 (W.D. Va. July 30, 2018) ("Take a prisoner who cuts his own wrists. A prison would have little basis to refuse treatment on the grounds that he himself had created the harm, or that he might try to commit suicide again.").

Second, this Court finds that the policy must be amended to clarify that these are temporary ineligibilities, not permanent exclusions. FDC and its experts seem to agree that the exclusion is only "temporary." *See* ECF No. 370, at 34–35. Although the policy already states that inmates are only ineligible "until [their] issues are considered to be resolved," ECF No. 340-23, at 10, the policy must be amended to minimize any confusion.

Third, this Court disagrees that FDC should be required to re-evaluate inmates after a period of no more than three months. *See* ECF No. 342, at 41. Plaintiffs have failed to provide a legal basis for that requirement. And both Dr. Keller and Dr. Dewsnup state that the question is determined on a case-by-case basis. *See* ECF No. 340-6, at 125 ("I think it's on a case-by-case basis, but as a general rule, I believe it's six months, but that's not a hard-and-fast rule."); ECF No. 369-3, at 8.

Finally, this Court finds that "the language in J.3 implying that patients can be excluded for vague things like 'chronic disciplinary issues' or 'chronic behavioral management issues'" must be amended. *See* ECF No. 342, at 41. Defendant admits that FDC considers these factors to be a basis for ineligibility. ECF No. 370, at 36. As this Court just explained, FDC must be mindful of

the fact that a history of "chronic disciplinary issues," in and of itself, is not a valid reason to exclude an inmate. Indeed, there are plenty of disciplinary issues that do not bear on an inmates' ability to "maintain a therapeutic provider-patient relationship."[23] *Cf. id.*

In sum, this Court finds that the exclusion for high-risk behaviors includes language that will lead to an inmate being excluded from necessary treatment for non-medical reasons. Such exclusion amounts to deliberate indifference.

11. <u>Clarifying MELD Score Calculation and Liver Transplant Policy</u>

Sometimes HCV infections can cause so much damage to a patient's liver that the patient needs a liver transplant. *See* ECF No. 10-1, at 6. Indeed, "HCV is . . . the most common reason for liver transplants in the United States." *Id.* at 3. Accordingly, FDC's policy includes a section on liver transplants. ECF No. 340-23, at 13. Both sides seek to amend the section. ECF No. 342, at 41–43; ECF No. 370, at 38–40. This Court begins with Plaintiffs' requests and then turns to Defendant's.

---

[23] For example, an inmate who is repeatedly found in possession of "excess photographs" could be considered to have chronic disciplinary issues. *See* Fla. Admin. Code R. 33-602.201(5)(a)(2). This Court can conceive of no reason how that history, in and of itself, could constitute a medical reason to deny treatment.

First, this Court agrees with Plaintiffs that "decompensation" must be defined as "the presence of encephalopathy, ascites, bleeding varices, or jaundice." *See id.* at 41. Dr. Keller states that is the "standard medical definition." ECF No. 340-6, at 86; *see also* ECF No. 369-10, at 4. Moreover, Defendant does not object to including that definition in the policy. ECF No. 370, at 38.

Second, this Court agrees with Plaintiffs that "it [must] be clarified to state that patients will be referred if they have **any one** of the listed items." ECF No. 342, at 41–42. Defendant does not object to that request. *See* ECF No. 370, at 37–43. Moreover, there is no dispute that any one of the listed conditions qualifies an inmate for referral. *See id.* at 38–39.

Third, this Court disagrees with Plaintiffs that "the policy should require that MELD scores be calculated every 30 days." ECF No. 342, at 42. Dr. Dewsnup testified that MELD scores cover a three-month period. *See* ECF No. 340-19, at 156–57. Moreover, Dr. Keller states that "he would not recommend a 30-day recalculation of MELD for patients who have decompensated cirrhosis." ECF No. 369-10, at 5. He explains that "inmates with anemia can ill afford a regular 30-day blood loss" and "drawing

blood every 30 days could cause an inmates' veins to collapse." *Id.* Plaintiffs offer no contrary medical evidence. *See* ECF No. 342, at 41–43; *see also* ECF No. 378, at 18–19.

Fourth, this Court agrees with Plaintiffs that referrals "must be [initiated] within 30 days of any one of the triggering events." ECF No. 342, at 42. There is no apparent medical reason to justify more than such a delay. And Defendant "do[es] not oppose the incorporation of a 30-day period-of-time for a referral," as long as it only constitutes the deadline for initiation. ECF No. 370, at 40.

Fifth, this Court agrees with Plaintiffs that "the policy [must] require the FDC to promptly comply with the transplant center's request for records and other information, and to promptly transport the inmate to and from the transplant center." ECF No. 342, at 42–43. Defendant does not offer any medical reason why it should be permitted to delay complying with such requests. ECF No. 370, at 42. And Defendant's long and sordid history shows that there is a risk of future harm absent clear instructions.

Finally, this Court disagrees with Defendant's request to revise the list of qualifying conditions. *See* ECF No. 370, at 38–39. Defendant offers no medical reason to remove the "significant complication or co-morbidity of cirrhosis" language. *See* ECF No.

370, at 39–40. Instead, Defendant simply notes that it "would be difficult for providers to interpret and apply consistently." *Id.* at 40. That difficulty is not a medical reason to deny an inmate access to a liver transplant.[24] Moreover, that argument is inconsistent with Defendant's position that medical staff must be given sufficient discretion. *See, e.g.*, *id.* at 10 (claiming that Plaintiffs' requested relief "shockingly seeks to remove medical judgment and discretion").

However, this Court agrees with Defendant that "for individuals who have been scheduled to receive DAA medication, are undergoing DAA treatment, or who have finished DAA treatment, a referral [must] be made only if the post-treatment MELD score is over 15." *Id.* at 39. Dr. Keller believes that is appropriate because DAAs "have the potential of lowering one's degree of fibrosis and the MELD score." ECF No. 369–10, at 4. Plaintiffs have offered no evidence to the contrary. *See* ECF No. 342, at 41–43; ECF No. 378, at 18–19.

---

[24] If anything, it might mean that the language needs to be further clarified.

12. Clarifying Exclusion for Life Expectancy

FDC's policy excludes from treatment anyone who does not "have a life expectancy sufficient to achieve a benefit from HCV viral eradication." ECF No. 340-23, at 10. Plaintiffs argue that "the policy should state that a patient is only ineligible if he or she has a life expectancy of less than 18 months." ECF No. 342, at 43. This Court disagrees.

The only support Plaintiffs offer for their request is the fact that the Federal Bureau of Prisons ("BOP"), Massachusetts, and Minnesota use eighteen months for their life-expectancy exclusions. *See id.* Neither the BOP, nor Massachusetts, nor Minnesota sets the national standard for what is appropriate. Moreover, Dr. Dewsnup states that if Plaintiffs' request were implemented, "FDC physicians would be less able to make decisions that were individualized to the patient's unique circumstances." ECF No. 369-3, at 10. As such, there appears to be a medical reason to justify the current wording of FDC's exclusion.

In sum, Plaintiffs have failed to show that the exclusion for life expectancy amounts to deliberate indifference.

13. <u>Correcting the Risk Factors</u>

FDC's policy provides that "[r]isk factors for [HCV] infection may include, but are not limited to, injection drug use, transfusion with HCV-infected blood or blood products, tattooing, vertical transmission from mother to child, and massive exposure to HCV-infected blood during fighting or other trauma." ECF No. 340-23, at 1. Plaintiffs argue that the list of risk factors should also explicitly include "being born between 1945 and 1965, previous incarceration, and HIV." ECF No. 342, at 43. This Court agrees. Dr. Dewsnup admitted that previous incarceration and being born between 1945 and 1965 should be included as risk factors. ECF No. 340-5, at 141. And he also stated that the co-infection rate of HCV and HIV "is somewhere between 25 and 40 percent." *Id.* at 16–17.

In response, Defendant notes that screening for HCV is offered to all patients "regardless of risk factors." ECF No. 370, at 46 (quoting ECF No. 340-23, at 6). But that argument misses the point. Risk factors affect the decision-making of an inmate who might be concerned whether he should *self-select* for screening. By giving inmates more risk factors, inmates can make better-informed decisions, which should lead to greater number of HCV-infected inmates being tested. Contrarily, by minimizing the list of

risk factors, FDC can avoid its duty to treat by keeping inmates underinformed and remaining ignorant of the true number of infected inmates. In sum, FDC's current wording of the risk-factor language amounts to deliberate indifference.

14. <u>Monitoring</u>

This Court's preliminary injunction requires Defendant to file monthly status reports outlining FDC's progress in treating HCV-infected inmates. *See* ECF No. 185, at 5–6; *see also id.* at 2 n.1 ("Like President Ronald Reagan, this Court will 'trust but verify.'"). The injunction requires Defendant to include specific statistics like, for example, "[t]he total number of inmates in FDC custody who have been identified as having chronic HCV." *Id.* at 6. Plaintiffs claim that the reports are "not sufficient . . . to adequately ensure that Defendant is in compliance." ECF No. 342, at 44–46. Accordingly, Plaintiffs propose several changes to the monitoring scheme. This Court agrees in part and disagrees in part.

First, this Court finds that the monthly status reports must include the total number of inmates who

    (a) have been screened/tested for HCV,
    (b) have been identified as having chronic HCV,

(c) have been identified as having chronic HCV and have been staged (which must be further broken down by stage, including F0, F1, F2, F3, F4, decompensated cirrhosis, and those with HIV),

(d) have been submitted to the Hepatitis C Committee for evaluation (which must be further broken down by stage, including F0, F1, F2, F3, F4, decompensated cirrhosis, and those with HIV),

(e) have begun treatment with DAAs,

(f) have completed treatment with DAAs,

(g) have achieved a sustained virologic response (SVR),

(h) have not achieved SVR, and

(i) have been deemed (temporarily or permanently) ineligible for treatment with DAAs along with the specific reason for ineligibility.

*See* ECF No. 342, at 44. This information is necessary for this Court to ensure that the permanent injunction is being complied with and that FDC has not relapsed to its sordid past. *Cf., e.g.*, *Wishtoyo Found. v. United Water Conservation Dist.*, No. CV 17-3869-DOC (PLAx), 2018 WL 5256099, at 75 (C.D. Cal. Sep. 23, 2018) (appointing a special master to "monitor compliance" with a permanent injunction and retaining jurisdiction "for the purposes of enforcing or modifying the terms of" a permanent injunction).

Second, this Court finds that Defendant's reports must include a certification regarding FDC's compliance "with the applicable deadlines for prisoners known to have chronic HCV in December 2017." *Id*. Again, this information is necessary to ensure compliance with this Court's permanent injunction.

Third, this Court disagrees that Defendant must provide Plaintiffs with updated versions of its spreadsheets or "all documentation" associated with prisoners deemed ineligible for treatment or who refuse staging *See id.* at 45. The status reports should be sufficient to monitor compliance. If they're not, Plaintiffs can move for a modification of the permanent injunction and explain why further information is required. Moreover, Plaintiffs can submit public-records requests for the spreadsheets and documentation if they so choose.

Fourth, this court disagrees that FDC should "be required to receive complaints from Plaintiffs' counsel about compliance with the order." *See* ECF No. 342, at 45–46. Again, the status reports should be sufficient to monitor compliance. If Plaintiffs want to initiate complaints, Plaintiffs are free to direct those to FDC. Hopefully, the parties will be able to resolve those complaints harmoniously. If not, it is Plaintiffs' prerogative to decide whether to bring those complaints to this Court's attention.

Finally, this Court agrees that any future changes to FDC's policy must be submitted to this Court for approval. *See id.* at 46. Given FDC's long and sordid history of neglecting HCV-infected inmates, as well as FDC's continued opposition to the relief

granted in this order, this Court finds that FDC must not be permitted to unilaterally amend its policy (at least for the time being). In the future, this Court may consider modifying the injunction to remove that requirement.

15. <u>Amending the Deadline for Treating F2s Who Were Known to Have Chronic HCV in December 2017</u>

This Court's preliminary injunction (which was entered in December 2017) distinguished between FDC's obligations with respect to inmates who were known to have chronic HCV at the time and inmates whom FDC only discovered to be infected in the future. *See* ECF No. 185. Plaintiffs point out that this dual track of deadlines presented an anomaly:

> Currently, for inmates known to have chronic HCV in December 2017 who are at F2, the treatment deadline is December 2019 and the evaluation deadline is September 2019. But going forward, F2 inmates will be treated at most within 1 year of staging (although Plaintiffs have requested 6 months) and evaluated at least 30 days before treatment. This produces an anomalous result: An F2 inmate discovered tomorrow will be treated within 1 year (June 2019), or 6 months (December 2018), whereas someone known in December 2017 will have to wait until December 2019 for treatment. Thus, the December 2019 treatment deadline and September 2019 evaluation deadline for F2 inmates known in December 2017 should be deleted, and all F2 inmates should be treated according to the policy going forward. (To phase in this change, the treatment deadline can begin to run from

the date judgment is entered, rather than the date
they were staged).

ECF No. 342, at 48.

Plaintiffs are right that the situation they describe is
anomalous. However, given the time that has passed since
Plaintiffs moved for summary judgment, the anomaly Plaintiffs
noted no longer exists.[25] Accordingly, Plaintiffs' request is denied
as moot.

16. <u>Concluding Note on Plaintiffs' Requests for Relief</u>

Let it be clear: this Court is not picking and choosing what
kind of treatment it personally thinks or feels Plaintiffs should get.
(If it were up to this Court, every inmate would be tested for HCV
and every non-contraindicated inmate with chronic HCV would be
immediately treated with DAAs.) Instead, this Court is simply
determining whether FDC is being deliberately indifferent by
failing to provide the minimally adequate treatment that the
Constitution requires. Where there was reasonable medical
disagreement about a request for relief, this Court recognized that
it could not order FDC to change its conduct. However, where there

---

[25] That is, an inmate who is staged F2 today will initiate treatment by
April 2020. An F2 inmate who was known in December 2017 will initiate
treatment by December 2019.

56

was no medical reason for particular conduct—or where even FDC's own experts found that certain conduct was warranted but FDC still failed to comply—this Court properly concluded that FDC needed to change course.

## C. *The Requirements for a Permanent Injunction*

Having discussed the merits of Plaintiffs' remaining claims for relief, this Court now turns to the requirements for a permanent injunction. To obtain a permanent injunction, Plaintiffs must show (1) that they have suffered an irreparable injury; (2) that their remedies at law are inadequate; (3) that the balance of hardships weighs in their favor, and (4) that a permanent injunction would not disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs have satisfied each factor.

First, Plaintiffs have suffered an irreparable injury. "[I]njunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'" *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). "In such circumstances, the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury

is imminent." *Id.* Here, FDC's history of past misconduct and its continued opposition to other forms of relief leads this Court to believe that future injury is imminent. Specifically, this Court finds that FDC will not treat HCV-infected inmates in an appropriate and timely manner. If these inmates are not treated, they will undoubtedly suffer irreparable injury.

Second, remedies at law are inadequate to address Plaintiffs' injuries. Plaintiffs suffer continued harm as well as the risk of future harm. Damages will not address those injuries.

Third, the balance of hardships weighs in Plaintiffs' favor. The only hardship Defendant faces is that FDC will have to spend more money and treat more inmates than it wants to.[26] Plaintiffs, on the other hand, face great injuries. "The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants." *Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002).

---

[26] It is no excuse to cry that resources may be diverted from other medical programs. FDC cannot use its constitutional duty to treat one group of inmates as a reason to not treat a different group. *Cf. Williams v. Bennett*, 689 F.2d 1370, 1388 (11th Cir. 1982) ("If . . . a state chooses to operate a prison system, then each facility must be operated in a manner consistent with the constitution.").

Fourth, the permanent injunction will not disserve the public interest. Rather, the public is undoubtedly interested in seeing that inmates' constitutional rights are upheld. *Cf. Laube*, 234 F. Supp. 2d at 1252 ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated . . . ."); *cf. also Costello v. Wainright*, 397 F. Supp. 20, 37 (M.D. Fla. 1976) ("[I]t seems clear to this Court that, in the long run, providing decent medical care and housing to inmates would serve to promote the rehabilitative goals of the criminal justice system so as to permit their re-entry into free society as upright and law abiding citizens and to prevent their re-entry into the criminal justice system."), *vacated in part on other grounds*, 539 F.2d 547 (5th Cir.), *rev'd*, 430 U.S. 325 (1977).

Finally, the permanent injunction satisfies the Prison Litigation Reform Act ("PLRA") because it is narrowly drawn, extends no further than necessary to effect the changes this Court concludes are constitutionally required, and is the least intrusive means of effecting such changes. *See* 18 U.S.C. § 3626(a)(1).

### III. Conclusion

This case started with three inmates facing deliberate indifference to their serious medical needs. Through persistence of

counsel, it was uncovered that FDC was being deliberately indifferent to more than just those three inmates. Indeed, FDC turned out to have a long and sordid history of failing to adequately manage HCV in its prisons.

Nearly two years later, FDC has come a long way. But FDC's improvement does not mean that it is no longer being deliberately indifferent to HCV-infected inmates, nor does it mean that there is no risk of such deliberate indifference reoccurring in the future. Defendant's continued opposition to Plaintiffs' requested relief proves just that.

This Court is entering a permanent injunction with several important deadlines. In fashioning those deadlines, this Court has been mindful to ensure that Defendant has ample time to comply while considering an appeal. This Court notes that if Defendant does appeal and seeks to stay this Court's order, Defendant must first seek a stay with this Court. Fed. R. App. P. 8(a)(1)(A). Moreover, even if this Court denies a stay pending appeal, Defendant may also move this Court to modify the injunction pending appeal. Fed. R. App. P. 8(a)(1)(C).

Accordingly,

**IT IS ORDERED:**

1. The parties' cross-motions for summary judgment, ECF No. 270 and ECF No. 342, are **GRANTED in part** and **DENIED in part**, as described in this order.

2. This Court retains jurisdiction for the purposes of enforcing and/or modifying the terms of this Court's permanent injunction.

3. The preliminary injunction entered in this case, ECF No. 185, which was subsequently modified and renewed, *see, e.g.*, ECF No. 437, is hereby dissolved.

4. No later than May 20, 2019, the parties must confer and file a jointly proposed briefing schedule regarding the entitlement to and determination of attorney's fees and costs.

5. The Clerk is directed to provide a copy of this order to inmate Steven A. McLeod. *See* ECF No. 450.

6. The Clerk is directed to enter judgment stating:

   a. Defendant must ensure that the Florida Department of Corrections ("FDC"), FDC's employees, and FDC's agents comply with FDC's

Hepatitis C Virus ("HCV") policy, HSB 15.03.09 Supplement #3, as it is revised.

b. Defendant must ensure that FDC's HCV policy, HSB 15.03.09 Supplement #3, is not modified absent this Court's instruction.

c. Defendant must ensure that, no later than May 20, 2019, FDC's HCV policy, HSB 15.03.09 Supplement #3, is modified as follows:

    i. The policy must be modified to reflect that treatment must be initiated for F0 and F1 inmates within two years of staging.

    ii. A section must be added to the policy requiring an explanation to anyone who refuses staging or treatment of, at least, (1) the consequences of HCV, (2) the availability, lack of side effects, and efficacy of the new medications, (3) the staging process, and (4) whether and when they will receive treatment.

    iii. The policy must be modified to reflect that (1) patients must be initially staged using a

FibroSure test within 30 days of confirming they have chronic HCV; (2) patients who need ultrasounds must receive an ultrasound within 90 days of confirming they have chronic HCV; (3) if a patient needs to be restaged as a result of an ultrasound, the restaging must take place within 5 days of receiving the ultrasound results; and (4) staff must rely on the test, exam, or study indicating the highest fibrosis level for staging.

iv. The policy must be modified to reflect that deadlines are mandatory.

v. The policy must be modified to reflect that staff have the discretion to restage inmates sooner than scheduled.

vi. The exclusion for time remaining on an inmate's sentence must be modified such that (1) it no longer refers to "pre-treatment evaluation"; (2) it no longer refers to "post treatment SVR assessment"; (3) it no longer

includes a "12-18 months" estimate; and (4) it reflects that an inmate—who has already been staged and evaluated—simply needs to have "sufficient" time remaining on their sentence to complete a course of treatment.

vii. The exclusion for high-risk behaviors must be modified to reflect that (1) high-risk behaviors only warrant a delay if there is a "medical reason" to delay treatment and (2) it only provides for temporary ineligibility, not permanent exclusion.

viii. Section J.3., which refers to "chronic disciplinary issues," must be amended to reflect that chronic disciplinary issues, in and of themselves, are not sufficient to render an inmate ineligible for treatment; rather, treatment may only be delayed for medical reasons.

ix. Section P, which governs referrals for liver transplants, must be modified as follows: (1) decompensation must be defined as "the

presence of encephalopathy, ascites, bleeding varices, or jaundice"; (2) it must be clarified to reflect that patients will be referred if they have any one of the listed items; (3) referrals must be initiated within 30 days of any one of the triggering events; (4) it must provide that FDC must promptly comply with the transplant center's request for records and other information, and to promptly transport the inmate to and from the transplant center; and (5) it must be clarified that for individuals who have been scheduled to receive DAA medication, are undergoing DAA treatment, or who have finished DAA treatment, a referral must be made only if the post-treatment MELD score is over 15.

x. Section A.2., which refers to risk factors, must be modified to include "being born between 1945 and 1965, previous incarceration, and HIV" as risk factors.

d.  Defendant must ensure that FDC initiates treatment for all known chronic-HCV inmates who are currently staged F0 or F1 within two years of the date of this order.

e.  Defendant must ensure that FDC either (1) adopts a system of opt-out testing along with an aggressive notice campaign or (2) adopts a system of opt-in testing paired with peer education. FDC must make its choice and Defendant must inform this Court of FDC's decision no later than May 20, 2019.

f.  Defendant must ensure that FDC forms a definite plan to make elastography available to its medical staff within a reasonably immediate timeframe. Defendant must file its proposed plan with this Court no later than May 20, 2019.

g.  Defendant must ensure that—for inmates who were known to have chronic HCV in December 2017, who have fibrosis stage 2, and who are eligible for treatment—FDC initiates treatment no later than December 31, 2019.

h. Beginning on June 3, 2019, and on the first day of each month thereafter, Defendant must file with this Court a status report reflecting FDC's progress in complying with this Court's injunction. That status report must include:

    i. A certification regarding FDC's compliance with the applicable deadlines for prisoners known to have chronic HCV in December 2017.

    ii. Information regarding the total number of inmates who:

        1. have been screened/tested for HCV,

        2. have been identified as having chronic HCV,

        3. have been identified as having chronic HCV and have been staged (which must be further broken down by stage, including F0, F1, F2, F3, F4, decompensated cirrhosis, and those with HIV),

4. have been submitted to the Hepatitis C Committee for evaluation (which must be further broken down by stage, including F0, F1, F2, F3, F4, decompensated cirrhosis, and those with HIV),

5. have begun treatment with DAAs,

6. have completed treatment with DAAs,

7. have achieved a sustained virologic response (SVR),

8. have not achieved SVR, and

9. have been deemed (temporarily or permanently) ineligible for treatment with DAAs along with the specific reason for ineligibility.

**SO ORDERED on April 18, 2019.**

**s/Mark E. Walker**
**Chief United States District Judge**